Signed by AustLII



Supreme Court

New South Wales

| | |
|---|---|
| Case Name: | Berhero Pty Ltd v Hinds |
| Medium Neutral Citation: | [2023] NSWSC 1022 |
| Hearing Date(s): | 13 June 2023 |
| Date of Orders: | 30 August 2023 |
| Decision Date: | 30 August 2023 |
| Jurisdiction: | Equity - Commercial List |
| Before: | Rees J |
| Decision: | Judgment for defendants. |
| Catchwords: | MORTGAGE BROKER — property developer engages broker to obtain $13.5M finance — vendor prepared to be paid in stages — first payment is $6.35M — developer wants 100% debt funding — broker provides Loan Term Sheet with features of loan required for purchase of land and development — broker entitled to fee on procuring discussion paper from lender 'in the terms of' the term sheet —application for finance misrepresents that developer has already purchased the land — seeks finance to finalise the development — bank issues discussion paper for $13.5M facility – lending covenants mean only half of funds needed for first payment will be available —contractual construction – whether contract substantially performed – principles and case law review at [66]-[69], [72]-[74] — no substantial performance — broker not entitled to fee. |
| | EXPERT EVIDENCE — expert in credit risk and lending policy — expert considers loan application and discussion paper — analysis of cashflows and application of lending conditions — whether report linked reasoning to expertise — principles at [81]-[83] |

Verify version

— whether assumptions proved — report admitted.

| | |
|---|---|
| Cases Cited: | Allianz Australia Ltd v Sim [2012] NSWCA 68 |
| | Australian Securities and Investments Commission v Rich [2005] NSWCA 152 |
| | Barrington Winstanley Group Pty Ltd v Edmonds [2022] NSWSC 531 |
| | Bolton v Mahadeva [1972] 1 WLR 1009 |
| | Cayden Pty Limited t/as Acuity Funding v Nouh [2008] NSWSC 1219 |
| | Connor v Stainton (1924) 27 WALR 72 |
| | Dasreef Pty Ltd v Hawchar (2011) 243 CLR 588 |
| | Ecosse Property Holdings Pty Ltd v Gee Dee Nominees Pty Ltd (2017) 261 CLR 544 |
| | Electricity Generation Corporation v Woodside Energy Ltd (2014) 251 CLR 640 |
| | Fuller v Avichem Pty ltd (t/as Adkins Building & Hardware [2019] NSWCA 305 |
| | Hart v Federal Commissioner of Taxation (No 2) [2016] FCA 897 |
| | Hoering v Isaacs [1952] 2 All ER 176 |
| | Pacific Carriers Ltd v BNP Paribas (2004) 218 CLR 451 |
| | Simpson Steel Structures v Spencer [1964] WAR 101 |
| | Zamperoni Decorators Pty Ltd v Lo Presti [1983] VR 338 |
| Category: | Principal judgment |
| Parties: | Berhero Pty Ltd (Plaintiff) |
| | Paul Hinds (First Defendant) |
| | RV Developments Australia Pty Ltd (Second Defendant) |
| | RV Developments Australia Pty Ltd as Trustee for RV Developments Australia Unit Trust (Third Defendant) |
| Representation: | Counsel: |
| | Mr B Le Plastrier (Plaintiff) |
| | Mr S Golledge SC/Mr J Douglas (Defendants) |
| | |
| | Solicitors: |
| | ClarkeKann Lawyers (Plaintiff) |
| | James Conomos Lawyers (Defendants) |
| File Number(s): | 2019/269928 |

# JUDGMENT

1    **HER HONOUR:** A mortgage broker trading as "Acuity Funding" seeks to recover its fee from defendant property developer, Paul Hinds, and his company, RV Developments Australia Pty Ltd. The fee was some $260,000 when charged but, with interest (at 2% per month), now stands at some $1.2 million.

2    The broker elicited an expression of interest (also known as a *discussion paper*) from Australian and New Zealand Banking Group Ltd (*ANZ*) to provide a $13.5 million facility for a property development in the Ripley Valley, near Ipswich in Queensland. The question is whether the discussion paper met the requirements of the contract between the broker and its clients, such that the broker is entitled to its fee.

## WITNESSES

3    The plaintiff relied on the evidence of its director, Ranjit Thambyrajah, who was cross-examined. The broker was a very confident man who was argumentative and gave non-responsive answers to questions he did not like. He could not remember quite a lot, which was at odds with his detailed affidavits. The broker sought to distance himself from critical documents in which he likely had a keen interest at the time, in particular, a memorandum of understanding between his clients and the vendors of the Ripley Valley property. Some of Mr Thanbyrajah's evidence was unlikely, including that he commented on the draft memorandum of understanding out of "courtesy", and that he did not inform ANZ that finance would be used to buy the land as the bank would have done a title search straightaway; see also [65 Ref143521915], [89 Ref143764719]. I have approached his evidence with caution and deferred to contemporaneous documents.

4    The defendants relied on the evidence of Mr Hinds, project manager Janelle Leeson and ANZ bank officer Andrew Muller. None were required for cross-examination. The defendants also relied on an expert report by Geoff Green. The plaintiff objected to the whole of Mr Green's report. I admitted the report. My reasons for doing so are at [80 Ref143777047]. Mr Green was not required for cross-examination.



Signed by AustLII

**BACKGROUND AND CONTEXT**

5    At the time of these events, Mr Hinds was an experienced builder and property developer. Mr Thambyrajah was an experienced mortgage broker. Mr Hinds had previously instructed the broker to obtain finance for various construction projects in the Australian Capital Territory, New South Wales and Queensland, being some five projects in the preceding five years.

**Proposed development**

6    In 2013, Mr Hinds was interested in acquiring 34 hectares in the Ripley Valley. The property had development approval to be subdivided into 426 residential lots. The site plan suggested that the lots would be developed in 16 stages.

7    On 15 April 2013, the vendors issued a letter of offer, indicating that they were prepared to be paid for the land in stages:

> Our conditions of sale for the purchasers consideration are as follows
> - Sale price of $13.5 million plus GST
> - Deposit of $150,000 plus GST …
> - Stage 1 – exchange of $5 million plus GST less $150,000 deposit, released
> - Stage 2 - 18 months from exchange date a payment of [$]3 million plus GST
> - Stage 3 - 27 months from exchange date a payment of $3 million plus GST
> - Stage 4 – 36 months from exchange date a final payment of $2.5 million plus GST
>
> Upon the first settlement, the vendors will guarantee that the property will be totally unencumbered and that the property will not be used as cross security.

As I read it, the proposal entailed the vendors making the property available to the purchaser after the Stage 1 payment to secure project finance.

8    Mr Hinds instructed Ms Leeson to contact the broker to see whether acquisition and development of the Ripley Valley property was financially feasible. According to Ms Leeson, Mr Hinds needed to raise finance in the order of $13.5 million in order to purchase the property. That is, Mr Hinds was proposing to wholly fund the land purchase by debt. Mr Hinds was not strictly looking for funding from only banks; he was also considering funding from second or third tier lenders.

