UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------------------X
The Roe Corporation, 267 Partners, LLC, and Buhm Jung Roe   :
                                                            :   **Case No.**
                    Petitioners,                            :
                                                            :
        -against-                                           :
                                                            :
Berhero Pty Limited (T/A Acuity Funding) and the Singapore  :
International Arbitration Centre                            :
                                                            :
                    Respondents.                            :
--------------------------------------------------------------------------X


## **PETITIONERS' MEMORANDUM OF LAW IN SUPPORT OF THEIR ORDER TO SHOW CAUSE TO STAY ARBITRATION**

CONWAY & CONWAY
99 Park Avenue, Room 810
New York, New York 10016
(212) 938-1080
*Attorneys for Plaintiffs*

# **TABLE OF CONTENTS**

**Page(s)**

TABLE OF AUTHORITIES..................................................................................................ii

PRELIMINARY STATEMENT............................................................................................1

STATEMENT OF FACTS.....................................................................................................1

LEGAL ARGUMENT............................................................................................................8

    I.      Standard For Issuance of a Temporary Restraining Order ("TRO")......................8

    II.     Petitioners Will Suffer Irreparable Harm Absent a Stay of the
            Singapore Arbitration...............................................................................................9

    III.    Petitioners are Likely to Prevail on the Merits of Their Petition............................10

          a.    Plaintiff's Fifth Cause of Action for Breach of Fiduciary Duty is Asserted
              within the Statute of Limitations for the Same Reasons Plaintiffs' Fraud
              Claims are Timely.............................................................................................10

          b.   The Arbitration Agreement included in the LTS & CA is a Substantial
              Element of Acuity's Scheme to Defraud Petitioners.......................................11

CONCLUSION.....................................................................................................................13

# TABLE OF AUTHORITIES

**Cases**                                                                                                         **Page(s)**

*Freedom Holdings, Inc. v. Spitzer,*
    408 F.3d 112, 114 (2d Cir. 2005)……………………………..………………………….8

*Garten v. Kurth,*
    265 F.3d 136, 142 (2d Cir. 2001)……………………..…………………...………….11

*Local 1814 I8nt'l Longshoremen's Ass'n, AFL–CIO v. New York Shipping Ass'n. Inc.,*
    965 F.2d 1224, 1228 (2d Cir. 1992)…………………………………….........................8

*Maryland Casualty Co. v. Realty Advisory Board on Labor Relations,*
    107 F.3d 979, 985 (2d Cir. 1997)………………………………………….…..….8,9

*Merrill Lynch Inv. Managers v. Optibase, Ltd.,*
    337 F.3d 125, 129 (2d Cir. 2003)…………………………………………………....9

*Moseley v. Elec. & Missile Facilities, Inc.,*
    374 U.S. 167, 172, 83 S. Ct. 1815, 1818, 10 L. Ed. 2d 818 (1963)…………….................11

*Nken v. Holder,*
    556 U.S. 418, 129 S. Ct. 1749, 1753, 173 L. Ed. 2d 550 (2009)……… ………………...8

*Polymer Technology Corp. v. Mimran,*
    37 F.3d 74, 77–78 (2d Cir. 1994)……………………………………….........................8

*UBS Sec., LLC v. Voegeli,*
    405 F. App'x 550, 552 (2d Cir. 2011)……………….........................................9

*Wild Bunch, SA v. Vendian Ent., LLC,*
    No. 17 CIV. 1383, 2018 WL 1365690, at \*3 (S.D.N.Y. Feb. 26, 2018)……………........10

**Statutes**

Fed. R. Civ. P. 65…...………………………………………………….………......….1

**PRELIMINARY STATEMENT**

Petitioners The Roe Corporation ("Roe Corp."), 267 Partners, LLC ("267 Partners"), and Buhm Jung Roe ("Mr. Roe," and collectively "Petitioners"), by and through their undersigned counsel, Conway & Conway, hereby submit this Memorandum of Law in Support of Their Order to Show Cause to Stay the Singapore Arbitration, initiated by Respondent Berhero Pty Limited (T/A Acuity Funding) ("Acuity") and administered by Respondent Singapore International Arbitration Centre ("SIAC," and collectively "Respondents"), pursuant to Rule 65 of the Federal Rules of Civil Procedure.