9    On 17 June 2013, Ms Leeson sent the broker the vendors' letter of offer, the site plan and two feasibility studies "for the purpose of establishing if we would

Verify version

Signed by AustLII

be able to secure Development Finance." Ms Leeson identified the following key points:

> Conceptually involving Hinds, myself and Acuity Finance modelling.
>
> Can we do this?
>
> • If so
>
> • In this form …
>
> consider [how] would work
>
> Vendors have agreed to staged payments and first mortgage position. Refer attached sales offer.

10   Ms Leeson noted the purchase price of $13.5 million, of which the first tranche was $5.5 million inclusive of GST (less a $150,000 deposit) to be paid within 90 days. Further:

> So if site values at $13.5m
>
> And achieve 50-60% LVR? On the land
>
> At 60% is $8.1m

11   That is, Ms Leeson recognised that the amount of funding which might be obtained from a lender would be limited by the valuation of the development site and the lender's financial covenants, such as Loan to Valuation Ratio (*LVR*). Ms Leeson noted that an access road needed to be built and referred to the attached project cashflows. Both feasibility studies forecast a loss in the first of the 16 stages, where large construction costs exceeded the expected sales proceeds of the 41 lots in that stage. As for a pathway for the development, Ms Leeson suggested:

> So start the access road
>
> Lock Presales
>
> Draw down keep going Head Works
>
> Next payment to Vendors not for 20mths
>
> Recycle around create self funding situation…using some mezzi at times if required
>
> Bottom line
>
> Can we do this as a purchase…preferred

12   Mr Thambyrajah read the email and attachments. He understood that Mr Hinds was seeking his assistance to obtain a finance facility that would enable him to satisfy the payment schedule set out in the vendors' letter. However, when it

was pointed out that there was nothing in Ms Leeson's email or attachments which suggested that the Stage 1 payment of $5 million was going to be provided in any way other than the finance which he had been asked to procure, the broker said "This is not the contract I signed. … *I don't remember seeing this* and … I never signed to this."

13    I accept that the material which Ms Leeson submitted to the broker was the first iteration of this proposed transaction. The clients appeared to be looking to the broker to shape the deal into something which may attract funding, including using "Acuity Finance modelling." However, I do not accept that the broker was unfamiliar with this material, in particular, the vendors' offer to accept $13.5 million plus GST in stages, with Stage 1 being $5 million plus GST on the exchange of contracts. As will be seen, the broker was very familiar with the proposed deal.

**Meeting the vendors**

14    On 7 August 2013, the vendors and their solicitor, Mr Hinds, Ms Leeson and the broker met. In advance of the meeting, Ms Leeson provided the broker with a written brief. According to the brief, the purpose of the meeting was *inter alia* to instil "Confidence in Funding" including walking through the key terms. Further, Mr Hinds did not want to pay the deposit; apparently the vendors had indicated they were not really interested in the deposit but, rather, the ability to complete. According to a "Meeting walk thru," the meeting was to commence with a general introduction, with the first item being "Little about RT," which I take to be a reference to the broker. Someone – likely Mr Thambyrajah – was going to tell the attendees about the broker. Further:

> **[Mr Thambyrajah] How we would run it take charge**
>
> Not just funding
>
> [Mr Thambyrajah] general management capacity [Ms Leeson] assisting
>
> - Overall coordination
> - Construct Fund
> - Sales if reqd

That is, the broker would be taking a more extensive role than simply arranging finance.

15    The briefing notes then turned to the key terms of the deal, which included that the purchaser would be entitled to sell lots in the development: (original emphasis)

> Plus so does [Mr Thambyrajah] op[ortuni]t[y] here to talk up his model **complete package**

Again, the broker would be given an opportunity to address the vendors as to the services he offered, being more than simply arranging finance.

16    Other terms of the proposed deal included the provision of security to the vendors. The briefing note emphasised that the vendors were sensitive about second mortgages and caveats, and listed points which might encourage the vendors to accept such an arrangement. The note also recorded "Qld issue Title to change after 1/3," presumably a reference to the fact that it was proposed that title would be transferred to Mr Hinds after the Stage 1 payment of $5 million plus GST (being roughly one third of the total purchase price). The transaction would also be subject to a valuation and finance, "No finance no deal."

17    The broker agreed that he reviewed these notes ahead of the meeting but said "all I would have discussed is what I could achieve on the property." However, "No finance no deal" were not instructions to him, "this was just an addendum to a meeting. … There is no instructions to me in here." The broker said he "cannot remember" whether he had been instructed by Mr Hinds and Ms Leeson that, unless they could get finance consistent with the payment regime suggested by the vendors, the deal could not go ahead.

18    Of course, Ms Leeson's briefing note is only an indication of what may have been discussed at the meeting. The broker did not recall what *was* said, other than that his role was then to seek finance and possibly secure sales, as described in Ms Leeson's agenda. According to Mr Hinds, the broker said that the plaintiff could provide various services to assist with the purchase and development of the property – beyond procuring finance – including assisting with the subdivision, general management and coordination of the project and obtaining pre-sales. The vendors said they were happy to explore Mr Hinds' potential purchase of the property.

Signed by AustLII

19      The broker met with Ms Leeson on 12 August 2013, participated in a telephone
        conference with Mr Hinds and Ms Leeson on 21 August 2013 and met with Ms
        Leeson again on 29 August 2013. On 2 September 2013, the broker emailed
        Mr Hinds a list of items required to support the application for finance, together
        with the broker's "Application Commercial Facility" form to complete. The
        broker did not accept that he then understood that finance was sought *inter alia*
        to pay the initial $5 million to be paid to the vendors on exchange, "Not from my
        finance. It's separate to my finance. What he had to provide the vendor has got
        nothing to do [with] my finance." This answer was at odds with the information
        provided by the clients to the broker to that point, which indicated that finance
        was needed for that very purpose.

20      On 10 September 2013, the broker met with Mr Hinds and Ms Leeson. Ms
        Leeson recalled that the broker said he would need to be a stakeholder in the
        deal and receive some of the project profits, as it was a difficult project to fund.
        As Mr Hinds recalls it, the broker said he required compensation for the work
        he had (and would) put into the negotiation of the proposed purchase and
        development of the property, in addition to his usual commission and fees. The
        broker required 25% of the profits from the development in return for
        structuring the purchase, obtaining finance for the purchase and development,
        project management of the development and obtaining pre-sales for the sub-
        divided lots.

21      The broker denies this. Rather, Mr Hinds and Ms Leeson proposed that, if the
        development proceeded, then Mr Hinds would receive 50% of the profits, Ms
        Leeson would receive 25% and the broker would receive the remaining 25%.
        The broker said "okay." Ms Leeson denied that it was her suggestion that the
        broker would receive 25% of the net profits of the project and recalled that the
        broker was the one who wanted to secure 25% of the net profits of the project.
        I consider it wholly unlikely that a property developer would offer a mortgage
        broker a 25% profit share in a development, absent some request. That is, I
        prefer Mr Hinds and Ms Leeson's version of events in respect of this matter.