**STATEMENT OF FACTS**

Roe Corp. is a New York corporation that engages in the business of real estate, and primarily the development or redevelopment of real estate projects in New York. 267 Partners is a New York Limited Liability Company that owns a property situated at 267 Broadway, New York, NY, 10007 (the "Property") Mr. Roe is the President, Chief Executive Officer, and a twenty five percent (25%) shareholder in Roe Corp, and the President and sole shareholder of 267 Partners. In or around July of 2023, Petitioners sought funding in order to begin a project to redevelop the Property (the "Tribeca Project"). The funding sought by Petitioners included a construction loan in the amount of approximately two hundred eighty million dollars ($280,000,000.00) (the "Loan"). On or about July 26, 2023, a consultant retained by Petitioners, Mr. Sungwoo Park ("Mr. Park") introduced Petitioners to Acuity. Acuity is an Australian entity that holds itself out as a broker with the ability to facilitate large commercial loans to borrowers. The Parties corresponded via email over the subsequent months, and on or about September 24, 2023, Acuity provided Petitioners a draft Loan Term Sheet and Cost Agreement ("LTS & CA"). Pursuant to the terms of the LTS & CA, Acuity represented to the Petitioners that it would

1

introduce, organize, arrange or obtain loan funds to fund the Tribeca Project. The LTS & CA required Petitioners to pay an initial processing fee of $100,000.00 to Acuity, and an additional "Fund Arrangement Fee" of four percent (4%) of the loan amount "in the event that the loan is conditionally approved to the Applicants, or a discussion paper is issued or a terms sheet is issued or a loan proposal is issued in the terms of the Loan Term Sheet[.]" *See Exhibit 2, LTS & CA*. The LTS & CA additionally included an arbitration clause, which required any disputes arising therefrom to be submitted to arbitration before the Singapore International Arbitration Centre ("SIAC"). As Acuity knew at the time of execution of the LTS & CA, Mr. Roe was 79 years old, and his health would prevent him from traveling across the globe to participate in a potential arbitration hearing. On or about September 30, 2023, under pressure from Acuity, Mr. Roe executed the LTS & CA in reliance on Acuity's representation that it would arrange for the funding of the Loan by a third-party lender that was ready, willing, and able to fund the loan.

However, On October 24, 2023, Acuity provided Petitioners with a Conditional Letter of Offer for Mortgage Finance (the "Conditional Offer") dated October 20, 2023 issued by Global Wise Investments Pte. Ltd ("Global Wise"), a company incorporated in Singapore. *See Exhibit 9, Conditional Letter of Offer*. The Conditional Offer contained several conditions precedent to the funding of the loan that had not been contemplated in the LTS & CA, including a requirement for security in the form of personal guarantees to be made by each shareholder[1] in the Roe Corporation (whereas the LTS & CA only provided for a personal guarantee from Mr. Roe and his associated companies). *See Exhibit 9, Conditional Letter of Offer*. Seven of the conditions precedent to loan funding were additionally within the exclusive control of Global Wise and/or unknown third parties, and thus Petitioners had no control over whether and when these

---

[1] Mr. Roe's three children are each twenty five percent (25%) shareholders in Roe Corp.

2

conditions precedent would be satisfied. Despite this, the Roe Corp. would be required to draw down on the loan within just ninety (90) days of the acceptance of the conditional offer, and pay two million eight hundred thousand dollars ($2,800,000.00) in fees to Global Wise prior to the disbursement of any Loan funds. These terms are commercially unworkable. On October 31, 2023, Acuity provided Petitioners with a "Deed of Agreement confirming our commission" and an "Addendum in relation to the proposed escrow account and drawdown," and began to pressure Petitioners to "acknowledge and accept the terms and conditions precedent contained in the [Conditional Offer]" and "acknowledge that if there exist any differences in the terms, conditions or nature of the funding between the [Conditional Offer] and the [LTS & CA] that these are acceptable to [Petitioners] and both documents remain valid and enforceable." *See Exhibit 10, October 31, 2023 Email and Attachments.* On November 29, 2023, Acuity again demanded that Petitioners execute the Conditional Offer and pay fees to Acuity. *See Exhibit 13, November 29, 2023 Email.*

In early 2024, Petitioners learned that Acuity had initiated an arbitration against another prospective borrower in Vietnam who had entered into a similar arrangement for loan funding with Acuity and Global Wise that had failed to result in a successful loan. Thus, on January 29, 2024, counsel for Petitioners sent a letter to counsel for Acuity[2] advising that "Without any visible business or activity that justifies the arrangement Global Wise is allegedly claiming to have the wherewithal for, much more would be required in due diligence before our client would entertain any proposal from them, much less pay in advance. At a minimum, our client requires a detailed history of Global Wise's business and activities, with specific reference to verifiable comparable lending arrangements to the one it has proposed here, and proof that it has the funds

---

[2] Troublingly, WongPartnership, LLC, Acuity's counsel, advised Petitioners that it also represented Global Wise.