22      More relevant to the background to, and context of, the contract, the broker
        clearly had a more extensive role in this potential development, that is, "Not

     Verify version

just funding." The broker had a profit-share. I infer that the broker would have been interested to know *the detail* of such a development; I do not accept the broker's efforts in cross-examination to distance himself from this detail: see [24 Ref143765738], [37 Ref143765766], [47 Ref143765801], [52 Ref143765828], [58 Ref143765879].

## Memorandum of understanding

23    On 23 September 2013, the vendors provided Mr Hinds' solicitor with a proposed memorandum of understanding, with "adjustments … underlined and in bold." Ms Leeson forwarded the document to Mr Hinds and the broker. Half an hour later, the broker replied, "This looks workable with minor variations." According to Mr Hinds, the broker proposed various changes to the draft memorandum of understanding. The broker said he did not make any changes to the document, which already had changes and mark-ups made by others. The document attached to the broker's email does contain various mark-ups. I cannot tell from the face of the document who made these revisions, that is, whether these amendments reflected the broker's "minor variations" or the vendors' "adjustments".

24    The broker said he reviewed the document to ensure that it was not in conflict with what he had been engaged to do, being to seek a finance proposal to fund the development. The broker said he did not pay a lot of attention to the memorandum of understanding as he was not a party to it, "What I looked at was whether the numbers they're talking about are going to conflict with what I need to do." He did not agree that he looked at the document to assess whether he was able to procure finance that suited Mr Hinds and for the purpose of complying with the memorandum of understanding: "That's not the reason it was provided. It was just for our record." The broker said he only bothered responding to the email out of courtesy; he only read the document as it was sent to him. The broker said he was then sitting on the side of negotiations with a view to organising finance but he did not then have a role as no contract had been signed with the clients.

25    In contrast, Ms Leeson recalled the broker having an active role in the revision and preparation of the memorandum of understanding, including liaising



directly with the vendors' solicitor. There is some support for this in the contemporaneous documents: see [32 Ref143858678]. The suggestion that the broker was then sitting on the sideline awaiting a contract may be at odds with the fact that it was *Ms Leeson* who later reminded the broker to send a contract: see [35 Ref143868865]. Consistent with the broker's expanded role in this development, with a profit share, it is likely that the broker paid more attention to this document than he was prepared to acknowledge. It does not much matter, where the broker agreed that he read the memorandum of understanding as executed.

26     On 9 October 2013, Mr Hinds and the vendors executed the memorandum of understanding. Mr Hinds agreed to set up a unit trust comprising 13.5 million units valued at $1 each. The units were to be issued to the vendors: clause 4. Mr Hinds would nominate a new corporate entity to act as trustee and undertake the development: clauses 3 and 15. Within four weeks, Mr Hinds would appoint a quantity surveyor to determine the reasonableness of all costs to be incurred by the trustee. Mr Hinds would also provide the vendors with a copy of his resumé: clause 6.

27     Within six weeks, Mr Hinds was to provide the vendors with details of pre-sales and "evidence that he has the necessary finance approvals to undertake the project": clause 7. The vendors agreed to maintain the confidentiality of this information, enter into a non-circumvent deed and authorise Mr Hinds to sell lots: clause 8. Within three months, clause 9 provided:

> Upon the transfer date, which shall be within 3 months of the date hereof, Hinds agrees to acquire 5 million units at the price of $1.00 each and to pay the applicable GST on the full purchase price for the sale of the property to the Trust.

28     GST on the full purchase price was $1.35 million. As such, Mr Hinds was obliged to pay $6.35 million by 9 January 2014. In turn, the vendors agreed to transfer legal title to the land to the trustee on the transfer date, on trust for themselves: clause 4. The trustee would grant an unregistered mortgage over the land to the vendors, to be protected by caveat; the caveat would be lifted to the extent necessary to permit the sale of individual blocks: clause 5.

Signed by AustLII

29    Within one year of the transfer date, Mr Hinds was to complete access roads to the land and acquire a further $2 million units at $1 each from the vendors: clause 10. The final payment was $13.5 million less the first payment of $5 million and the second payment of $2 million (plus interest): clause 14. Mr Hinds agreed to make final payment within three years of the transfer date, by the trustee paying 30% of the net proceeds of sale of each block sold: clause 11-13. For each principal payment, an equivalent number of units with a dollar value of the payment would be transferred to Mr Hinds: clause 14. The vendors' caveat would be withdrawn on final payment: clause 5.

**Broker's expanded role**

30    On 13 October 2013, Mr Leeson circulated a proposed invitation for builders to buy lots in the Ripley Valley development. Interested builders were invited to make an appointment to meet with the broker and a representative for the developer in Brisbane on 21 and 22 October 2013. Further: (emphasis added)

> **Invitation for Appointment**
>
> To achieve best mix as such the Developer has invited/engaged the Development Financier and *General Project Cooordinator* Mr Ranjit Thambyrajah (Principal of Acuity Funding) to meet with selective Builders in regards to Building opportunities for the Daley Road site.
>
> Ranjit is a Private Banker who consistently holds title of the No 1 Commercial Broker in Australia with the largest volume per annum. Refer attached profile.
>
> He is a wholesaler and therefore not normally available at retail front. This is an opportunity for Builders to meet and discuss primarily opportunities at Daleys Road and if they choose have input as to increasing business bottom line.

31    Of the draft, Ms Leeson observed "Less is best up to Ranjit to take thru whole scenario rather than attempt to bring up potential objections now ie how it works until he has an opportunity to talk through properly." The broker was happy with the draft, "Well done Janelle. Well worded." That is, the broker's role was "Not just funding."

32    On 16 October 2013, the broker emailed the vendors' solicitor, thanking him for his involvement in achieving an executed memorandum of understanding, "I'm very sure that it would not have happened if another, less experienced Lawyer was acting on it." Further, the solicitor was asked to assist Mr Hinds to obtain a letter from the vendors "as per clause 8 b of the MOU" to assist with securing

sales. (Clause 8(b) obliged the vendors to provide Mr Hinds with an authority to sell the blocks or permit builders to erect dwellings on the allotments.)

33     From November 2013 on, the broker regularly travelled with Ms Leeson to Brisbane to meet with potential buyers of lots, including a number of small speculative builders, as well as meetings with valuers, quantity surveyors and Mr Muller. On 8 November 2013, the selling agent reported to the broker on the outcome of meetings with builders interested in building houses on the development site.

34     The feasibility studies initially provided by Ms Leeson forecast a loss in the first stage of development. The broker thought that the 16-stage development as shown in these feasibility studies might not satisfy a bank's appetite for funding, as a bank would not generally allow a negative cashflow situation to be carried forward from one stage to the next. The broker had many discussions regarding the cashflow with Mr Hinds and Ms Leeson. On 4 November 2013, the broker sent Ms Leeson a revised feasibility study. The development was now consolidated into Stage 1 (100 lots), Stage 2 (140 lots) and Stage 3 (186 lots). The broker said he put the first five stages together into one "mega stage." All stages were now expected to generate a profit. For Stage 1, development costs of $8,515,090 were more than covered by lot sales of $14.828 million.