3

it claims before expending any further resources on its 'Conditional Offer.'" *See Exhibit 14, January 29, 2024 Letter.* On February 16, 2024, Mr. Park advised Acuity that Mr. Roe would request that the LTS & CA be terminated, and that Mr. Roe would "reconsider getting a new loan that would be mutually beneficial if you provide him [Acuity's] track record and sources of fund[s]." *See Exhibit 15, February 16, 2024 email.* On March 18, 2024 Petitioners received a letter from counsel for Global Wise in response to the January 29, 2024 letter indicating that Global Wise did not have adequate capital to fund the Loan, and the Loan funding would instead be provided by Elite Crown Diamond Ltd. ("Elite Crown Diamond"), a United Kingdom entity for which the Chairman of Global Wise is also a Director. *See Exhibit 18, March 18, 2024 Letter.* Global Wise failed to provide any of the information requested by Petitioners that would have supported that Global Wise was ready, willing, and able to fund the Loan, or that Global Wise had any track record of providing loans of a similar nature.

At this time, Petitioners also learned that Acuity has a long track record of engaging in similar fraudulent schemes, whereby Acuity would enter into loan agreements with prospective borrowers requiring a significant initial deposit and fund arrangement fee in exchange for Acuity obtaining a conditional loan offer or document of a similar nature from a third-party lender on behalf of the borrower, knowing that the loan would not ultimately be funded and Acuity would nonetheless sue the borrower for fees. For example:

- In 2011 Acuity failed in its claim for its brokerage fees before the New South Wales Supreme Court in *ACN 075 911 410 Pty Ltd v Almaty Pty Ltd* [2011] NSWSC 333 (20 April 2011), on the grounds that Acuity only obtained a National Australia Bank discussion paper instead of the conditional loan approval required under the brokerage agreement. *See Exhibit 6, Order Dated April 20, 2011.*

4

- In 2013, Acuity failed in its claim for its brokerage fees in an arbitration which was the subject matter of *Berhero Pty Ltd (trading as Acuity Funding) v Dinsey* [2013] QCATA 311 (Queensland Civil and Administrative Tribunal). In those proceedings, like here, Acuity only provided the would-be borrower with a preliminary document that was never followed up with a more concrete offer. The Tribunal held that fees paid under the brokerage agreement were for a service that was never performed. *See Exhibit 5, October 8, 2013 Order.*

- In 2019 Acuity failed in its claims for its brokerage fees before the New South Wales Supreme Court under similar circumstances in *Berhero Pty Ltd v Hinds* [2019] ACTSC 378 (31 May 2019). *See Exhibit 7, May 31, 2019 Order.*

- In 2023 Acuity failed in its claims for its brokerage fees before the New South Wales Supreme Court under similar circumstances in *Berhero Pty Ltd v Hinds* [2023] NSWSC 1022 (30 August 2023). *See Exhibit 8, August 30, 2023 Order.*

- Additionally, in SIAC Arbitration No. ARB 946/20/JZH between claimants Acuity and Global Wise and four Vietnamese respondents who required a loan to construct and develop a property, the first respondent therein entered into a loan brokerage agreement with Acuity and subsequently a facility agreement with Global Wise, arranged by Acuity. However, the first respondent was unable to pay Acuity's fund arrangement fee and Global Wise's front-end fee and no loan monies were disbursed. *See Exhibit 9, July 14, 2022 Arbitration Award.*[3]

---

[3] Notably, the SIAC is the only forum in which Acuity was able to prevail on its claims relating to its fraudulent scheme, despite the similar factual nature of the dispute to the many others in which Acuity's frivolous claims were routinely denied and Acuity was frequently ordered to pay its opponents' costs.