**The contract**

35     On 6 November 2013, Ms Leeson sent an email to the broker, reminding him to create mandates. Shortly afterwards, the broker emailed Mr Hinds, attaching a Finance Mandate and a Sales Mandate for the broker to act. (It is only necessary to consider the former). Mr Hinds executed the documents the same day. The Finance Mandate comprised a cover letter from the broker to Mr Hinds, noting his request that the broker act for him in procuring finance and enclosing a Loan Term Sheet and Costs Agreement. As I read it, the Loan Term Sheet set out the salient features of the loan which the broker was to procure for its clients, while the Costs Agreement set out how the broker would be paid for this service.



Signed by AustLII

36     The Loan Term Sheet noted that the borrowers were Mr Hinds and the
       company to be incorporated to be trustee for a unit trust to be known as Ripley
       Valley Unit Trust. The guarantor was Mr Hinds. Further: (emphasis added)

> **Loan Amount:**   *Of up to* a gross maximum loan (cash drawings) of
> *approximately* $13,500,000.00 (consisting of *approximately* $8,500,000.00 for
> stage one, $3,700,000.00 for stage two and $1,300,000.00 for stage three.
> These splits are *only an estimate and may vary* in its final form of this staged
> development.

37     The broker said he did not know where the figure of $13.5 million came from,
       "These are prepared by my office, not by me … so I can't tell you with certainty
       when we got the information and when this was compared in comparison to
       that." The broker did not accept that the figure was sourced from the
       memorandum of understanding and said he was not involved in the preparation
       of the document as his staff were "quite experienced so I don't necessarily sit
       there and instruct them [on] what to do."

38     It is perfectly obvious where the figure of $13.5 million came from. This was the
       purchase price of the Ripley Valley land as identified in the vendors' letter of
       offer of 15 April 2013, Ms Leeson's initial email to the broker on 17 June 2013
       and the memorandum of understanding executed on 9 October 2013. I note
       also that the amounts to be advanced in Stage 1, 2 and 3 closely aligned with
       the revised feasibility study circulated by the broker on 4 November 2013,
       specifically, the development costs for each stage. Unless the broker's staff
       were familiar with this spreadsheet, the most likely source of information to
       populate the Loan Amount was Mr Thambyrajah.

39     Further: (emphasis added)

> **Purpose**:   *Purchase of land* and develop the site into residential allotments for
> sale.

       The broker agreed that he understood that the purpose of the loan was to
       purchase the land, but insisted the funds were "to assist" in the purchase of
       land, then said he did not understand that the reason why Mr Hinds wanted
       him to arrange a loan was to enable him to purchase the land and develop the
       site.

40     The Loan Sheet turned to the subject of interest rates, loan term and
       repayments, then: (emphasis added)

Verify version

> **Valuation**: *Loan Amount to be subject to valuation* of the Security Properties carried out by an approved valuer at the cost of the borrower.

41    The Loan Term Sheet turned to guarantees, processing fees, the broker's banking details and brokerage fee. Finally, the borrowers authorised and directed the broker "to arrange the loan facility *as set out in the Loan Term Sheet.*" The Loan Sheet and the Costs Agreement were stated as constituting the entire agreement between the parties.

42    As to the broker's fees, clause 4 of the Costs Agreement provided: (emphasis added)

> … In the event that the loan is conditionally approved to the Applicants, or a discussion paper is issued or a terms sheet is issued or a loan proposal is issued *in the terms of the Loan Term Sheet*, then the Brokerage Fee set forth in clause 12 of the Loan Term Sheet ("Brokerage Fee") shall become immediately due and payable by the Applicants to the facilitator.
>
> All such letters issued by the underwriter and which *is in terms of the loan term sheet* but which is subject to: a) an acceptable valuation; and b) satisfactory credit checks of the Applicants; and c) proof of suitable serviceability; and d) acceptance by the Underwriter; and e) verification of all documentation provided; and f) satisfactory pre sales of between 80% and 100% of peak debt cover at all times; and g) any further condition or covenant that the underwriter may deem applicable to this transaction. …

43    It is not easy to make sense of the second paragraph of clause 4, nor is it necessary to construe the offending portion where the defendants accept that the document issued by ANZ was a "discussion paper" within the meaning of the first paragraph subject, of course, to whether the discussion paper was issued "in the terms of the Loan Term Sheet."

**Post-contractual conduct**

44    On 12 November 2013, the vendors, Mr Hinds, Ms Leeson and the broker signed a Non Circumvention and Non Disclosure Agreement, presumably in accordance with clause 4 of the memorandum of understanding. On 19 November 2013, RV Developments Australia was incorporated. Mr Hinds was the sole director and shareholder. The company was appointed as trustee for RV Developments Australia Unit Trust.

45    On 19 November 2013, Mr Hinds provided the broker with income tax returns and financials. On 21 November 2013, Mr Hinds provided the broker with the latest version of the feasibility study. The broker said "I wouldn't have looked at

    Verify version



that, but the office would have. … I have experts in my office who are very capable of doing it." The broker then said he did not recall whether he looked at it, and then said "It would've been looked at, for sure."

46    Stages 1 to 5 of the original 16 stages of the development now together comprised Stage A. The broker agreed that he looked at the summary for Stage A, as he had previously emphasised to Mr Hinds that the bank would need to be satisfied that each of the individual stages would be cashflow positive. The summary included the following items:

| STAGE A | | Construction cost |
|---|---|---|
| … | | |
| Land Costs 1st | | $ 5,500,000.00 |
| Land Costs 2nd | | $ 2,200,000.00 |
| … | | |
| Interest Cost On Land | 7.50% | $ 412,500.00 |

47    The broker agreed that the interest of $412,500 was 12 months' interest on the "Land Costs 1st" amount of $5.5 million. He understood from the summary that, in Stage A, the developer was seeking to borrow $5.5 million from the bank together with interest on that amount for 12 months. The broker recognised that the $5.5 million was the first tranche payable under the memorandum of understanding. It was also proposed that Stage A costs would include the second instalment under the memorandum of understanding, being $2.2 million, albeit with no provision for interest on that amount. (It will be recalled that the second tranche was not payable until one year after the transfer date).

Signed by AustLII

**A misrepresentation**

48    Mr Hinds said he called the broker on 21 November 2013 and asked for
      assistance to complete the "Application Commercial Facility" form. The broker
      said to just complete the first page, sign and date each page, and return the
      form to the broker. Mr and Mrs Hinds did so. As submitted to ANZ, the form set
      out the assets and liabilities of RV Developments. The company's assets were
      $13.5 million, comprising the Ripley Valley land. The company's liabilities were
      $5 million, being a mortgage loan from National Australia Bank. While the form
      suggested that RV Developments already owned the land, it did not. Nor did
      RV Developments have a mortgage with National Australia Bank (*NAB*) for $5
      million. In fact, RV Developments and Mr Hinds' banked with Westpac. Mr
      Hinds said this portion of the form was not completed by him, nor seen before
      these proceedings.

49    The broker said he did not recall seeing the "Application Commercial Facility"
      form, which was completed by Mr and Mrs Hinds, "we do not touch the
      application form." Further, "we attach things as we receive it, we never touch it
      … What you're proposing would've come unstuck immediately upon doing a
      search of the property or an evaluation of the property, which are both done by
      the bank. … there's no way that we touched it and we do not tamper with
      documents." Further, "We just give documents as they're given. We do not
      tamper with them. We do not do anything with them." The broker did not accept
      that the form suggested that the company had the land as an existing asset,
      but then agreed that "the office would have" realised that this was not true.