5

On April 29, 2024, Acuity initiated an arbitration in Singapore before the SIAC (the "Singapore Arbitration"), by filing a Notice of Arbitration naming each of the Petitioners as respondents and claiming entitlement to payment of a fund arrangement fee in the amount of eleven million two hundred thousand dollars ($11,200,000.00) by Petitioners to Acuity despite Acuity's failure to provide requisite consideration under the LTS & CA to Petitioners. *See Exhibit 1, Notice of Arbitration.* On January 13, 2025, Acuity filed its Statement of Claim, and on February 24, 2025, Petitioners filed their Statement of Defence, noting therein that "the LTS & CA are voidable and the Respondents have rescinded the LTS&CA by virtue of Acuity's fraudulent misrepresentation." *See Exhibit 3, Statement of Defence.* On or about June 5, 2025, Petitioners retained Grant Thornton to perform an investigation into Acuity, Global Wise, Elite Crown Diamond, and various other related entities and individuals. On June 19, 2025, Grant Thornton provided its resulting report to Petitioners, which confirmed Petitioners suspicions as to the fraudulent nature of the LTS & CA and Conditional Offer. With respect to Global Wise, Grant Thornton found that in its filings with Singaporean regulators, Global Wise's directors (one of whom has been convicted of criminal violations of the Singapore Companies Act relating to fraudulent activities in her directorship at other entities) declared that Global Wise qualified as a small company under Singaporean law, meaning that it met two of the following three criteria: (1) Its revenue does not exceed SGD10 million for each FY; (2) Its total assets at the end of each FY does not exceed SGD10 million; or (3) It has not more than 50 employees at end of each FY. Grant Thornton further noted that "Global Wise has a limited public profile, with minimal information available about its operations and affiliations(,)" that numerous allegations of fraudulent activity involving Global Wise have been made in various online forums, and that Global Wise's sole shareholder had declared bankruptcy and was discharged in 2011. *See Exhibit*

*4, Grant Thornton Report, Section 2.* Global Wise had no ability to provide $280,000,000.00 in loan funding to Petitioners, as is of course supported by Global Wise's own admission of the same in its March 18, 2024 letter to Petitioners. *See Exhibit 19, March 18, 2024 Letter.* Grant Thornton's investigation similarly determined that Elite Crown Diamond, the entity Global Wise advised would fund Petitioners' loan in March of 2024, had no ability to fund Petitioner's contemplated Loan. Grant Thornton found that "Elite Crown Diamond has filed its financial statements under the micro-entity accounts since FY2018, where a company qualifies as a micro-entity if it meets at least two (2) of the following criteria: an annual turnover of GBP1 million or less, balance sheet of GBP500,000 or less, or 10 employees or fewer[,]" that in 2024 Elite Crown Diamond maintained net assets of just 2,296 pounds sterling, and that "According to the company's financial statements for FY2017, its principal activity was described as 'Educational support services.'" *See Exhibit 4, Grant Thornton Report, Section 7.* Like with respect to Global Wise, Grant Thornton found that Elite Crown Diamond has "limited public profile, with minimal information available about its operations, business activities and projects" and numerous allegations of fraudulent activities in various online forums. It is clear that neither entity had any ability to fund Petitioners' Loan. With respect to Acuity, Grant Thornton found that "Berhero as well as ACN 075, which previously traded under the name Acuity, has a history of initiating legal proceedings against parties over processing and brokerage fees it claims entitlement to[,]" including each of the cases referenced above in addition to others, the vast majority of which resulted in the dismissal or denial of Acuity's claims.

As Petitioner's agreement to the LTS & CA was procured by Acuity's fraud, and the arbitration clause within the LTS & CA is substantially related to Acuity's scheme to defraud Petitioners as will be further detailed below, there is no valid arbitration agreement between

7

Petitioners and Acuity, and any potential award resulting from the Singapore Arbitration would be unenforceable.

## LEGAL ARGUMENT

### I. Standard For Issuance of a Temporary Restraining Order ("TRO")

In the Second Circuit, the standard for a temporary restraining order is the same as that of a preliminary injunction. *Local 1814 I8nt'l Longshoremen's Ass'n, AFL–CIO v. New York Shipping Ass'n. Inc.,* 965 F.2d 1224, 1228 (2d Cir.). To obtain a temporary restraining order there must be a demonstration of 1) irreparable harm and 2) either a showing of a likelihood of success on the merits, or a sufficiently serious question going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in the moving party's favor. *Polymer Technology Corp. v. Mimran,* 37 F.3d 74, 77–78 (2d Cir.1994). "To satisfy the irreparable harm requirement, Plaintiffs must demonstrate that absent a preliminary injunction they will suffer 'an injury that is neither remote nor speculative, but actual and imminent,' and one that cannot be remedied 'if a court waits until the end of trial to resolve the harm.'" [internal citation omitted] Freedom Holdings, Inc. v. Spitzer, 408 F.3d 112, 114 (2d Cir. 2005). Irreparable harm, in the context of an Arbitration Proceeding, occurs when a movant would be "forced to expend time and resources arbitrating an issue that is not arbitrable, and for which any award would not be enforceable." *Maryland Casualty Co. v. Realty Advisory Board on Labor Relations,* 107 F.3d 979, 985 (2d Cir.1997). To demonstrate a likelihood to succeed on the merits, there must be more than a mere possibility that relief will be granted. *Nken v. Holder,* 556 U.S. 418, 129 S. Ct. 1749, 1753, 173 L. Ed. 2d 550 (2009).