50    Mr Hinds and the broker were both emphatic that the false information on the
      Application Commercial Facility form was added by the other. I note, of course,
      that Mr Hinds was not required for cross examination. I note also that all four
      pages of the form bear a facsimile marking indicating that the pages were
      faxed from Mr Hinds' company, presumably with the Statement of Assets &
      Liabilities completed as described. Against this, the copy of the Application
      Commercial Facility form annexed to the broker's affidavit had been emailed
      internally from a scanner to another internal email. (The broker said this was an
      automatic office process). I note also that both Mr Hinds and the broker
      continued to represent to ANZ that there was an existing mortgagee which

Verify version

needed to be paid out: see [64 Ref143859310]. The broker further represented that his client had purchased the land years earlier: see [65 Ref143859356].

51     I make no finding as to who completed the relevant pages of the Application Commercial Facility form, but nor does it matter where the inaccuracy of this information would have been readily apparent to the broker. The broker did not accept that he reviewed the application for finance submitted to ANZ, "My office would've … I don't have to if my office has. No I don't. … I may not have, I may have … this is a very old file." I do not accept these disclaimers. By submitting the Application Commercial Facility form to ANZ, RV Developments represented that it had already purchased the Ripley Valley land, subject to finance from NAB. The funds now sought from ANZ were, thus, needed to fund construction and, ostensibly, refinance NAB.

**Application for finance**

52     On 12 December 2013, the broker submitted the application to ANZ. The bank was provided with the broker's Application Commercial Facility form, a five page document entitled "Application for mortgage finance for approximately $13,500,000.00" (also known as a *white paper*) and various attachments, including – at about page 450 of the bundle of attachments – the feasibility study described at [48 Ref143614999].

53     The white paper included the following: (emphasis added)

> **This funding request:**  Proposal is *to finalise subdivision* / sell / develop a housing estate of 426 lots (500 titles) and park …
>
> **Loan Sought**   Of up to a gross maximum loan (cash drawings) of approximately $13,500,000.00  (consisting of approximately $8,500,000.00 for stage one, $3,700,000.00 for stage two and $1,300,000.00 for stage three. These splits are only an estimate and may vary in its final form of this staged development.
>
> The first drawdown will be for approximately $5.5M - $6M at time of settlement.

54     The description of "Loan Sought" replicated the Loan Amount in the Loan Term Sheet, save for the suggestion that the first drawdown would be $5.5 to $6 million. The broker agreed that this was a reference to the need to pay – at least – $5 million under the memorandum of understanding; he described that as the first drawdown in the white paper. The security offered for the loan was

a registered mortgage over the Ripley Valley land. (To achieve this, the (non-existent) mortgage to NAB would need to be paid out.) As for serviceability, the white paper stated that the loan would be cleared from the progressive sale of lots.

55  The broker denied drafting the white paper, "that was done by my office." He did not recall whether he read the white paper at the time, and said it was not thought necessary to tell the bank that the developer had to purchase the property with the loan funds, "We probably didn't see the need to because the bank would do a search and know immediately he'd be buying the land." The feasibility also referred to GST and stamp duty, which the borrower would not have had to pay if it already owned the land, "I knew they will know. … They had the feasibility. They would have seen it." I accept that the broker's staff may well have prepared the white paper but I do not accept that the broker was unfamiliar with its contents or did not review it at the time. The fact that the borrower needed funds to acquire title to the land was 'buried' in the compendious attachments to the application, rather than made plain 'up front'.

56  Mr Hinds said he did not see the white paper until commencement of these proceedings. Rather, Mr Hinds was proceeding on the basis that the broker was securing finance in terms of the Loan Term Sheet. The broker agreed that the white paper was never given to the client.

**Discussion paper**

57  Mr Muller was responsible for managing ANZ's property portfolio for development and investment, mainly in south-eastern Queensland. On 22 January 2014, Mr Muller provided the broker with a discussion paper. In his cover email, Mr Muller advised the broker that he had "proposed full limit as per your original paper, albeit it will be a staged development."

58  In its discussion paper, the bank expressed interest in providing a Progress Draw Facility of $13.5 million. The purpose of the facility was "To assist staged development at … Ripley."   The bank proposed to take a mortgage over the land, a personal guarantee from Mr Hinds and additional security in the form of a general security agreement over RV Developments, corporate guarantees



Verify version

from Mr Hinds' other companies and a 'tripartite agreement.' Various conditions precedent may be included in a letter of offer, including:

>   2.  Lending is not to exceed the lower of 75% of Total Development Costs (ex GST) or 60% of Gross Realisable Value (ex GST)
>
>   3.  Minimum debt coverage to be 100% from complying presales.

59    Mr Muller said that, at the time, staged developments were pioneering. For such developments, ANZ would fund a portion of the civil and construction costs (subject to quality surveyor reports) and a portion of the cost of acquiring the land. ANZ would not fund 100% of the acquisition costs; the developer always had to contribute a portion towards the land. The bank would then be repaid by the developer once works were done for the initial stage and pre-sales achieved. Once this occurred, the developer would then approach the bank for further funding of future stages. The conditions precedent were also consistent with the usual practice of the bank at the time: any lending was not to exceed 75% of development costs or 60% of gross realisable value, being the value of the project as assessed by the bank's valuer.

**Subsequent events**

60    The defendants began to pay the broker's fee by (somewhat irregular) monthly instalments of $5,500. The last instalment was paid on 1 August 2016.

61    The client also persisted in its efforts to obtain finance from ANZ albeit, so far as the evidence reveals, 14 months passed between the discussion paper and the broker's next communique with Mr Muller. The defendants obtained a series of valuations of the Ripley Valley land. The defendants also continued to represent – in documents which the broker provided to the bank in December 2015 and April 2016 – that $4,336,364 was required to discharge the existing mortgagee (presumably a reference to the non-existent loan from NAB). However, in May 2016, Mr Muller advised that "ANZ has made the decision to withdraw from the residential subdivision in certain regions throughout Australia. … we will not be able to assist with the funding of the proposed development at Ripley Valley."

62    The broker approached other financiers. Perry Finance expressed interest, if the developer provided $4 million to clear the (non-existent) land debt. On 31

Verify version

May 2016, the broker replied, "The client has indicated that the purchase price was $3,300,000 on 17/03/2004. The clients have owned the property for more than 12 years." The broker agreed that the information disclosed to Perry Finance was not correct but "that was not the credit submission … This was a teaser to see if there was any interest. It is not a credit submission. … This was sent to another broker. He is not a lender. He is a broker. I have to keep things simple with brokers, so that I can get in the next level. … That's not accurate, and I don't know why it was written that way, but it was. … It was a typo … in the submission, the valuation … would have been attached [and] would have said that they're not the owner. It wouldn't have made any difference." The broker's evidence on this subject was unsatisfactory. It is also consistent with the broker's ease in representing to ANZ in the loan application and subsequent communications that the defendants owed the Ripley Valley land, when he knew this was untrue.