### II. Petitioners Will Suffer Irreparable Harm Absent a Stay of the Singapore Arbitration

8

Here, absent the issuance of a TRO staying the Singapore Arbitration, Petitioners will suffer irreparable harm. The Singapore Arbitration is currently scheduled for an evidentiary hearing to begin during the week of July 21, 2025. Any such hearing will result in the issuance of an award that is not enforceable, as there is no valid arbitration agreement between the Parties. Courts in the Second Circuit have consistently held that a party who is forced to arbitrate a claim that is not arbitrable suffers irreparable harm. *See Maryland Cas. Co. v. Realty Advisory Bd. on Lab. Rels.*, 107 F.3d 979, 984–85 (2d Cir. 1997) ("in light of the conclusion above that the district court correctly determined that the dispute is not arbitrable because the six Partners's employees are not covered by the Agreement, Maryland would be irreparably harmed by being forced to expend time and resources arbitrating an issue that is not arbitrable, and for which any award would not be enforceable.") *See also UBS Sec., LLC v. Voegeli,* 405 F. App'x 550, 552 (2d Cir. 2011) ("Being forced to arbitrate a claim one did not agree to arbitrate constitutes an irreparable harm for which there is no adequate remedy at law.") *See also Merrill Lynch Inv. Managers v. Optibase, Ltd.,* 337 F.3d 125, 129 (2d Cir. 2003) ("In finding that MLIM would suffer irreparable harm absent a preliminary injunction, the district court properly relied on *Maryland Casualty Co. v. Realty Advisory Board on Labor Relations,* 107 F.3d 979 (2d Cir.1997), which affirmed a preliminary injunction granted in favor of a party resisting arbitration on the ground that the dispute was outside the arbitration agreement.") Here, absent the issuance of a preliminary injunction, Petitioners will be forced to expend time and resources defending the Singapore Arbitration. They will be forced to do so without the benefit of testimony from their primary witness, Mr. Roe, who is unable to travel to Singapore due to his age and health; and, in the event the hearing goes forward as scheduled and an award is issued, said award will be unenforceable, as the arbitration agreement at issue was procured by Acuity's

fraud and is thus invalid. Acuity, on the other hand, will not be prejudiced by the issuance of a preliminary injunction, which would simply delay the Singapore arbitration hearing while this Court determines the merits of Petitioners' underlying Petition.

### III.  Petitioners are Likely to Prevail on the Merits of Their Petition

Petitioners are likely to prevail on the merits of their underlying Petition to Stay the Singapore Arbitration, as the LTS & CA was procured by Acuity through fraudulent means. Acuity never intended for Petitioners to receive their contemplated loan funding, rather, Acuity intended to extract millions of dollars in fees from Petitioners based on false promises, and the use of a foreign arbitration forum in which Petitioners are severely disadvantaged to enforce the fraudulent LTS & CA.

#### a.  Acuity Fraudulently Induced Petitioners to Enter into the Loan Term Sheet and Cost Agreement ("LTS & CA")

Acuity fraudulently induced Petitioners to enter into the LTS & CA. "[T]o establish fraudulent inducement a plaintiff must prove '(1) a misrepresentation or omission of material fact; (2) which defendant knew to be false; (3) which the defendant made with the intention of inducing reliance; (4) upon which the plaintiff reasonably relied; and (5) which caused injury to the plaintiff." *Wild Bunch, SA v. Vendian Ent., LLC*, No. 17 CIV. 1383, 2018 WL 1365690, at *3 (S.D.N.Y. Feb. 26, 2018). Here, Acuity made a misrepresentation of material fact to Petitioners in representing to Petitioners that Acuity would facilitate the issuance of a large commercial loan to Petitioners from a third-party lender that was ready, willing, and able to issue such a loan. Acuity, based on its long-running pattern of engaging in similar schemes by which it extracted fees from prospective borrowers in exchange for the facilitation of loans that never materialized, knew this representation to be false. Further, with the minimum level of due diligence appropriate for a multimillion dollar commercial loan agreement, Acuity knew or should have