## CONTRACTUAL CONSTRUCTION

63    The first question is to consider the meaning of the contract between the broker and its clients. There was no dispute as to the relevant principles. A contract is interpreted as at the date on which it was entered into: *Ecosse Property Holdings Pty Ltd v Gee Dee Nominees Pty Ltd* (2017) 261 CLR 544 at 551; [2017] HCA 12 at [16] (per Kiefel, Bell and Gordon JJ), [77] (per Nettle J). The meaning of the contract is determined objectively by reference to what a reasonable person would have understood the contract to mean having regard not only to the text of the document but to the surrounding circumstances known to the parties and the purpose and object of the transaction: *Pacific Carriers Ltd v BNP Paribas* (2004) 218 CLR 451 at 461; [2004] HCA 35 at [22] (per Gleeson CJ, Gummow, Hayne, Callinan and Heydon JJ). Appreciation of the commercial purpose or objects is facilitated by an understanding of the genesis of the transaction, the background, the context and the market in which the parties are operating. The Court is entitled to approach the task of construction on the assumption that the parties intended to produce a commercial result, construing the contract so as to avoid making commercial nonsense or working commercial inconvenience: *Electricity Generation*



Signed by AustLII

*Corporation v Woodside Energy Ltd* (2014) 251 CLR 640 at 656; [2014] HCA 7 at [35] (per French CJ, Hayne, Crennan and Kiefel JJ).

64    In *Cayden Pty Limited t/as Acuity Funding v Nouh* [2008] NSWSC 1219, which also concerned Acuity Funding and Mr Thanbyrajah, Bryson AJ considered a contract which incorporated the clients' proposal for purchasing a childcare business – which set out the salient features of the proposed transaction – and the broker's retainer letter. The clients' proposal showed what the clients needed and were asking the broker to do: the clients proposed to offer $2 million for the childcare business, of which 80% or $1.6 million, would be debt financed. The clients proposed an interest-only loan at an interest rate of up to 8.5% per annum. His Honour considered that the terms of the clients' proposal indicated that "strict conformity with the proposal was not required or contemplated": at [7]. The broker's retainer letter contemplated that the loan to be obtained was not rigidly defined, where the loan amount was to be "up to" 80% of the purchase price with an expected maximum loan of $1.76 million. "Obviously there was room for flexibility and contemplation that the loan might be less": at [8]. The interest rate may range between 8% and 10% and the term of the loan "was not highly concrete": at [8].

65    Here, the Loan Term Sheet also allowed for some flexibility in the finance to be sourced by the broker. The Loan Amount was "up to" a maximum "of approximately" $13.5 million, consisting of "approximately" $8.5 million for stage 1, $3.7 million for stage 2 and $1.3 million for stage 3 with "The splits [being] only an estimate and may vary." The Loan Amount was also "subject to valuation" of the Ripley Valley land. As such, an offer of finance which was different to the Loan Amount, either as to the facility limit or the amount of finance available for different stages of the development, may still fall within the description of the Loan Amount.

66    The Loan Term Sheet also proposed that security for the loan would be provided by a registered mortgage granted by the trustee company over the Ripley Valley land, together with a personal guarantee from Mr Hinds. This presupposed that title to the land would vest in the borrower. Under the memorandum of understanding, with which both Mr Hinds and the broker were

Verify version

familiar, title to the land would not be transferred to RV Developments until the first payment was made. It would have been understood by a reasonable person standing in the position of the broker and the client that the finance needed to facilitate the first payment.

67    Consistently with this, the Purpose of the loan was "*Purchase of land and develop the site …*" The surrounding circumstances known to the parties on the date on which the contract was entered into included the memorandum of understanding, which obliged Mr Hinds to pay the vendors $6.35 million by 9 January 2014, at which time legal title to the Ripley Valley land would be transferred to RV Developments. In light of this provision, allowing for some flexibility, the broker was tasked with obtaining loan approval which enabled the clients to make this payment.

68    The Costs Agreement noted that Mr Hinds and the trustee company engaged the broker for 360 days on an exclusive basis. Having regard to this provision, I do not accept the defendants' submission that the broker was obliged to obtain finance within the time frame prescribed by the memorandum of understanding, in particular, by 9 January 2014. Whilst the memorandum of understanding formed part of the background and context of the contract, it was not incorporated by reference and the Costs Agreement included an express term with a different time frame.

**CONTRACTUAL PERFORMANCE**

69    The next question is whether the discussion paper amounted to substantial performance of the broker's obligations under the contract. Whether there has been substantial performance is a question of fact to be determined in the circumstances of each case and on the whole of the evidence: *Simpson Steel Structures v Spencer* [1964] WAR 101 at 104 (per Hale J); *Hoering v Isaacs* [1952] 2 All ER 176 at 179 (per Somervell LJ); *Zamperoni Decorators Pty Ltd v Lo Presti* [1983] VR 338 at 342 (per Anderson J). For example, in *Bolton v Mahadeva* [1972] 1 WLR 1009, a contract to install a home heating system was not substantially performed where the system did not heat adequately and gave out fumes so as to make the living rooms uncomfortable. In *Connor v Stainton* (1924) 27 WALR 72, a contract to erect a sheep-proof fence was not

substantially performed where the fence posts were installed too far apart and required the addition of "droppers" to be effective, albeit at a cost of roughly half of the contract price. While the fence was not useless, "the fence would be of an entirely different character from that which the plaintiff had contracted to erect; and it is not open to one who has undertaken to perform work of a certain kind to say that he has done something which is of a different nature, but which is really as good and as satisfactory as that which he had undertaken to do": at 74 (per McMillan CJ).

70    Returning to *Cayden,* Bryson AJ considered at [9]-[11]:

> When considering what performance by the [broker] could be accepted as a performance of the obligation and the work which it undertook under the retainer agreement there must be some flexibility. … However unless there was some performance and some loan approval was obtained which fitted in with either what was proposed in the Proposal or with what the defendants actually came to do in their contemplated sale, there could be no entitlement to payment of a fee.
>
> … It is, to my mind a matter of degree how far off a departure from the Proposal would still be a performance of the work. In my opinion substantial performance is required, and a performance which the [clients] accepted and fitted into whatever arrangements they ultimately made … would be sufficient.
>
> The ordinary approach to entitlement to payment under a commission arrangement such as this is that payment for work done is earned when the commission is fully carried out and completed and, if less is done, no payment is earned. …

71    There, the broker procured an email from BankWest setting out a loan structure that was acceptable to the bank, being 70% of the purchase price, to be repaid by principal and interest payments, with interest at 9.49%. Bryson AJ concluded that the bank's offer departed in a number of important respects from what had been sought; indeed the bank asked whether the clients were prepared to proceed on a "recognisably different basis". Such a loan "would have been no use whatever for the purchase the clients had in view … It was so far short of anything useful that it could not be said that the work in the retainer was done": at [13].