10

known that Global Wise and its associated entities, including Elite Crown Diamond, were in no position to fund a $280 million commercial loan, based on publically available regulatory filings, as detailed in the Grant Thornton reported attached hereto as Exhibit 4. Acuity made misrepresentations to Petitioners with the intent that Petitioners would rely on said misrepresentations, execute the LTS & CA and included arbitration agreement, and pay a $100,000.00 deposit to Acuity. Petitioners reasonably relied on Acuity's misrepresentation that it would facilitate a loan from a lender ready, willing, and able to fund such a loan in executing the LTS & CA. Of course, Petitioner's very purpose in executing the LTS & CA and paying significant fees to Acuity was to actually obtain the contemplated loan. Finally, Acuity's fraudulent inducement caused injury to Petitioners, in that Petitioners paid a $100,000.00 deposit to Acuity in exchange for no consideration, and Petitioners are now subject to a multimillion dollar arbitration claim by Acuity on the opposite side of the globe, which Petitioners cannot adequately defend as the primary witness in support of Petitioners' defense, Mr. Roe, is unable to travel to Singapore to give testimony at any hearing due to his age and infirmity.

### b. The Arbitration Agreement included in the LTS & CA is a Substantial Element of Acuity's Scheme to Defraud Petitioners

Like with respect to any other contract, fraud in the inducement vitiates an arbitration clause. *See Moseley v. Elec. & Missile Facilities, Inc.,* 374 U.S. 167, 172, 83 S. Ct. 1815, 1818, 10 L. Ed. 2d 818 (1963) (Justice Black Concurring). ("We agree with the Court that fraud in the procurement of an arbitration contract, like fraud in the procurement of any contract, makes it void and unenforceable and that this question of fraud is a judicial one, which must be determined by a court.") While claims regarding fraud associated with contracts containing arbitration clauses are sometimes subject to determination by arbitration, that is not the case where the arbitration clause itself is a substantial element of the fraudulent scheme. *See Garten v.*

11

*Kurth*, 265 F.3d 136, 142 (2d Cir. 2001) ("As the Court explained in *Moseley*, however, arbitration is not mandated where the arbitration clause is part of the fraudulent scheme—where it is used to carry out the fraud.") That is the case here. As revealed by both Petitioners' own research and Grant Thornton's investigation, Acuity has engaged in a similar scheme to defraud prospective borrowers then later initiate litigation or arbitration to attempt to collect unearned contractual fees numerous times. *See Exhibits 5, 6, 7, 8, 9 Prior Adjudications and 4 Grant Thornton Report.* Acuity followed the same course of action here, whereby it fraudulently induced Petitioners to execute the LTS & CA, accepted payment of Petitioner's $100,000.00 initial deposit, provided to Petitioners' an illegitimate conditional loan offer from a purported third-party lender represented by the same counsel as Acuity and with no wherewithal to fund Petitioners' loan, and then initiated an arbitration against Petitioners to collect an $11,200,000.00 fund arrangement fee for which it provided no consideration in return. Acuity selected the SIAC as the forum for arbitration, despite itself being located in Australia, as Acuity knew that Mr. Roe was 79 years old, in poor health, and would be unable to attend an arbitration hearing to give testimony on the other side of the world in Singapore. Mr. Roe, as the signatory to the LTS & CA on behalf of Petitioners, is an essential witness to Petitioners' defense of any matter arising out of the LTS & CA. Notably, among all of the previous instances in which Acuity carried out its fraudulent scheme against prospective borrowers, the only instance in which Acuity prevailed in its claims against the borrowers was in an arbitration before the SIAC, in which the arbitration panel found that Acuity was entitled to payment of fund arrangement fees even though the prospective borrower in that case never received its contemplated loan. Thus, as the arbitration clause included in the LTS & CA is a substantial element of Acuity's scheme to defraud Petitioners, there is no valid arbitration agreement between the Parties, and this Court should

issue a preliminary injunction staying the Singapore Arbitration while it determines the merits of Petitioners' underlying Petition.

## CONCLUSION

For the foregoing reasons, Plaintiffs request that this Court issue an Order granting Petitioners a Temporary Restraining Order staying the Singapore Arbitration until such date that the Court reaches a decision as to the merits of Petitioners' Petition to Stay Arbitration.

Dated: New York, New York
July 2, 2025

Respectfully submitted,

CONWAY & CONWAY
Kevin P. Conway (6946)
*Counsel for Petitioners*
99 Park Avenue, Suite 810
New York, New York 10016
Tel: (212) 938-1080
Fax (212) 938-1207

13