72    More recently, in *Barrington Winstanley Group Pty Ltd v Edmonds* [2022] NSWSC 531, the contract provided that a mortgage broker was to arrange finance "within the ambit of the instructions set out" in a schedule. The schedule listed a number of features of the proposed finance, including that the

term of the loan was 12 months. The broker obtained offers of finance for three months only. Darke J considered that a loan offer of only three months could not be said to be a loan offer within the ambit of the broker's instructions, where the period of a loan "is obviously a matter of importance, and there is a significant difference between a three month term and a 12 month term": at [80]. The mortgage broker was not entitled to its fee.

73    Here, in order to substantially perform the broker's obligations under the contract with its client, the broker was tasked with obtaining finance of $13.5 million, to be drawn down in stages, such that the client could purchase the Ripley Valley land, in particular, by meeting the obligation under the memorandum of understanding in respect of the Stage 1 payment. If the broker arranged finance which was less than $13.5 million, or permitted a first drawdown of less than $8.5 million, that may still amount to substantial performance of the broker's obligations under the contract as long as, for practical purposes, the client was able to proceed with the Ripley Valley purchase and development.

74    Although there is no suggestion that Mr Hinds was planning on contributing his own funds to the Stage 1 payment under the memorandum of understanding, I consider that obtaining finance which necessitated some contribution may still amount to substantial performance of the broker's obligations, given the definition of Loan Amount. The question is whether there was a significant difference on a matter of importance between the Loan Term Sheet and the discussion paper: *Barrington* at [80]. Or as Bryson AJ put it in *Cayden*, was the discussion paper "so far short of anything useful that it could not be said that the work in the retainer was done": at [13].

**Expert evidence**

75    It is here that the defendants' expert evidence becomes important. Mr Green is a chartered accountant and financial consultant with credit and risk experience with NAB and ANZ. Mr Green has worked in the Credit Risk Review function at ANZ and in the Asset Quality Assurance function at NAB. Both functions review lending decisions to confirm compliance with lending policy and

Verify version

Signed by AustLII

conditions, and to review loan quality generally. As a consequence, Mr Green has significant experience in reviewing the application of lending policy.

76    Mr Green said ANZ's discussion paper set out generic lending criteria for property development lending, detailed the nature of information that would be required to seek a formal loan approval and did not reflect any analysis or assessment of the information provided in the broker's application. Further, the discussion paper included two conditions precedent which may operate in practice to restrict the amount of funding available. First, lending was not to exceed the lower of 75% of Total Development Costs or 60% of gross realisable value (LVR). Second, the debt was to be 100% covered by complying pre-sales.

77    Applying the LVR requirement, $3.3 million would be available for the first land purchase. Using the covenant limit of 75% of Total Development Costs, and having regard to general industry practice, Mr Green assumed that these costs excluded GST and loan brokerage. The eligible Total Development Costs were $6,325,275. The portion which may be funded, being 75%, was $4,743,956. As the conditions precedent required the application of the lower of these two ratios, the bank may have funded $3.3 million, leaving an unfunded component of $3,835,150.

78    The plaintiff objected to the admissibility of Mr Green's report on the basis that it failed to expose his reasoning process, linking his specialised knowledge with the opinions expressed. It was said that Mr Green's observations on ANZ's discussion paper could be made by any reader of the letter without the need to deploy his expertise. Likewise, Mr Green's analysis of cash outflows shown in the borrower's feasibility spreadsheet was said not to require specialised knowledge but simple arithmetic. So too Mr Green's analysis of the implications of the bank's LVR requirement on the funding likely to be made available by the bank and the resulting funding shortfall.

79    As French CJ, Gummow, Hayne, Crennan, Kiefel and Bell JJ observed in *Dasreef Pty Ltd v Hawchar* (2011) 243 CLR 588; [2011] HCA 21 at [37]: (emphasis added)

Verify version

> … it is ordinarily the case, as Heydon JA said in *Makita*, that "the expert's evidence must explain how the field of "specialised knowledge" in which the witness is expert by reason of "training, study or experience", and on which the opinion is "wholly or substantially based", applies to the facts assumed or observed so as to produce the opinion propounded". The way in which s 79(1) is drafted necessarily makes the description of these requirements very long. *But that is not to say that the requirements cannot be met in many, perhaps most, cases very quickly and easily.* That a specialist medical practitioner expressing a diagnostic opinion in his or her relevant field of specialisation is applying "specialised knowledge" based on his or her "training, study or experience", being an opinion "wholly or substantially based" on that "specialised knowledge", *will require little explicit articulation or amplification once the witness has described his or her qualifications and experience, and has identified the subject matter about which the opinion is proffered.*

80    As Allsop P also noted in *Allianz Australia Ltd v Sim* [2012] NSWCA 68, the requirements of section 79 "should not be elevated into something more than they are: procedural rules to limit evidence to that which is rational and coherent and properly arising from expertise and directed to areas in respect of which the court needs assistance": at [9].

81    Forensic accounting is an area of expertise where the task assigned to an expert may be less subjective and less susceptible to inference such that meeting the requirements of section 79 may be more easily satisfied: *Hart v Federal Commissioner of Taxation (No 2)* [2016] FCA 897 at [23]-[25] (per Bromwich J). In that case, it was submitted that a forensic accountant's report should not be admitted as the financial records reviewed by the expert could equally be reviewed by the Court. Bromwich J disagreed, considering that the expert drew information from a range of records, presented the information in a coherent form and drew conclusions as to the source and destination of funds. At [35]-[36]:

> The measure of whether evidence falls within s 79(1) is not whether the task can in theory be performed by a sufficiently capable judge in the particular area given enough time and effort, without the application of accepted specialised knowledge, but whether the task is in fact carried out by the genuine application of such accepted specialised knowledge that adds the required level of value to the evidentiary and judicial process. …

> It is not to the point that a mere lawyer, sitting as a judge, might, if given enough time and lay instruction or other help or guidance, even by a well-informed barrister, be able to carry out and perhaps even understand … and form views about …

82    I consider Mr Green's area of expertise, being the analysis of cashflows and application of lending conditions, to be similarly less subjective and susceptible

Signed by AustLII

to inference. Mr Green's observations on the discussion paper included its basic features. Mr Green also assessed that the discussion paper "did not reflect any analysis or assessment of the information provided in the Application." As I read it, this assessment was based on his experience, earlier summarised, as to what the letter revealed about what the bank had done before issuing the discussion paper, where the bank was up to in its process, and what the bank had yet to do. I consider that his observations reflected his industry experience as set out in his *curriculum vitae*. In other words, his observation was an application of his specialised knowledge, which added value to the evidentiary and judicial process. I do not agree than a judge reading the letter would necessarily come to the same conclusion, absent such expertise.

83    The same can be said in respect of Mr Green's analysis of the cash outflows shown on the feasibility study. As senior counsel for the defendants submitted, Mr Green analysed an 8-page spreadsheet comprising numerous line items and "extracted from that universe of information" a subcategory of expenses which, on his analysis, were costs associated with settlement of the land purchase. It cannot be said that Mr Green's evidence was merely in the form of line items, which the Court could read itself: *Hart* at [33]. It is self-evident that Mr Green was relying on his experience to identify those expenses which were relevant to settling the land purchase and, based on those expenses, calculating the funding required for the Stage 1 payment. Beyond this, it is unclear what further reasoning Mr Green could have proffered in support of his opinion. In those circumstances, I consider Mr Green's assessment of the required funding to be admissible.

84    The plaintiff also objected to the report on the basis that some of Mr Green's assumptions were unstated and unsupported. First, he assumed the contract price reflected the value of the property. (I think Mr Green was here setting out his methodology). Second, where the discussion paper did not define Development Costs, "having regard to general industry practice, I assume that the Development Costs exclude GST, and the loan brokerage". Both assumptions fed into Mr Green's calculation of the funding shortfall.

Verify version

85     That an expert report is based on facts assumed, but not proved, at the time
       when the report is tendered does not mean that the report is inadmissible *per
       se*. Those facts may be proved later by other means. If, by the end of the trial,
       the assumption is not proven, then the Court may place little or no weight on
       the report: *Australian Securities and Investments Commission v Rich* [2005]
       NSWCA 152 at [136] (per Spigelman CJ); *Fuller v Avichem Pty ltd (t/as Adkins
       Building & Hardware* [2019] NSWCA 305 at [89] (per Payne JA, White JA
       agreeing). It follows that even if the assumptions stated in Mr Green's report
       were not proven, that would not affect the admissibility of his report. Where Mr
       Green was not then challenged in cross-examination on his statement that
       general industry practice was that GST and loan brokerage were excluded
       from development costs, I see no reason to disregard his approach.

**Conclusion**

86     In her initial contact with the broker in June 2013, Ms Leeson recognised that
       the amount of funding which might be obtained from a lender would be limited
       by the valuation of the development site and the lender's financial covenants,
       such as LVR. However, as the proposal developed into a memorandum of
       understanding and application for finance, there was no suggestion in the
       contemporaneous documents that Mr Hinds proposed to contribute equity to
       the Stage 1 payment. It was put to the broker that Mr Hinds had never
       indicated up to the point of entry into the contract that he was in a position to
       make any contribution to the moneys that would have to be paid for the
       acquisition of title to the land; the broker said that Mr Hinds *did* but agreed that
       he had not mentioned this in his three affidavits, "I probably should have." I
       agree.

87     The unchallenged evidence of Mr Hinds and Ms Leeson was that Mr Hinds
       needed to wholly fund the $13.5 million purchase price by debt. Of the staged
       payments, Ms Leeson said that $5.5 million was needed in order for Mr Hinds
       to commence Stage A of the project. Under the memorandum of
       understanding, payment of $5.5 million was the first in a series of events.
       These funds could not come at a later time in the project as the project could
       not otherwise proceed at all. Mr Hinds said the funding procured by the broker
       had to be for the purpose of acquiring the land as provided in the memorandum

Signed by AustLII

of understanding as the deal would otherwise not have been possible. Stage A required the purchase and transfer of the land as the initial trigger for the project. The first payment of $5.5 million had to be paid at the commencement of Stage A, not within Stage A. Without the purchase of the land, the rest of the project could not continue. If the bank retained certain funds from the outset, with only remaining funds available for land acquisition, then Stage A could never have been completed.

88    What the clients wanted was not faithfully conveyed in the application for finance. The change of emphasis in the white paper, when compared with the Loan Term Sheet, is important. Gone is reference to the "*Purchase* of land," as stated in the Loan Term Sheet as the purpose of the loan. The borrower was now seeking funds "to *finalise subdivision* / sell / develop …". In combination with the untrue information in the Application Commercial Form, the broker represented that the borrower already owned the land (subject to finance from NAB) and needed further funds to complete the development.

89    The broker did not accept that he had a concern that, if the bank was told that the land would be acquired through debt finance with no equity contribution, then it was unlikely that the bank would be interested in the proposal. It does rather appear, however, that this piece of information was 'buried' in the compendious attachments to the application, rather than made plain 'up front'. However, the client actually needed finance to enable him to meet the Stage 1 payment under the memorandum of understanding. That was the task the broker had accepted, albeit with "room for flexibility": *Cayden* at [8]. The broker's entitlement to its fee depending on substantially performing this task.

90    Having requested funding for a different purpose, it is unsurprising that the discussion paper envisaged funding which did not meet the client's requirements as set out in the Loan Term Sheet. The Loan Amount in the discussion paper was $13.5 million, being the precise sum referred to in the Loan Term Sheet. The problem, however, was that the Purpose of the finance sought by the clients – "*Purchase of land* and develop the site" – could not be achieved without a substantial contribution of funds by the clients. The discussion paper included two conditions precedent, which had the result that

the bank may have funded $3.3 million, leaving an unfunded component of $3,835,150. Given the large funding shortfall, Mr Green was of the opinion that the discussion paper was not sufficient to purchase and development the property as it did not provide sufficient funds for the settlement of the first land purchase. Mr Green analysed the cash outflows shown in the feasibility analysis and identified that $7,135,150 was required to settle the first land purchase. This was materially outside the range of $5.5 million to $6 million identified in the white paper as the approximate first drawdown. I agree. Put another way, it was roughly half of the Stage 1 payment under the memorandum of understanding.

91      It may be relevant to consider whether the client accepted the broker's performance and fitted the finance arranged into whatever arrangements they ultimately made: *Cayden* at [10]. The defendants' conduct in proceeding to pay the broker's fee by instalments and persisting with efforts to obtain finance from the ANZ are admissions against interest, suggesting that the defendants considered the broker's performance of the contract to suffice. Such admissions are, however, not determinative. Further, my ability to place weight on this post-contractual conduct is constrained by an agreement reached by the parties, such that the defendants' cross claim was not pressed. The defendants' submissions noted that the agreement extended to limit the evidence upon which the broker would rely to make good its contract claim: no reliance was placed on acts or omissions by the defendants after the date of issue of the discussion paper except the alleged failure to pay and, in that regard, only as evidence going to loss and the calculation of interest. In line with this agreement, the plaintiff's submissions did not refer to these post-contractual matters.

92      Overall, I am not satisfied that the discussion paper was "in the terms of the Loan Term Sheet" entitling the broker to its fee, where the Loan Term Sheet obliged the broker to not only obtain finance "up to" $13.5 million, but finance available to be used by the client to "*Purchase the land* …". There was a significant difference on a matter of importance between the Loan Term Sheet and the discussion paper: *Barrington* at [80]. Or as Bryson AJ put it in *Cayden*, the discussion paper was "so far short of anything useful that it could not be

said that the work in the retainer was done": at [13]. What the broker delivered was not in substantial compliance with what the brokerage agreement contemplated.

## ORDERS

93   The broker accepted that, if the discussion paper was not "in the terms of the Loan Term Sheet", then the broker would have to refund the instalments already paid. The parties agreed that this figure was $154,000. For these reasons, I make the following orders:

(1)   Judgment in favour of the defendants in the amount of $154,000 together with interest under section 100 of the *Civil Procedure Act 2005* (NSW).

(2)   Summons otherwise dismissed with costs.

(3)   Commercial List Cross-Statement dismissed.

(4)   Cross claimants to pay the cross defendants' costs thrown away.

(5)   Parties to notify any errors or omissions within 7 days.

\*\*\*\*\*\*\*\*\*\*