Exhibit B

**IN THE MATTER OF AN ARBITRATION UNDER**

**THE ARBITRATION RULES OF**

**THE SINGAPORE INTERNATIONAL ARBITRATION CENTRE**

**(6TH EDITION, 1 AUGUST 2016)**

BETWEEN

1.  **BERHERO PTY LIMITED (TRADING AS ACUITY FUNDING)**
    **(ABN 32 060 065 821)**

...Claimant

AND

1.  **THE ROE CORPORATION (DOS ID: 2859163)**
2.  **267 PARTNERS, LLC, (DOS ID: 5606747)**
3.  **BUHM JUNG ROE**

...Respondents

---

## CLAIMANT'S STATEMENT OF REPLY

---

**Counsel for the Claimant**
**WongPartnership LLP**
12 Marina Boulevard, Level 28
Marina Bay Financial Centre Tower 3
Singapore 018982
Tel: +65 6416 8000
Fax: +65 6532 5722
Tiong Teck Wee / Samuel Teo /
Donny Trinh / Teo Yu Hui, Frederick

Dated 24 March 2025

# CONTENTS

I.    **INTRODUCTION AND EXECUTIVE SUMMARY**................................................3

II.   **RELEVANT FACTUAL BACKGROUND**....................................................5

    A.    Events leading up to the execution of the LTS&CA and issuance of the Conditional Offer...........................................................................6

    B.    Events after the issuance of the Conditional Offer...........................................12

    C.    Events after the Meeting and after the Conditional Offer had lapsed...............17

    D.    Acuity's demands for payment of the Fund Arrangement Fee and the events thereafter...........................................................................26

III.   **THE RESPONDENTS' DEFENCES ARE BASELESS AND WITHOUT MERIT**...........................................................................30

    A.    The Conditional Offer was in the terms of the Loan Term Sheet....................30

    B.    There is no basis to imply into the LTS&CA the Implied Terms sought by the Respondents...........................................................................38

    C.    Even if the Implied Terms are implied into the LTS&CA, Acuity has not breached the Implied Terms and the LTS&CA has not been terminated..........40

    D.    There was no unilateral mistake whether at common law or in equity.............48

    E.    There was no misrepresentation, much less fraudulent misrepresentation, by Acuity to the Respondents...........................................................53

IV.   **CONCLUSION** ...........................................................................55

## I.    <u>INTRODUCTION AND EXECUTIVE SUMMARY</u>

1.    This Statement of Reply ("**Reply**") is submitted on behalf of Acuity pursuant to the Tribunal's Procedural Order No. 2 dated 23 February 2025 and the revised Procedural Timetable annexed thereto. The Reply is submitted in response to the Respondents' Statement of Defence dated 24 February 2025 ("**Defence**"). Unless otherwise specifically defined, Acuity adopts in this Reply the same abbreviations and nomenclature used in Acuity's Notice of Arbitration dated 29 April 2024 ("**NOA**") and Statement of Claim dated 13 January 2025 ("**SOC**").

2.    For the avoidance of doubt, save as otherwise expressly admitted in this Reply, Acuity denies each and every allegation in the Defence, and the Respondents are put to strict proof thereof.

3.    The express terms of the LTS&CA are clear. Clause 4 of the Costs Agreement provides that the Fund Arrangement Fee "*shall become immediately due and payable*" in the event that "*the loan is conditionally approved to the Applicants, or a discussion paper is issued or a terms sheet is issued or a loan proposal is issued in the terms of the Loan Term Sheet.*" These express terms should be given effect.

4.    The Respondents' defences are nothing more than afterthoughts contrived *ex post facto* to evade their clear and express contractual obligation to pay the Fund Arrangement Fee.

5.    The terms of the LTS&CA (including the Fund Arrangement Fee) were specifically negotiated. These negotiations were at arm's length between sophisticated and commercially savvy parties. In particular, Mr Roe is a seasoned businessman and experienced real estate investor who has multiple real estate interests in New York with a net worth of more than USD 80 million. On Roe Corp's website, Mr Roe is described as having "*over 35 years of experience in real estate ownership" and "has extensive*

*private real estate fund manging experience and has syndicated and successfully completed multiple projects in New York City.*"

6.  At no point in time during the negotiations of the LTS&CA and/or at any point in time thereafter did the Respondents raise any issues and/or concerns with Global Wise's readiness, willingness, and/or ability to provide funds for Project Tribeca. This was not until Amini's letter dated 29 January 2024, more than 3 months after the Conditional Offer was issued. It was also not until the present arbitration that the Respondents asserted that the Conditional Offer was not "*in the terms of the LTS&CA*" or that they had purportedly made a "*mistake*".

7.  However, none of these are true. Among other things, Global Wise was in fact ready, willing, and able to provide funds for Project Tribeca. The Respondents' suggestion that the Conditional Offer should have been identical to the LTS&CA is contractually and commercially untenable given that Clause 4 of the Costs Agreement clearly provided and contemplated that the Conditional Offer may contain "*further condition or covenant that the lender/underwriter may deem applicable to this transaction.*" Significantly, Amini, in this letter dated 29 January 2024, took the position that the Conditional Offer was a "*verbatim repetition of the Acuity Loan Term Sheet recitation without more.*" It is also plainly unbelievable that Mr Roe as a seasoned businessman and experienced real estate investor would have made a "*mistake*".

8.  In any case, none of these were the real reasons why the Respondents did not sign the Conditional Offer. The real reason why the Respondents did not sign the Conditional Offer was because of the "*Diana issue*". Ms Diana Roe ("**Diana**"), Mr Roe's daughter and a shareholder of Roe Corp, had opposed the Conditional Offer and the loan. With Roe Corp being a family business, Mr Roe did not want to proceed with the Conditional Offer and the loan in the face of Diana's opposition.

9.  Throughout this time, Acuity was patient with the Respondents and extended numerous indulgences to them. This included proposing solutions to address the issues raised by Diana.

10. However, Mr Roe could not resolve the "*Diana issue*". Indeed, as matters stand today, the Respondents still have not secured financing for Project Tribeca and the project remains at a standstill.

11. Be that as it may, Acuity was still keen to reach an amicable resolution and continued to attempt to engage the Respondents constructively. However, the Respondents were not interested and wanted Acuity to issue a "*Cancellation Letter*" and re-negotiate a new deal.

12. Left with no choice, Acuity commenced the present arbitration to recover the Fund Arrangement Fee rightfully due to it.

## II.  **RELEVANT FACTUAL BACKGROUND**

13. The Respondents' account of the facts relevant to this dispute as set out in Section 4 of their Defence is incomplete, inaccurate, and/or misleading. The true background to this dispute as can be seen from the contemporaneous documents and correspondence and as set out below supports Acuity's claims and lays bare the Respondents' defences for what they are – afterthoughts that the Respondents have contrived *ex post facto* so as to evade their clear and express contractual liability to pay Acuity the Fund Arrangement Fee.

**A.** **Events leading up to the execution of the LTS&CA and issuance of the Conditional Offer**

14. Acuity was first introduced to Mr Roe and Mr Park Sungwoo ("**Mr Park**") by Dr Hwang Gi Sun ("**Dr Hwang**") on or around 26 July 2023.[1]

    a. At all times, it was Acuity's understanding that Mr Park was authorised and Mr Park had held himself out as being duly authorised to represent Mr Roe and his businesses (including Roe Corp and 267 Partners) and to negotiate the funding and funding documents for Project Tribeca on their behalf. In any case and as the record shows, Mr Roe was copied on most if not all the e-mail correspondence exchanged between Acuity and Mr Park.

    b. Contrary to the Respondents' assertion at paragraph 4.1.2 of the Defence, Dr Hwang was not a representative of Acuity. Dr Hwang was a business associate of Acuity and was not authorised to represent Acuity in any capacity.

15. On 8 August 2023, Acuity sent an initial Loan Term Sheet and Costs Agreement ("**Initial LTS&CA**") to the Respondents.[2] It is significant to note that like the LTS&CA that was eventually executed by the parties, Clause 4 of the Costs Agreement read with Clause 12 of the Loan Term Sheet of the Initial LTS&CA likewise provided that the Fund Arrangement Fee was 4% of the loan amount and was payable "*[i]n the event that the loan is conditionally approved to the Applicants, or a discussion paper is issued or a terms sheet is issued in the terms of the Loan Term Sheet*".

---

[1] **C-002**, email from Dr Hwang to Mr Park, Mr Nguyen, Mr Roe and 0113044814@paran.com, timestamp 10:52pm, subject: "*Preparing Loan Term Sheet etc*", at page 4.
[2] **C-014**, email from Mr Nguyen to Mr Park, Mr Roe, Mr Thambyrajah, Ms Christine Stephens ("**Ms Stephens**"), Dr Hwang, Ruby Troung and 0113044814@paran.com, timestamp 9:39pm, subject: "Re: Loan Term Sheet & Cost Agreement – Tribeca Manhattan Tower – Construction Funding" and attaching, *inter alia*, the document tiled "RT Signed Loan Term Sheet and Costs Agreement – Tribeca NY".

16.     On 11 August 2023, Mr Park informed Acuity that "*BJ will give you counter offer early next week*".[3] "*BJ*" refers to Mr Roe. In his e-mails, Mr Park would usually refer to Mr Roe as "*BJ*".

17.     On 16 August 2023, Mr Park wrote to Acuity as follows:[4]

> Dear, Mr. Viet Anh Nguyen.
>
> BJ respectfully propose you below 2 things.
>
> 1. Interest rate will be a variable interest rate calculated as equal to USD RFR 4-week Treasury Bill Rate plus a Margin of 5.00%. lf the USD RFR rate drops below 0.0%
> p.a., then it will be treated as 0.0%. (Alternatively, the Borrower may choose USD RFR 8 weeks, 13 weeks, 26 weeks, or 52 weeks).
>
> - Interest rate will be a variable interest rate calculated as equal to USD RFR 4-week Treasury Bill Rate plus a Margin of 3.00%. lf the USD RFR rate drops below 5.0% p.a., then Minimum interest rate will be treated as 8.0%.
>
> 2. Fund Arrangement Fee of 4% plus VAT/GST/Etc (if required to be collected) of the loan amount as described in point 3 of this Loan Term Sheet and point 4 of the Cost
>
> - Fund Arrangement Fee will be 3% of loan amount.
>
> BJ totally understand your policy, however everybody expect interest rate will be down next year which is starting the first draw of construction loan. We will look forward to receiving your positive response.
>
> Sung Park

---

[3] **C-015**, email from Mr Nguyen to Mr Park, Mr Roe, Mr Thambyrajah, Ms Stephens, Dr Hwang and 0113044814@paran.com, timestamp 10:32am, subject: "*Conditional Offer for Mortgage Finance – Tribeca Manhattan Tower*" at page 10.
[4] **C-015** at pages 9 to 10.

18. From Mr Park's e-mail, it is clear that the Respondents had taken cognisance of and were aware of the Fund Arrangement Fee; this would include the conditions under which the Fee would be payable. In other words, the Respondents were aware since the outset that a Fund Arrangement Fee of 4% of the loan amount would be payable "*[i]n the event that the loan is conditionally approved to the Applicants, or a discussion paper is issued or a terms sheet is issued in the terms of the Loan Term Sheet*". This is regardless of whether they chose to accept the loan.

19. This is also consistent with the services to be provided by Acuity as set out in Clause 3 of the Costs Agreement of the Initial LTS&CA which provides as follows:[5]

> The Applicants engage the facilitator to the exclusion of all others unless otherwise stated in this document, for the purposes of **either introducing, organising, arranging or obtaining loan funds in the sum described in clause 3 of the Loan Term Sheet,** ('the advance') for the purpose as set out in clause 5 of the Loan Term Sheet ('the purpose'). The Applicants hereby warrant that they have not engaged nor will they during the continuance of this agreement engage any other party to source finance for them for the purpose, and are not currently liable to pay any brokerage, commission, or other moneys to any third party for the sourcing of the finance. In the event that the Applicants breach the provision of this clause by obtaining funding for the purpose at any time until this agreement has been terminated, then all moneys payable hereunder shall become immediately due and payable by the Applicants to the facilitator and **the Applicants agree that such payment is a genuine pre-estimate of the facilitators loss and reasonable remuneration for the service performed and does not amount to a penalty**.

> Upon securing the finance required for the above mentioned purposes Berhero Pty Ltd t/as Acuity Funding will maintain the status of being the exclusive agency for any further funding required by the applicants and or their agents against the security properties for a period of 5 years.

---

[5] **C-014**.

20.     From the above, it is clear that Acuity was not obliged to ensure that the Respondents *received* funding. This is not unreasonable given that whether the Respondents would eventually receive funding would depend on various factors many of which would be out of Acuity's control and/or for which Acuity is not and cannot be held responsible for. Purely by way of example, the Respondents could for reasons of their own and unconnected with Acuity choose not to go with the lender introduced by Acuity, the Respondents could also fail to meet the conditions precedent for funding (which are customary in any loan transaction). In this regard and as provided for in Clause 3 of the Costs Agreement of the Initial LTS&CA, the Fund Arrangement Fee represents "*reasonable remuneration for the service performed*" by Acuity and "*does not amount to a penalty*".

21.     It is clear from Mr Park's e-mail dated 16 August 2023 that although the Respondents were aware of the Fund Arrangement Fee and the conditions under which the Fee would be payable, the Respondents did not raise any issues with the same save for the quantum of the Fund Arrangement Fee. In particular, the Respondents did not counter that the Fund Arrangement Fee should only be payable upon proof that the lender was ready, willing and/or able to provide the loan and/or successful disbursement of the loan.

22.     On 18 August 2023, Acuity responded to say that "*the proposed figures are not accepted*" but that it could "*offer a discount*" by reducing the interest rate from 5% to 4.8% and the Fund Arrangement Fee from 4% to 3.5%.[6]

23.     On 6 September 2023, Mr Park wrote to Acuity as follows and informed Acuity that Mr Roe was looking to bring in a joint venture and/or equity partner for Project Tribeca:[7]

---

[6] **C-015** at page 9.
[7] **C-015** at page 8.

Dear, Mr. Viet Anh Nguyen and Dr. John Hwang.

I am very sorry for BJ not to decide for construction loan yet.

BJ needs to cooperate with new equity partners to sign on your term sheet because he has to invest the cash for another project with big opportunity over 500M in Midtown Manhattan.

So, BJ wants to have a JV partnership with New Equity Partners for this Broadway Project.

Please let me know if you have any questions.

Sung Park

24. On the same day, Acuity responded to say that "*[w]e will need to issue a new LTS & CA **_without discount_** once a new equity partner were found by your side*".[8]

25. Following further discussion and correspondence between the parties,[9] on 24 September 2024, Acuity sent the Respondents a "*revised LTS&CA to reflecting [sic.] our support and revised funding structure to suit your situation.*"[10] In this connection, it bears highlighting that the Fund Arrangement Fee as a percentage of the loan amount did not change (*i.e.* the Fund Arrangement Fee remained as 4% of the loan amount); the description of the services to be provided by Acuity as set out in Clause 3 of the Costs Agreement of the Initial LTS&CA also did not change (*i.e.* Acuity was only responsible for "*introducing, organising, arranging **_or_** obtaining loan funds*" and was not obliged to ensure that the Respondents *received* funding); Clause 3 of the Costs Agreement of the LTS&CA likewise provided that the Fund Arrangement Fee was "*reasonable remuneration for the service performed*" by Acuity and "*does not amount to a penalty*".

---

[8] **C-015** at page 8.
[9] **C-015** at pages 6 to 8.
[10] **C-015** at page 6; **C-005**.

26. As such and for the same reasons as set out at paragraph 15 above, insofar as the Respondents aver that the Representation (as defined at paragraph 4.1.5 of the Defence) "*was operative in the mind of Mr Roe in executing the LTS&CA on behalf of the Respondents*" and that the Respondents had "*entered into the LTS&CA in reliance on the Representation*" (which Acuity does not admit and put the Respondents to strict proof thereof), the operative "*Representation*" was that Acuity would assist to introduce, organise, arrange, *or* obtain a loan for the Respondents, and not that Acuity would *guarantee* that the Respondents would receive funding.

27. On 30 September 2024, the Respondents returned the signed LTS&CA to Acuity.[11] The LTS&CA was signed and initialled on every page by Mr Roe on behalf of Roe Corp and 267 Partners.

28. The Respondents did not raise any issues with the LTS&CA, including with the Fund Arrangement Fee. In this connection, it bears reiterating that in the LTS&CA, the Respondents variously declared that they have "*read and completely understood this agreement*", that they "*are not in any physical or mental impairment that affects or impacts on [their] ability to understand this agreement and commit to this agreement*", that they "*have been advised to seek legal and financial advice before signing this agreement*" and "*there has been no undue pressure put on [them] to accept this Agreement by [Acuity].*"[12]

29. From the above, it is clear that the LTS&CA (including the Fund Arrangement Fee) was a document that was specifically negotiated between the parties. These negotiations were at arm's length and the parties had entered into the LTS&CA with their eyes wide open, with full understanding and acceptance of the terms of the LTS&CA. It also bears highlighting that these were sophisticated and commercially

---

[11] **C-015** at page 5; **C-005**.
[12] **C-005**.

savvy parties. In particular, Mr Roe was an experienced businessman and real estate investor:

a. As can be seen from Mr Roe's Personal Financial Statement as of 10 October 2023 that he had submitted to Acuity as part of the loan application process,[13] Mr Roe has multiple real estate interests in New York with a net worth more than USD 80 million. [14]

b. On Roe Corp's website, Mr Roe is described as follows: [15]

> Buhm Jung Roe has **over 35 years of experience** in real estate ownership, acquisition, management, development and construction of numerous residential and commercial properties in New York City. **He has extensive private real estate fund managing experience and has syndicated and successfully completed multiple projects in New York City.** In addition, he has solid development and construction experience from residential and commercial buildings to luxury condominium buildings from the ground up.

30. Following the signing of the LTS&CA, on or around 5 October 2023, pursuant to Clause 4 of the Costs Agreement and Clause 11 of the Loan Term Sheet, Roe Corp and 267 Partners made payment of the non-refundable processing fee of USD 100,000.[16]

## B. Events after the issuance of the Conditional Offer

31. On or around 20 October 2023, Acuity arranged and Global Wise issued the Conditional Offer. The Conditional Offer was sent to the Respondents on 25 October

---

[13] **C-016** at page 6.

[14] **C-016**, email from Mr Park to Mr Nguyen, Mr Roe, Mr Thambyrajah, Ms Stephens, Dr Hwang and 0113044814@paran.com, timestamp 9.26am, subject: "*Re: Loan Term Sheet & Cost Agreement – Tribeca Manhattan Tower – Construction Funding*", and attaching, *inter alia*, the document titled "2023_10_11_18_38_20_Application_ACUITY".

[15] **C-017**, Roe Corp's website, accessible at https://www.roecorp.com/executive-team.

[16] **C-006** and **C-007**.

2023.[17] Accordingly, pursuant to Clause 4 of the Costs Agreement read with Clause 12 of the Loan Term Sheet, the Fund Arrangement Fee was immediately due and payable.

32. Strictly speaking, the Fund Arrangement Fee would have been due on 20 October 2023 and late payment interest would start running from 21 October 2023. However, given that the Conditional Offer was sent to the Respondents on 25 October 2023, Acuity will limit its claim for late payment interest on the Fund Arrangement Fee to starting from 26 October 2023 until the date of full payment.

33. Sometime between 27 October to 1 November 2023, Acuity's Mr Ranjit Thambyrajah ("**Mr Thambyrajah**") and Mr Viet Anh Nguyen ("**Mr Nguyen**") met with the Respondents' representatives, including Mr Roe, Mr Park and Ms Diana Roe ("**Diana**"), in New York City ("**Meeting**"). Diana is Mr Roe's daughter and holds 25% of the shares in Roe Corp.[18]

34. It was Acuity's understanding that the purpose of this Meeting was for the Respondents to sign the Conditional Offer. To this end, Mr Thambyrajah and Mr Nguyen had brought along with them hard copies of the Conditional Offer to obtain the Respondents' wet-ink signatures on the document.[19]

35. However, at the Meeting, and to Acuity's surprise, Diana refused to allow the Respondents (including Mr Roe) to sign the Conditional Offer. Among other things, Diana was not agreeable to the term in the Conditional Offer requiring upfront cash payment of USD 450,000 of the Establishment Fee upon acceptance of the Conditional Offer, without any part of the loan first being disbursed. In this regard, the Conditional Offer provided as follows:

---

[17] **C-015** at page 1; **C-005**.
[18] **C-003**.
[19] **C-015** at page 1.

|  | |
|---|---|
| Establishment Fee: | Establishment Fee of 1% of loan amount (USD2,800,000) becomes due and payable on acceptance of this Conditional Loan Offer and is to be collected by Acuity Funding on behalf of Funds Provider. USD 450,000 of this fee is payable on acceptance of this Letter of Offer, with the balance to be collected at first drawdown of funds. This fee is refundable if the Lender/Funds Provider decides not to fund the project, despite Borrowers and Guarantors passing all Due Diligence and all Conditions Precedent being met and found to be satisfactory. |

36. In this regard, it is Acuity's understanding from Global Wise that the Establishment Fee (and in particular the upfront cash payment of USD 450,000) was required for Global Wise to establish a trust account through which it could then disburse the loan to the Respondents. In the event that Global Wise decides not to fund Project Tribeca despite the Respondents passing all due diligence checks and meeting all conditions precedent, this sum of USD 450,000 would be refunded to the Respondents.

37. This came as a surprise to Acuity because as far as Acuity was aware, Diana was only a shareholder and was not a director of Roe Corp and had no role or interest in 267 Partners. However, Mr Roe informed Acuity that given that Roe Corp was essentially a family business, he and Roe Corp would only be able to move forward with the Conditional Offer and the loan with the buy-in of the rest of his family members who were shareholders of Roe Corp.[20]

38. In addition, and to Acuity's further surprise, Mr Roe informed Acuity that instead of the USD 25 million to refinance existing debt and USD 25 million to purchase the air rights for Project Tribeca as had already been agreed under Clause 3 of the Loan Term

---

[20] **C-018**, email from Mr Park timestamp 1:04am, subject "*Re: Conditional Offer for Mortgage Finance – Tribeca Manhattan Tower*" at page 1.

Sheet, the Respondents now required an additional USD 10 million (*i.e.* a total of USD 60 million) for both.

39. Notably, despite raising these issues, the Respondents did not raise any issue and/or concern regarding Global Wise's readiness, willingness and/or ability to provide the loan to the Respondents and/or ask for proof of the same. The Respondents also did not say that the Fund Arrangement Fee was not due and payable. Further, the Respondents also did not take the position as they now assert, that the Conditional Offer was not issued in the terms of the LTS&CA and/or that the Conditional Offer was commercially unreasonable and unworkable (save for the issue raised by Diana).

40. Notwithstanding the above and strictly without prejudice to Acuity's position (including that the condition for payment of the Fund Arrangement Fee had been met and that the Fund Arrangement Fee was immediately due and payable), in the interest of assisting the Respondents to finalise the loan with Global Wise, Acuity agreed to see what it could do to address Diana's and Mr Roe's concerns.

41. On 1 November 2023, Acuity sent the Respondents drafts of an "Addendum to the Loan offer by Global Wise Investments Pte Ltd dated 20th October 2023" ("**Draft Addendum**") and a "Deed of Agreement" ("**Draft DOA**").[21]

42. The Draft Addendum were intended to among other things, address the issues raised by Diana and Mr Roe at the Meeting. Among other things:

　　a. The Draft Addendum provided that "*the loan amount will allow an initial loan drawdown of up to USD60,000,000 to assist with the refinance of the existing debt plus the purchase of the air right…*".

---

[21] **R-016**. The email exhibited at **R-016** is dated 31 October 2023, timestamp 12:57pm. However, this date is erroneous due to the time difference. The email was sent on 1 November 2023 at 12:57am. A copy of the email from Acuity's servers reflecting the date as 1 November 2023 is exhibited at **C-019** for completeness.

    b.    The Draft Addendum further provided that the sum of USD 450,000 would be *"placed into an Escrow Account held by the Lender (Global Wise Investments Ptd Ltd) and Acuity Funding's Lawyers' Trust Account to be released once the Lender informs the Borrower and Guarantors that they are ready to fund…"*.

43.    In addition, and as a result of the maters set out at paragraphs 35 and 37 above, Acuity included in the Draft Addendum *"[a]n undertaking that an immediate resignation of all other parties other than [Mr Roe] as Directors of all companies associated with this transaction and the shares of any other parties be transferred back to [Mr Roe] occur"*.[22]

44.    The Draft DOA on the other hand, was intended to confirm the payments due to Acuity and Global Wise under the LTS&CA and the Conditional Offer (should the Respondents accept the Conditional Offer) and other terms of the same. As can be seen from the first paragraph of the Draft DOA, had the Respondents accepted the Conditional Offer, Acuity would have been prepared to allow the Respondents to pay the Fund Arrangement Fee from the first drawdown under the loan. However, the Respondents neither accepted the Conditional Offer nor signed the Draft DOA.

45.    Contrary to the Respondents' assertion at paragraph 4.4.8 of the Defence, the Draft Addendum and the Draft DOA were not instruments to pressure the Respondents to accept the Conditional Offer. In fact, and as seen from Section II(C) of this Reply below, the Respondents took their time to consider the Draft Addendum and Draft DOA. The Respondents eventually also did not sign the Draft Addendum, the Draft DOA, or the Conditional Offer. Clearly, the Respondents were not pressured and did not feel pressured to accept the Conditional Offer.

---

[22] **R-016.**

### C. Events after the Meeting and after the Conditional Offer had lapsed

46. Following the Meeting and Acuity's e-mail attaching the Draft Addendum and Draft DO, on 4 November 2023, Mr Park sent an email to Acuity stating as follows:[23]

> Dear, Chairman Ranjit and Director Viet.
> I hope both traveled very well and reached home safely.
> I am very sorry not to return answer to you on time.
> **Please give us more time for BJ's lawyer to review the addendum docs.**
> **BJ will do his best to complete the deal soon.**
> Thank you so much again for your visiting to our office.
> Sung Park

47. On 5 November 2023, given that the Conditional Offer had lapsed on 4 November 2023, Mr Nguyen wrote to Mr Park as follows:[24]

> Dear Mr Park,
>
> Thank you for your email and the warm hospitality in New York. We have arrived home safely and looking forward to come back soon.
>
> We understand your need of lawyer review, however since the Conditional Loan Offer has not been accepted before its expiration date, we must explain to the lender and seek approval for an extension of time.
>
> Lender would be in better position to consider the extension if you can specify how many days to finalise the deal.
>
> Please advise the above so we can advise lender for their decision.
>
> Looking forward to hearing from you.
>
> Best regards,
>
> Viet Anh Nguyen

---

[23] **C-020**, Email from Mr Park to Mr Nguyen, Mr Thambyrajah, Mr Roe, Ms Stephens, Dr Hwang and timestamp 11:46am, subject: "*Re: Addendum and DOA regarding fees for Manhattan tower*", at pages 4 to 5.

[24] **C-020** at page 4.

48.     On 6 November 2023, Mr Roe sent an email to Acuity as follows:[25]

> Hi Viet,
>
> We are very happy you and Ranjit arrived to your home safely.
>
> We are in the middle of discussing the Agreement and the Addendum with our lawyer.
>
> I would appreciate if you could give your lawyer contact information, so our lawyer can communicate with your lawyer.
>
> I am not sure at this time how many days I will need to finalize the deal.
>
> I will have a better idea soon and I will let you know.
>
> Thank you very much again for visiting us.
>
> Regards,
>
> B. J. Roe

49.     On the same day, Ms Christine Stephens ("**Ms Stephens**") from Acuity sent an email to the Respondents, attaching a letter and invoice for payment of the Fund Arrangement Fee.[26]

50.     On 14 November 2023, Mr Park wrote to Acuity, stating (amongst other things) that "*[Mr Roe] needs more time to discuss about this deal with his family and lawyer*".[27]

51.     On 20 November 2023, Mr Park wrote to Acuity as follows:[28]

---

[25] **C-020** at pages 2 to 3.
[26] **C-020** at page 2; **C-009**.
[27] **C-020** at page 2.
[28] **C-020** at page 1.

Dear Mr. Viet Ahn Nguyen and Ranjit Thambyrajah.
BJ is negotiating with NYC developer who is very experienced in new construction and reliable to figure out guarantee issues.
The new developer is now on due diligence to make a new JV based on your conditional loan offer.
If you do not mind, BJ will email you before Wednesday this week.
I am very sorry to delay on signing.
I am sure BJ will keep the deal with your team for both profitable partnership.
Sung Park

52. On 23 November 2023, Mr Park wrote to Acuity again as follows:[29]

Dear Mr. Viet Ahn Nguyen and Ranjit Thambyrajah.
BJ is still working on making JV with the developer.
Only few issues are remaining to complete the terms.
I hope the deal reach out the goal in this week, however Thanksgiving day is tomorrow, so I will do my best for it and let you know as soon as deal done.
Thanks.
Sung Park

53. From Mr Park's 20 November 2023 and 23 November 2023 e-mails, it appears that the Mr Roe was working on bringing in a "*new developer*", and that Mr Roe's discussions with the "*new developer*" were *based on the existing Conditional Offer*. The Respondents did not take the position as they now assert that the Conditional Offer was not issued in the terms of the LTS&CA and/or that the Conditional Offer was commercially unreasonable and unworkable. If that was genuinely the Respondents' position, Mr Roe would not have been engaged in discussions with the "*new developer*" based on *the existing Conditional Offer*. That Mr Roe was doing so clearly shows that the Respondents' assertions in this regard in their Defence are nothing more than afterthoughts.

---

[29] **C-020** at page 1.

54. Further, despite being aware that the Fund Arrangement Fee was due and payable, given Ms Stephens' e-mail dated 6 November 2023 attaching the invoice for the Fund Arrangement Fee and Mr Nguyen's e-mail dated 13 November 2023 reminding the Respondents that they are "*still liable to pay our fund arrangement fee plus interest, since we already delivered our service as contracted*",[30] the Respondents did not deny that the Fund Arrangement Fee was due and payable and/or that Acuity had "*already delivered our service as contracted.*" Further, the Respondents also did not raise any issue and/or concern regarding Global Wise's readiness, willingness and/or ability to provide the loan to the Respondents and/or ask for proof of the same.

55. Tired of not receiving a clear and firm response from the Respondents on how they wished to proceed, on 23 November 2023, Mr Nguyen wrote to the Respondents as follows:[31]

> Dear Mr Park and Mr Roe,
>
> Thank you for the updated information.
>
> We have been instructed that a Letter of Demand for fee payment and the cancellation of Conditional Loan Offer will be issued by 5pm (New York time) next Monday 27th November 2023.
>
> To avoid the event, we must receive a copy of a fully signed Conditional Loan Offer and a Letter of Request for time extension with clear reasons via email before 5pm next Monday.
>
> Best regards
>
> Viet Anh Nguyen

---

[30] **C-020** at pages 1 to 2.
[31] **R-017**.

56. On 29 November 2023, Mr Thambyrajah followed up with a further letter from Acuity as follows, and re-attached Acuity's invoice for the Fund Arrangement Fee and the Draft DOA:[32]

> Dear Mr Roe,
>
> Following on from our letter to you of the 7th of November, we received multiple written and verbal requests for extensions of time for you to sort out the current stalemate between your shareholders, directors and stakeholders in the project that were preventing you from moving forward on the project.
>
> It is now the 29th of November and we do not see any progress despite being told a number of times that it will only take a few days more. It is regrettable you continue to have disharmony within your stakeholders.
>
> We are unable to extend any further time for you to reach some kind of consensus between yourselves as how to move forward with the project, working to reinstate the recently lapsed loan offer and deal with our outstanding fees. We will give you till close 5pm of Friday 1st of December 2023, New York time to confirm that you are proceeding by:
>
> 1. Signing the lapsed loan offer with a written request for an extension of time to enable your signature to be accepted,
> 2. Paying the USD450,000 into the nominated bank account mentioned in the loan offer, and
> 3. Signing the Deed of Agreement related to Funds Arrangement Fee Tribeca231023 or make full payment of Acuity's fees and transfer of the shares now due to Berhero Pty Limited, attached to the email again for convenience.
> 4. Providing signed and witnessed copies of all three items to myself on ranjit@acuityfunding.com and to Mr. Viet Anh on vietanh@acuityfunding.com
> 5. All originals to be couriered to my office by DHL on the same day.
>
> Should you choose to not proceed, please make immediate payment of the attached invoice. If this does not happen by Monday the 4th of December

---

[32] **R-018**.

2023, then an immediate default will occur on this file that will not be able to be rectifiable with Acuity or its lender and investors moving forward.

Acuity will issue a Letter of Demand against all relevant parties, including those that are obstructing the fulfilment of this funding process personally, where relevant, and move the file to collections. There will be no further grace period entertained.

Fees due to Acuity Funding will accrue interest at 2% per month from the date of invoice (7 November 2023) until paid.

Yours Faithfully
Ranjit Thambyrajah

57. The "*current stalemate between your shareholders, directors and stakeholders*" and "*disharmony within your stakeholders*" referred to in Acuity's letter was a reference to Mr Roe and Roe Corp being unable to move forward with the Conditional Offer and the loan given Diana's opposition to the same.

　　a. As mentioned above, at the Meeting, Diana had opposed the loan on account of the term in the Conditional Offer requiring upfront cash payment of USD 450,000 of the Establishment Fee upon acceptance of the Conditional Offer, without any part of the loan first being disbursed.

　　b. Although Acuity had addressed this in the Draft Addendum and Draft DOA, the Respondents did not sign these documents. It is Acuity's understanding that this was because Diana had continued to oppose the Conditional Offer and the loan. It was also for this reason that Mr Roe was in discussions with a "*new developer*" to develop the project instead of Roe Corp.

58. Up until this time, Acuity had been patient with the Respondents and had given them time to "*reach some kind of consensus between [themselves] as to how to move forward with the project*". This was on account of the Respondents telling Acuity "*a number of*

*times that it will only take a few days more*". This was not the only indulgence granted by Acuity to the Respondents. In both Ms Stephens' e-mail dated 6 November 2023 and Mr Thambyrajah's e-mail dated 29 November 2023 attaching Acuity's invoice for payment of the Fund Arrangement Fee, Acuity did not insist on the Respondents paying late payment interest. This was even though the Fund Arrangement Fee had been due and payable since 25 October 2023.

59.    On 4 December 2023, Mr Park wrote to Acuity as follows:[33]

> Dear Ranjit Thambyrajah and Viet Anh Nguyen
> I am happy to let you know **for BJ to keep the loan offer**.
> BJ just has a new developer, Prosper Property Group instead of Roe Corp.
> This developer has more than 60 years experience and credit in NYC.
> **I am very sorry not to respond on time because of the Diana issue, as**
> **you know BJ can not sign on the documents without Diana's consent.**
> **When BJ has a below developer he can handle this project by himself**
> **with new developer.**
> **So BJ and Damien will be the guarantor up to the ownership ratio.**
> **Would you send us revised Conditional Loan Offer with changed**
> **developer name?**
>
> Damien Smith
> Prosper Property Group
> 70 Lafayette St, 4th Floor | New York, NY 10013
> Phone: 201-707-1955
> www.ProsperPG.com
>
> **Once you send us revised one, BJ and Damien will return it to you on**
> **Monday.**
> **And we deposit 450K to the Escrow Account set up by lender's lawyer**
> **and borrower's lawyer.**
>
> Sung Park

---

[33] **C-018.**

60.  On 7 December 2023, Mr Park sent a further email to Acuity as follows:[34]

> Good morning, Mr. Ranjit Thmbyrajah and Viet Anh Nguyen.
>
> **As you know, I am very sorry for the delay due to the Diana Issue.**
>
> However, BJ has been working steadily to complete the deal so far.
>
> **I hope you understand that most developers in New York are accustomed to pay everything at the closing also not to pay any costs before the first withdrawal.**
>
> **So, it is difficult to agree to paying the costs before loan closing.**
>
> **Since BJ had a difficult time reaching an agreement with Damien based on your Term Sheet, Conditional Loan Offer, and Addendum, there is no more issue if you allow making escrow account.**
>
> **Damien's lawyer is looking forward to creating an escrow account with the Lender's lawyer.**
>
> BJ has selected a very good developer. So, I am very confident that carrying out this project with this developer will bring good results for you.
> Sung Park

61.  Mr Park's e-mails are notable for a number of reasons:

a.   First, this was a clear acknowledgement that Mr Roe and Roe Corp were not able to move forward with the Conditional Offer and the loan on account of "*the Diana issue*". The solution proposed in Mr Park's 4 December 2023 e-mail was therefore to move forward with the Conditional Offer and the loan with Prosper Property Group ("**Prosper**") instead of Roe Corp as the developer. That way,

---

[34] **C-021**, email from Mr Park to Mr Thambyrajah, Mr Roe, Mr Nguyen, Ms Stephens, Dr Hwang, Ms Jenny Pham and 0113044814@paran.com, timestamp 5.19am, subject "*Re: Conditional Offer for Mortgage Finance – Tribeca Manhattan Tower*".

given that Roe Corp would no longer be involved in Project Tribeca, "*Diana's consent*" would not be required.

b.   Second, this would be on the basis of the Conditional Offer as revised by the Draft Addendum and the Draft DOA. Contrary to the assertions that the Respondents have now put forward in their Defence, Mr Roe (and Mr Park) did not raise any issue and/or concern as to Global Wise's readiness, willingness and/or ability to provide the loan and/or ask for proof of the same, and Mr Roe (and Mr Park) also did not take the position that the Conditional Offer was not issued in the terms of the LTS&CA and/or that the Conditional Offer was commercially unreasonable and unworkable.

c.   In Mr Roe's discussions with Prosper, the only issue of concern was the upfront cash payment of the USD 450,000 towards the Establishment Fee prior to disbursement of the loan, which had been addressed by the escrow mechanism in the Draft Addendum.

d.   In fact, Mr Roe was content to move forward with the Conditional Offer as revised by the Draft Addendum and the Draft DOA, and Mr Park had in his e-mail requested Acuity to send across the "*revised Conditional Loan Offer*" with the only change to be made being the "*developer name*". Thereafter, Mr Roe would "*deposit 450K to the Escrow Account set up by lender's lawyer and borrower's lawyer*" in accordance with the terms of the Draft Addendum.

e.   Third, it was not disputed that the Fund Arrangement Fee was due and payable. This was despite the fact that it is apparent from Mr Park's 7 December 2023 e-mail, the LTS&CA featured in the discussions between Mr Roe and Prosper, and Mr Roe and Prosper would have been aware of the terms of the same (including

the Fund Arrangement Fee and the conditions for payment of the Fund Arrangement Fee).

## D. Acuity's demands for payment of the Fund Arrangement Fee and the events thereafter

62.  Given the matters that had transpired (in particular, the "*Diana issue*"), Acuity had lost faith in Mr Roe, and was not confident that despite Mr Roe purportedly having secured a "*new developer*" in Prosper, that Mr Roe would and/or would be able to move forward with the deal and/or that Acuity would be paid its Fund Arrangement Fee.

63.  Accordingly, on 7 December 2023, Acuity wrote to the Respondents to demand payment of the Fund Arrangement Fee first.[35] On the same day, Acuity also wrote to the Respondents on a without prejudice ("**WP**") basis responding to Mr Park's 7 December 2023 e-mail as follows:[36]

> Dear Park,
>
> Without Prejudice except as to costs
>
> I confirm receipt of your email.
>
> As you can appreciate from your excuse relating to Diana, we cannot take any variations sought by you unless it is written in letter form and signed by all Directors and Shareholders with greater than 9% shareholding in any of the related entities.
>
> Your email to my group, nor this response from me will halt any actions by us to collect on the fees now due.

---

[35] **C-010**.

[36] **C-022**. That Acuity exhibits this WP letter, should not be construed as a general waiver over all WP communications.

64. Indeed, even as of today, Mr Roe, despite having Prosper as a "*new developer*", still has not secured funding for Project Tribeca.[37] Further, Acuity also did not receive any response from the Respondents to its 7 December 2023 letter. This validated Acuity's fears that it would not be paid its Fund Arrangement Fee.

65. On 8 January 2024 and 16 January 2024, on behalf of Acuity, WongP as solicitors for Acuity wrote to the Respondents to demand payment of the Fund Arrangement Fee.[38]

66. On 29 January 2024, Amini LLC ("**Amini**"), the Respondents' erstwhile solicitors, responded to WongP's letters dated 8 January 2024 and 16 January 2024.[39]

   a. Significantly, this was the first time that the Respondents asserted that they were not liable to pay the Fund Arrangement Fee given that Acuity had not shown that Global Wise was ready, willing and able to provide funding for Project Tribeca. This was also the first time that the Respondents asserted that the terms of the Conditional Offer were commercially unreasonable and/or unworkable.

   b. It is also significant to note that contrary to the Respondents' assertions in their Defence that the Conditional Offer was not issued in the terms of the LTS&CA, the Respondents took the position in Amini's letter that the Conditional Offer was a "***verbatim repetition of the Acuity Loan Term Sheet recitation without more***".

---

[37] Paragraph 4.4.7 of the Defence.
[38] **C-011**, **C-012** and **C-013**. See also **C-023** and **C-024**.
[39] **R-020**.

67. Thereafter, WongP and Amini engaged in further correspondence with a view to reaching an amicable resolution of the matter.[40] However, the parties were not able to amicably resolve the matter. Amongst other things:

    a. In response to the Respondents' request for proof of Global Wise's ability to fund Project Tribeca, Acuity had explained and provided documents to show that Global Wise was a private credit financier backed by investors which included amongst others Elite Global Equity Fund, a fund regulated by the Cayman Monetary Authority and part of the Elite group of companies ("**Elite**").[41] Acuity also provided proof that Elite had a capital base of EUR 10 billion, and shared Elite's project financing track record.[42] Despite this, the Respondents refused to consider the explanation and documents provided by Acuity and took the position that "*[g]iven the expiration of the parties' agreements under their own terms, that is the end of the matter.*"

    b. Acuity also gave the Respondents the opportunity to suggest amendments to the Conditional Offer.[43] However, the Respondents refused to engage.

68. Of note, as WongP and Amini were exchanging correspondence, on 16 February 2024, Mr Park wrote to Dr Hwang as follows:[44]

> Hi Dr. Hwang,
> I received a phone call from you regarding our case.
> B. J. Roe can reconsider getting a new loan that would be mutually beneficial if you provide him its track record and sources of fund
> from Ranjit Thambyrajah.

---

[40] **C-025 to C-030**.
[41] **R-008**.
[42] **R-008**.
[43] **C-025**.
[44] **R-019**.

I think it is good for Acuity Fund and B. J. Roe to proceed with the deal and make the loan happen, rather than going through a lawsuit and incurring losses.

**However, B. J. Roe needs to have a Cancellation Letter signed by Ranjit Thambyrajah that states that the Loan Term Sheet and Costs Agreement,**
**that B. J. Roe signed on 09/29/2023, is null and void.**

After, B. J. Roe receives this Cancellation Letter, B. J. Roe can reconsider getting a new loan from Ranjit Thambyrajah.

**B. J. Roe is also negotiating with a new equity partner, so he would like to get only simple construction loan.**
**I would like to start again based on the construction loan term sheet that was initially presented to him on 8th August, 2023.**

As you said, this will be beneficial for both parties, B. J. Roe and Ranjit Thambyrajah.

Have a good day.

Sung Park

69. Mr Park's e-mail is significant for a number of reasons:

    a. First, Mr Roe's request for a "Cancellation Letter" was clear acknowledgement that the LTS&CA was valid and binding and in full force and effect, and that the Fund Arrangement Fee was due and payable.

    b. Second, it is also apparent from Mr Park's e-mail that the reason why the Respondents (in Amini's letters) were refusing to engage Acuity in finding an amicable resolution to the matter was because the Respondents were looking to end the original deal and negotiate a new deal involving a "*new equity partner*" and for "*only simple construction loan*". The purported issues raised by the Respondents (in Amini's letters) had therefore been contrived for this purpose.

    c. In particular, nowhere in Mr Park's e-mail did he express any concern regarding Global Wise's readiness, willingness, and/or ability to provide funding for Project Tribeca and/or take the position that the Conditional Offer was not "*in*

*the terms*" of the LTS&CA and/or that the terms of the Conditional Offer were commercially unreasonable and/or unworkable.

d. Third it is clear from Mr Park's e-mail that Mr Roe fundamentally did not have any issues with the terms of the LTS&CA, the Fund Arrangement Fee, and/or the condition under which the Fund Arrangement Fee would be payable, given that Mr Roe was offering to "*start again **based on the construction loan term sheet that was initially presented to him on 8th August, 2023***". In this regard, it bears recalling that the Fund Arrangement Fee as a percentage of the loan amount and the condition under which the Fund Arrangement Fee would be payable *were the same* in the Initial LTS&CA dated 8 August 2023 and the LTS&CA that was eventually signed by the parties.

e. Fourth, it is also clear from Mr Park's e-mail that Mr Roe was no longer working with Prosper and was "*negotiating with a new equity partner*". This was only slightly more than two months after Mr Park had informed Acuity that Mr Roe had secured Prosper as the "*new developer*", and validated Acuity's fear back in 7 December 2023 that Mr Roe would not and/or would not be able to move forward with the deal and/or that Acuity would not be paid its Fund Arrangement Fee.

## III. THE RESPONDENTS' DEFENCES ARE BASELESS AND WITHOUT MERIT

### A. The Conditional Offer was in the terms of the Loan Term Sheet

70. The Respondents' assertion that "*the terms of the Conditional Offer materially differ from the terms of the LTS, such that the Conditional Offer was not issued in terms of the LTS*" is incorrect.[45]

---

[45] Paragraph 5.1.1 of the Defence.

71.　It is apparent from paragraph 4.4.2 of the Defence that the Respondents' case is not that "*the terms of the Conditional Offer materially differ from the terms of the LTS*", but that the Conditional Offer contains *additional terms* that "*are not present in the LTS*". In other words, it is the Respondents' case that for the Conditional Offer to have been "*issued in terms of the LTS*", the Conditional Offer must have been *identical* to the LTS. The Respondents' case is contractually and commercially unviable and is wrong.

72.　First, this is an argument that the Respondents have raised *for the first time* in their Defence. Almost 16 months have passed between the time when the Conditional Offer was issued to the Respondents on 25 October 2023 and when the Respondents submitted their Defence. However, the Respondents never once took the position that the Conditional Offer was "*not issued in terms of the LTS*". **This includes in the Respondents' Response to Notice of Arbitration and Counterclaim submitted on 29 May 2024**.

73.　That the Respondents' Defence in this regard is nothing more than afterthought contrived *ex post facto* to evade their clear and express contractual obligation to pay the Fund Arrangement Fee can be seen from the fact that in Amini's letter dated 29 January 2024, it was the Respondents' position that the Conditional Offer was a "***verbatim repetition of the Acuity Loan Term Sheet recitation without more***".[46] The Respondents have not given any explanation for this change in position.

74.　Second, Clause 4 of the Costs Agreement defines what it means for "*a discussion paper*", "*a terms sheet*", or "*a loan proposal*" to be "*issued in the terms of the Loan Term Sheet*":[47]

---
[46] **R-020** at page 2.
[47] **C-005**.

All such letters issued by the lender/underwriter and which is in terms of the loan term sheet but which is subject to: a) an acceptable valuation; and b) satisfactory credit checks of the Applicants; and c) proof of suitable serviceability; and d) acceptance by the Underwriter; and e) verification of all documentation provided; and f) third party proof that all taxes are current and paid to date; g) a funding schedule that is acceptable to the underwriter; and h) any further condition or covenant that the lender/underwriter may deem applicable to this transaction are agreed to be a discussion paper, a terms sheet, or a loan proposal within the terms of this agreement upon which the fund arrangement fee is due and payable.

75. As can be seen from the above, Clause 4 of the Costs Agreement does not require that the Conditional Offer be identical to the Loan Term Sheet before the obligation to pay the Fund Arrangement Fee is triggered. Quite the opposite, Clause 4 of the Costs Agreement expressly provides that the Conditional Offer may contain "*any further condition or covenant that the lender/underwrite may deem applicable to this transaction*" and that notwithstanding, it is nevertheless agreed that the Conditional offer is "*a discussion paper, a terms sheet, or a loan proposal within the terms of this agreement upon which the fund arrangement fee is due and payable.*" In other words, although the Conditional Offer contains additional terms, this does not mean that it was not "*issued in terms of the LTS*" and/or that the Respondents' obligation to pay the Fund Arrangement Fee has not arisen.

76. That it was contemplated that the Conditional Offer would not be identical to the Loan Term Sheet and may contain additional terms not set out in the Loan Term Sheet can also be seen from other clauses in the Loan Term Sheet.[48] For example,

   a. Clause 6 of the Loan Term Sheet provides among other things that "*25% of the Establishment Fee will become due and payable at time of receiving the Loan Offer and will be capped at USD 450,000 plus GSTNAT/etc. This fee is*

---

[48] **C-005**.

*refundable if the Lender decides not to fund project, despite Borrowers and Guarantors passing all Due Diligence and all Conditions Precedent being met and found to be satisfactory*". This shows that it was contemplated that the Conditional Offer would include among other things "*Due Diligence*" requirements and "*Conditions Precedent*".

b.   Clause 7 of the Loan Term Sheet provides that whilst the term of the loan is "*expected to be approximately, 5 years*", this was ultimately a matter to be "*determined by the Lender*".

c.   Clause 8 of the Loan Term Sheet similarly provides that "*the specific repayment schedule will be submitted by the Borrower and approved by the Lender*".

77.   Further, and as is apparent from Annex A of the Respondents' own Defence, the key terms of the Conditional Offer were substantially similar if not identical to the terms of the Loan Term Sheet. These include, the purpose of the loan, the loan term, the loan amount, the interest rate, the securities to be provided, and the repayment schedule.

78.   The only difference that the Respondents are able to point to is that the Loan Term Sheet required "*personal guarantees from Mr Buhm Jung Roe and any associated companies*" whilst the Condition Offer required "*personal guarantees from any shareholders of The Roe Corporation (DOS ID: 285913) with a shareholding greater than 9% of total shares*". However, this does not mean that Conditional Offer was "*not issued in terms of the LTS*".

a.   As shown above, the Costs Agreement does not require the Conditional Offer to be identical to the Loan Term Sheet before the Respondents are obliged to pay the Fund Arrangement Fee.

b.    In any case, this is not a difference that is so significant and/or material that it can be said that the Conditional Offer was "*not issued in terms of the LTS*". In this regard, it bears reiterating that the key terms of the Conditional Offer were substantially similar if not identical to the terms of the Loan Term Sheet.

c.    Further, the Respondents had only provided the shareholding structure of Roe Corp to Acuity on 17 October 2023 *after the LTS&CA had been issued and signed by the parties*.[49] Upon receipt of the shareholding structure, on 19 October 2023, Acuity wrote to the Respondents as follows:[50]

> Dear Mr Park,
>
> There shareholder listing for the borrower shows that there are 4 individuals each with a shareholding greater than 9%. **The 3 additional shareholders (Mr John Roe, Mr Robert Roe and Ms Diana Roe) will also need to provide a personal guarantee in addition to the one from Mr Buhm Jung Roe.** We will also need ID for each of these guarantors.
>
> Alternatively they would need to surrender their shares prior to drawdown and confirm this in writing now.
>
> Please be advised that we will also need to do an amendment to the Loan Term Sheet and Costs Agreement to reflect the addition of these parties if they are retained as shareholder of the borrower.
>
> Regards
> Viet Anh Nguyen

---

[49] **C-003**, Email from Mr Park to Mr Nguyen, Mr Thambyrajah, Ms Christine Stephens, Dr Hwang, and 0113044814@paran.com, timestamp 4:18am, subject: "*FW: Additional Information*".

[50] **C-031**, Email from Mr Nguyen to Mr Park, Mr Roe, Mr Thambyrajah, Ms Christine Stephens, Dr Hwang, and 0113044814@paran.com, timestamp 10:18am, subject: "*Re: FW: Additional Information*".

79. Third, the Respondents' Defence in this regard ignores the commercial purpose and nature of a term sheet. A term sheet is only intended to set out the *broad and/or key terms* of the transaction and is not intended to be exhaustive of the terms on which the parties will transact. A term sheet will therefore usually be followed by among other things more detailed negotiations, due diligence, and transaction documentation. In the context of a financing transaction, the purpose of a term sheet is simply to set out the key parameters based on which the potential lender will carry out further due diligence and parties will negotiate the transaction documentation. An overly developed term sheet can be a waste of time and costs as detailed points on conditions precedent, representations and warranties, covenants and events of default, will, if necessary be reopened later based on the results of lenders' continuing due diligence.[51] Instead, the financial terms set out in a term sheet usually include "*amount, term, repayment schedule, interest margin, fees, any special terms and a general statement that the loan will contain representations and warranties, covenants, events and other usual clauses.*"[52]

80. Whilst the Respondents have also asserted at paragraph 4.4.4 of the Defence that "*the terms of the Conditional Offer are commercially unreasonable and/or unworkable*", it appears that the Respondents are not relying on this assertion in support of their argument that the Conditional Offer "*was not issued in terms of the LTS*". Nonetheless and for completeness, Acuity will deal with the Respondents' assertion here. The Respondents' assertion is plainly untenable.

81. First, from the time that the Conditional Offer was issued to the Respondents on 25 October 2023 until Amini's letter dated 29 January 2024, the Respondents never took the position that the Conditional Offer was "*commercially unreasonable and/or*

---

[51] **CL-001**, Graham D. Vinter, *Project Finance* (3rd Edition) (Sweet & Maxwell), at [7-002].
[52] **CL-002**, Phillip R. Wood, *International Loans, Bonds, Guarantees, Legal Opinions* (3rd Edition) (Sweet & Maxwell) at [2-004].

*unworkable*". This is save for the issues raised by Diana and Mr Roe at the Meeting which Acuity had addressed *vide* the Draft Addendum. The Respondents did not say that the Draft Addendum failed to address the issues raised by Diana and Mr Roe at the Meeting; on the contrary, it was the Respondents' position that the Draft Addendum had adequately addressed these issues. This can be seen from the fact that on 4 December 2023, Mr Park had requested Acuity to issue a revised Conditional Offer incorporating the terms of the Draft Addendum, and that Mr Roe was prepared to move forward with the Conditional Offer and the loan on this basis.[53] The Respondents' assertion that the Conditional Offer was "*commercially unreasonable and/or unworkable*" is therefore clearly yet another afterthought.

82.    Second, the Respondents have asserted that the Conditional Offer was "*commercially unreasonable and/or unworkable*" as there were seven conditions precedent to be satisfied by Global Wise and/or external third parties and the Respondents were required to draw down on the loan within 90 days of acceptance of the Conditional Offer.

a.    However, this does not mean that the Conditional Offer was "*commercially unreasonable and/or unworkable*". The Respondents have neither explained nor adduced any evidence to show why the conditions precedent could not and/or would not have been satisfied in time for the Respondents to draw down on the loan.

b.    Further, there was flexibility in the drawdown date. As seen from the "Drawdown" clause, the "Loan Sought" clause, and s/no. 15 of the "Conditions Precedent" in the Conditional Offer, it was for the Respondents to propose the drawdown schedule for Global Wise's approval.[54] If the Respondents required

---

[53] **C-018**.
[54] **C-008**.

more time for first drawdown, this could have been negotiated and agreed with Global Wise. However, this never happened given that the Respondents never accepted the Conditional Offer.

83.   As for the Establishment Fee, it is plainly incorrect for the Respondents to assert that "*the Conditional Offer would have required the Respondents to pay USD 2,800,000 to Global Wise, on top of the Fund Arrangement Fee and Late Payment Interest… without having obtained any loan monies from Global Wise*".

   a.   As can be seen from the "Establishment Fee" clause in the Conditional Offer, only USD 450,000 of the Establishment Fee would have been payable upfront "*on acceptance of this Letter of Offer*"; the remainder of the Establishment Fee would only be collected "*at first drawdown of funds*". Further, "*this fee is refundable if the Lender / Funds Provider decides not to fund the project, despite Borrowers and Guarantors passing all Due Diligence and all Conditions Precedent being met and found to be satisfactory*".[55]

   b.   As for the USD 450,000 of the Establishment Fee, Acuity had in the Draft Addendum, offered for this sum to be paid into escrow.

   c.   In the Draft DOA, Acuity had also offered to allow the Respondents to pay the Fund Arrangement Fee from the first drawdown *without Late Payment Interest*.

84.   In the premises, the Respondents assertion that the Conditional Offer was "*commercially unreasonable and/or unworkable*" is plainly incorrect.

---

[55] **C-008**.

**B.** **There is no basis to imply into the LTS&CA the Implied Terms sought by the Respondents**

85. A term will only be implied into a contract where:[56]

    a.    There is a gap in the contract that needs to be filled by implying a term to give effect to the parties' presumed intentions, and the gap arose because the parties did not contemplate the gap.

    b.    It is necessary in the business or commercial sense to imply a term to give the contract efficacy. The court will approach this determination with conservatism which ensures that the court will not rewrite the contract for the parties based on its own sense of what is fair and just and will not improve the contract which the parties have made for themselves.

    c.    The specific term to be implied is one which the parties, having regard to the need for business efficacy, would have responded "Oh, of course!" had the proposed term been put to them at the time of the contract. The basic overriding principle is that a term is not to be implied into a contract lightly. A term that is not reasonable, not equitable, unclear, or that contradicts an express term of the contract, will not be implied.

86. There is no basis to imply into the LTS&CA the Implied Terms sought by the Respondents, as set out at paragraph 4.3.1 of the Defence.

87. There is no gap in the LTS&CA that needs to be filled. In this connection, it bears recalling that the LTS&CA (including the Fund Arrangement Fee) were specifically negotiated between the parties at arm's length. The parties were sophisticated and

---

[56] **CL-003**, *Sembcorp Marine Ltd v PPL Holdings Pte Ltd and another and another appeal* [2013] 4 SLR 193 at [101].

commercially savvy and had entered into the LTS&CA with their eyes wide open and with full understanding and acceptance of the terms of the LTS&CA. Paragraph 29 above is repeated.

88. If the Respondents were genuinely concerned about the readiness, willingness, and ability of any lender introduced by Acuity to provide funding for Project Tribeca, the Respondents could have negotiated for assurances in this regard to be expressly included in the LTS&CA. However, the Respondents did not do so.

89. This only goes to show that this was not a matter of concern for the Respondents. Indeed, and as shown in Section II above, at no point in time after the Conditional Offer was issued did the Respondents raise any concerns regarding Global Wise's readiness, willingness, and/or ability to provide financing for Project Tribeca. This was despite the fact that both at the Meeting and subsequent thereto, the parties were discussing other terms of the Conditional Offer, such as the payment of the USD 450,000 towards the Establishment Fee and the amount required to refinance existing debt and to purchase the air rights for Project Tribeca. The first time that the Respondents had raised any issue with Global Wise's readiness, willingness, and ability to provide financing was in Amini's letter dated 29 January 2024, when the Respondents were attempting to cancel the existing deal and enter into a new deal.[57]

90. For the same reasons, it is also not necessary for business efficacy to imply the Implied Terms into the LTS&CA. Further, it also bears recalling that the purpose of the LTS&CA was for Acuity to introduce, organise, arrange or obtain a loan for the Respondents for Project Tribeca. Acuity was not under any obligation to ensure and/or guarantee that the Respondents *received* funding. Paragraphs 19, 20 and 25 above are repeated.

---

[57] **R-020**.

91. Further, the Implied Terms are plainly at odds with the express terms of the LTS&CA and in particular, Clause 4 of the Costs Agreement. Clause 4 of the Costs Agreement is clear that the Fund Arrangement Fee is payable upon among other things, "*a discussion paper is issued or a terms sheet is issued or a loan proposal is issued in the terms of the Loan Term Sheet*". Clause 4 of the Costs Agreement further provides that any such "*discussion paper*", "*terms sheet*", and/or "*loan proposal*" may contain "*any further condition or covenant that the lender/underwriter may deem applicable to this transaction*".

92. What the Respondents are seeking to do in the present case is to re-write the LTS&CA and to improve the bargain that the parties have made. This should not be allowed.

**C.    Even if the Implied Terms are implied into the LTS&CA, Acuity has not breached the Implied Terms and the LTS&CA has not been terminated**

93. At the outset, it bears highlighting that the burden lies on the Respondents to prove that Global Wise was not ready, willing and/or able to provide funding to the Respondents for Project Tribeca. However, apart from making bare assertions, **the Respondents have not adduced a single iota of evidence to prove their case**. For this reason alone, the Respondents' Defence that Acuity has breached the Implied Term, is not entitled to the Fund Arrangement Fee, and that the LTS&CA has been terminated, must fail.

94. Clearly, the Respondents' Defence in this regard is an afterthought contrived *ex post facto* to evade their clear and express contractual obligations to pay the Fund Arrangement Fee. It bears reiterating that from the time that the Conditional Offer was issued on 25 October 2023 until Amini's letter dated 29 January 2024, the Respondents never raised any issues and/or concerns with Global Wise's readiness, willingness, and/or ability to provide funding for Project Tribeca. Paragraph 89 above is repeated.

95. In any case, Global Wise was a lender that was ready, willing, and able to provide funding for Project Tribeca.

96. First, Global Wise's readiness and willingness to provide funding is evident from the fact that it had issued the Conditional Offer and had, through Acuity, continued to engage the Respondents in discussions on the terms of the Conditional Offer both at the Meeting in New York and thereafter. In fact, Global Wise, through Acuity, had gone so far as to propose the Draft Addendum to address the issues raised by Mr Roe and Diana at the Meeting in New York. Further, even after the parties' solicitors got involved in the matter, Acuity, through WongP, continued to attempt to engage the Respondents to find an amicable resolution to the matter. If Global Wise was not ready and willing to provide funding, there would have been no reason for Global Wise and/or Acuity to have expended time and costs (including having Mr Thambyrajah and Mr Nguyen fly to New York to meet with the Respondents) to engage the Respondents.

97. Throughout this time, Acuity was more than patient with the Respondents and had given them time to "*reach some kind of consensus between [themselves] as to how to move forward with the project*".[58] Although the Fund Arrangement Fee was due on 25 October 2023, Acuity had only issued its invoice for the same on 6 November 2023. Even then and even in Mr Thambyrajah's subsequent e-mail dated 29 November 2023 re-attaching Acuity's invoice, Acuity did not insist on the Respondents paying late payment interest.

98. Second, and as explained in WongP's letter dated 18 March 2024 to Amini, Global Wise was a legitimate and credible lender who was able to provide funding for Project Tribeca.

---

[58] **R-018**

a.    Acuity is a private credit arranger and Global Wise is a private credit financier backed by investors. Acuity and Global Wise have been long time business partners and frequently work together on project financing opportunities. Acuity would source for these opportunities and Global Wise would put together the financing from its investors.

b.    Global Wise's investors include among others, the Elite group of companies.

(i)    The Elite group of companies has a long history of project finance and a wide-ranging portfolio spanning various sectors including property development, energy and infrastructure, hospitality, healthcare, technology, and food and agriculture.[59]

(ii)    Global Wise's Chairman, Mr Lankan Bal, is also a director of Elite Crown Diamond Ltd, a corporation registered in the United Kingdom, and the Chief Strategy Officer of Elite Global Equity Fund, an entity regulated by the Cayman Monetary Authority. In his capacity as Chairman of Global Wise, Mr Lankan Bal would present potential project financing opportunities to Elite for funding (including those sourced by Acuity), and would advise and assist Elite to manage the same.

(iii)    Elite has a strong capital base. For instance, Elite Crown Diamond had entered into a joint venture with the British Jordanian Group with a capital base of over ten billion euros to finance projects all around the globe.[60]

(iv)    Most recently, on 19 September 2024, Elite Global Equity Fund had written to Acuity and Global Wise to "*express interest in financing project*

---

[59] **R-008**, at page 93 of the Respondents' Bundle of Factual Exhibits (Statement of Defence).
[60] **R-008**, at page 138 to 139 of the Respondents' Bundle of Factual Exhibits (Statement of Defence).

*opportunities in Vietnam and the United States*" and had stated they "*can allocate up to $1 billion toward financing projects within the regions.*"[61] Attached to the letter was a portfolio report from Caprock Merchant showing that the Elite group of companies had funds in excess of USD 2.9 billion, and an All Accounts Balances Report from Wells Fargo showing that Elite Crown Cayman Limited (also part of the Elite group of companies) had a balance of more than USD 2 billion.

c. Apart from the Elite group of companies, Global Wise also has other investors[62] and has successfully funded other projects in Vietnam (together with Acuity),[63] and in Africa.[64]

99. In the premises, even if the Implied Terms are implied into the LTS&CA (which they should not be), Acuity has not breached the Implied Terms, and the Respondents are not entitled to terminate the LTS&CA and the LTS&CA has not been validly terminated. In any case:

a. Even if Acuity has breached the Implied Terms, the Respondents have not been deprived of substantially the whole of the benefit of the LTS&CA. Paragraphs 19, 20 and 25 above are repeated. As such, the Respondents are not entitled to terminate the LTS&CA and the LTS&CA has not been validly terminated.

b. Further, the Respondents' purported Termination Email does not in fact terminate the LTS&CA. The purported Termination Email is reproduced at paragraph 68 above. Contrary to the Respondents' assertions at paragraph 5.1 of

---

[61] **C-032**.
[62] **C-033**.
[63] **C-034**.
[64] **C-035**.

their Defence, Mr Park did not inform Acuity that "*the Respondents intended to proceed on the basis that the LTS&CA would be null and void*". Quite the opposite, Mr Park in his e-mail was requesting Acuity to issue a "*Cancellation Letter sign by Ranjit Thambyrajah that states that the Loan Term Sheet and Costs Agreement, that B.J. Roe signed on 09/29/2023, is null and void*". In fact, this shows that it was Mr Roe's position that the LTS&CA was valid and binding and in full force and effect. Paragraph 69 above is repeated.

c. In any event, regardless of whether the LTS&CA has been validly terminated, this does not change or in any way alter the Respondents' contractual obligation to pay the Fund Arrangement Fee.

100. The above puts paid to the suggestion in the Respondents' Defence that the entire transaction was a scam designed for Acuity to receive payment of the Fund Arrangement Fee without introducing a legitimate, credible lender to the Respondents. If that was indeed Acuity's intention (which it was not), Acuity would simply have insisted on payment of the Fund Arrangement Fee immediately after the Conditional Offer was issued and would not have expended time and costs to engage the Respondents.

101. In this connection, the Respondents have at paragraph 4.4.6 of their Defence asserted that Acuity has in its past dealings with other entities also been unable to procure loans from lenders that were ready, willing and able to provide the loans, and referred to three Australian Court proceedings and another SIAC arbitration that Acuity was previously involved in.

102. Acuity's assertion is plainly untrue and these cases do not show that Acuity has in the past been unable to procure loans from lenders that were ready, willing and able to provide the loans.

a. *Berhero Pty Ltd (trading as Acuity Funding) v Dinsey* [2013] QCATA 311 concerned an application by Acuity for leave to appeal against the decision of the Queensland Civil and Administrative Tribunal ("**QCAT**").[65] The matter before the QCAT concerned a claim by one George Dinsey ("**Dinsey**") for refund of the non-refundable deposit that he had paid to Acuity with interest thereon, amounting to AUD 11,535.83. In that case, Dinsey had contracted with Acuity to obtain a loan to refinance what appears to be a debt that he owed ANZ Bank, and also for working capital. Acuity obtained for Dinsey a preliminary offer for a factoring facility. Dinsey claimed that this was not what he had contracted for and purported to repudiate the contract for failure of consideration. Contrary to the Respondents' assertion, this was not a case concerning whether the lender introduced by Acuity was ready, willing, and/or able to provide the loan.

b. The Respondents have mischaracterised Acuity's claim in *ACN 075 911 410 Pty Ltd v Almaty Pty Ltd* [2011] NSWSC 333. Acuity claim in that case was not for brokerage fees, but for a "*declaration that it has an equitable charge over the land in Folio Identifier 3/1112929 of which the first defendant is the registered proprietor.*"[66] The charge was set out in a loan term sheet and costs agreement. In that case, Acuity's claim was primarily dismissed on the basis that Acuity had failed to prove the contents of the loan term sheet and costs agreement and had failed to get the loan term sheet and costs agreement admitted as evidence.[67] The Court further held that even if Acuity had succeeded in admitting the loan term sheet and costs agreement into evidence, the charge did not cover Acuity's fees (which were approximately S$151,500).[68] Whilst the Court went on to hold that

---

[65] **R-010**.
[66] **R-011**, at [1].
[67] **R-011**, at [26].
[68] **R-011**, at [31].

it did not appear that Acuity was in any event entitled to its fees, this was because the "*Discussion Paper*" that was issued by the National Australia Bank expressly stated that "*this Paper is not an offer for finance*" and accordingly, there was no loan that was conditionally approved. This was again not a case concerning whether the lender introduced by Acuity was ready, willing, and/or able to provide the loan. In any event, this case is vastly different from the present case where it is clear and it is not disputed that the Conditional Offer was an offer for financing.

c.  The Respondents' reliance on *Berhero Pty Ltd v Hinds* [2019] ACTSC 378[69] and [2023] NSWSC 1022[70] is also misplaced. In that case, the key issue was whether the discussion paper issued by ANZ Bank was "*in the terms of the Loan Term Sheet*". There, the Court found that the discussion paper was not "*in the terms of the Loan Term Sheet*" as the quantum of the loan offered was insufficient to meet the purposes for which the loan term sheet had been entered into.[71] Again, this was not a case concerning whether the lender introduced by Acuity was ready, willing, and/or able to provide the loan.

103. As regards SIAC Arbitration No. ARB 946/20/JZH this does not assist the Respondents at all and in fact, undermines the Respondents' defences in this case.

a.  In that case, Acuity procured Global Wise to grant a loan facility of up to USD 400 million to a Vietnamese company, Fulland Real Estate Joint Stock Company ("**Fulland**"), for the development mixed-use residential and commercial property in Hanoi, Vietnam. The facility agreement was guaranteed by the other

---

[69] **R-012**.
[70] **R-013**.
[71] **R-013**, at [90].

respondents. Pursuant to the terms of the loan term sheet and costs agreement in that case and the facility agreement, Fulland was liable to pay Acuity a fee of 4% of the loan amount (*i.e.,* USD 16 million).

b. The tribunal in that case comprising of Dr Michael Pryles AO PBM, Dr Le Net, and presided by Mr Alastair Henderson, found in favour of Acuity, and ordered Fulland and the other respondents to pay Acuity the sum of USD 16 million with pre- and post-award interest thereon, as well as Acuity's costs.

c. In that case, Fulland, like the Respondents in the present case, had similarly contended that "*it has not received documentary evidence confirming the legal status/capacity and the financial capacity of [Global Wise], and its ability to provide loans as a foreign lender, or any evidence that funds were actually available for lending.*"[72] Fulland's argument was roundly rejected by the tribunal which held as follows:

> 316. As regards the financial capacity of [Global Wise] to provide loans, and the actual availability of funds for lending, the Tribunal considers that [Fulland's] arguments are fundamentally misconceived.
>
> a. As a matter of English law, **there was no obligation on [Global Wise] (or [Acuity]) to demonstrate in advance that funds were actually available for loan to the 1st Respondent**.
>
> b. **If the Respondents had required that assurance, they could have included it as a condition in the Facility Agreement. But there is no such requirement in the Facility Agreement**. The Facility Agreement simply required [Global Wise] to make loan funds available immediately upon fulfilment of certain conditions including (inter alia) receipt of the Utilisation Request.

---

[72] **R-014**, at [314].

c. If those pre-conditions had been fulfilled, there would have been an immediate obligation binding [Global Wise] to provide funds. If funds were not then available as required, [Global Wise] would likely have been in breach of contract and potentially liable for damages suffered by the 1st Respondent as a result. **But to repeat, there is no duty under English law for a lender to prove that it has funds ready to lend, unless the loan contract expressly requires advance proof (which the Facility Agreement does not). The lender's duty is simply to make the funds available as soon as it is legally obliged to do so.**

d. The 1st Respondent's reference to Vietnamese law does not assist. Article 14.2 of Decree No. 219/2013/ND-CP77 (Decree on Management of Non-Government Guaranteed Foreign Loans of Enterprises and of Loan Repayment) does not place any responsibility on the Claimants with regard to the lender's financial capability. On the contrary, it expressly allocates relevant responsibility to the 1st Respondent. It states:

"*Responsibilities of Borrowers: To be responsible for the legal and financial capability of the foreign lender and of its capability to provide the loan*" (emphasis added).

104. Likewise in the present case, there is nothing in the LTS&CA and/or under Singapore law that requires Acuity to demonstrate that any lender that it introduces to the Respondents had "*funds actually available for loan*". As mentioned above, "*[i]f the Respondents had required that assurance, they could have included it as a condition*" in the Loan Term Sheet and Costs Agreement. However, they did not do so.

## D. There was no unilateral mistake whether at common law or in equity

105. In order for a contract to be vitiated for a unilateral mistake in common law, it must be proven that:[73]

---

[73] **CL-004**, *Lim Zhipeng v Seow Suat Thin and another matter* [2020] 2 SLR 1151 at [74].

a.    one party has made a mistake;

b.    the mistake is a sufficiently important or fundamental mistake as to a term of the contract; and

    (i)    The relevant mistake to avoid the contract must pertain to a term of the contract, and cannot merely be a mistaken assumption about the circumstances under which the contract was or would be concluded.[74]

c.    the non-mistaken party has actual knowledge of the mistaken party's mistake.

    (i)    In general, the time at which to assess whether the non-mistaken party possessed the requisite knowledge is at the point of contract formation

    (ii)    Actual knowledge pertains to the non-mistaken party's subjective state of mind, which absent express admission or incontrovertible evidence, would invariably be inferred from all the surrounding circumstances, including the experiences and idiosyncrasies of the person. If a court upon weighing all the circumstances, thinks that the non-mistaken party is probably aware of the error made by the mistaken party, it is entitled to find, as a fact that the former party has actual knowledge of the mistake.[75]

    (iii)    "Nelsonian knowledge", namely, wilful blindless or shutting one's eyes to the obvious, may also lead the Court to find that the non-mistaken party had actual knowledge.

    (iv)    In other words, for actual knowledge to be made out, it must be shown that the non-mistaken party actually knew of the relevant fact. However, the means by which the subjective knowledge of the non-mistaken party is ascertained may include considerations of the matter from an objective perspective.[76]

---

[74] **CL-005**, *Quoine Pte Ltd v B2C2 Ltd* [2020] 2 SLR 20 ("**Quione**") at [82].
[75] **CL-005**, *Quione* at [106].
[76] **CL-005**, *Quione* at [107].

106. For a unilateral mistake in equity to arise and vitiate a contract, it must be proven that:

    a.    the purported mistake must be sufficiently important or fundamental mistake as to a term of the contract.[77]

    b.    the non-mistaken party must have had at least constructive knowledge of the mistaken party's mistake; and

        (i)    Constructive knowledge will be imputed where a reasonable person in the position of the non-mistaken party would have known of the mistake, notwithstanding that it cannot be proven that he did indeed have that knowledge.[78] This inquiry adopted by the Court is necessarily an objective one.

    c.    the non-mistaken party must have engaged in some unconscionable conduct in relation to that mistake.

        (i)    The definition of "*unconscionable conduct*" as set out at [142] of BOM v BOK and another appeal[79] ("**BOM**") is relevant.[80] That is, to invoke the doctrine of "*unconscionable conduct*", the Plaintiffs must show that he was suffering from an infirmity that the other party exploited in procuring the transaction.[81]

        (ii)    This infirmity relates to the mistaken party being poor and ignorant or suffering from other forms of infirmities of sufficient gravity, whether

---

[77] **CL-006**, Andrew Phang Boon Leong, *The Law of Contract* (2nd Edition) (Singapore Academy of Law) at [10.207].

[78] **CL-007**, *Chwee Kin Keong and others v Digilandmall.com Pte Ltd* [2005] 1 SLR(R) 502 at [44].

[79] **CL-008**, *BOM v BOK and another* [2019] 1 SLR 349 ("***BOM***").

[80] **CL-005**, *Quione* at [109].

[81] **CL-008**, *BOM* at [142].

physical, mental and/or emotional in nature, as to have acutely affected his ability to "conserve his own interests.[82]

(iii) Relevant factors which the Court will consider include whether the transaction was conducted at an undervalue or there was a lack of independent advice provided to the mistaken party. [83]

107. The Respondents' Defence in this regard is plainly untenable.

108. First, the Respondents have not adduced a single shred of evidence to support their assertion that they were purportedly labouring under the mistaken belief that in entering into the LTS&CA, the Implied Terms were part of the LTS&CA ("**Purported Mistake**"). The Respondents have not produced any e-mails, messages, memoranda, notes, or other documents to show that they were labouring under the Purported Mistake.

109. On the contrary and as shown in Section II above, the terms of the LTS&CA (including the Fund Arrangement Fee) were specifically negotiated between the parties. The parties had entered into the LTS&CA with their eyes wide open, with full understanding and acceptance of the terms of the LTS&CA.

a. Indeed, in signing the LTS&CA, the Respondents had declared among other things that they had "*read and complete understood this agreement*".

b. The Respondents had also declared that they are "*not in any physical or mental impairment that affects or impacts on [their] ability to understand this agreement and commit to this agreement*" and that they "*have been advised to seek legal and financial advice before signing this agreement*".

---

[82] **CL-008**, *BOM* at [141].
[83] **CL-008**, *BOM* at [142].

110. Further, and as shown in paragraph 29 above, Mr Roe was a seasoned and experienced business-man and real estate investor. Mr Roe therefore would have known the importance of ensuring that the important aspects of a deal are covered expressly in the contract. Had Mr Roe been genuinely concerned about the readiness, willingness, and/or ability of any lender introduced by Acuity to provide funding for Project Tribeca, he could and would have negotiated for express assurances to be included in the LTS&CA. However, he did not do so.

111. In addition, at no point in time up until Amini's letter dated 29 January 2024 did the Respondents raise any issues with Global Wise's readiness, willingness, and/or ability to provide funds for Project Tribeca. The Respondents also did not take the position that the Fund Arrangement Fee would only be payable upon proof that Global Wise was ready, willing, and/or able to provide funds.

112. In the premises, the Respondents' assertion that they were labouring under the Purported Mis-take when they entered into the LTS&CA is plainly untenable, and is nothing more than an afterthought.

113. Second, even if the Respondents were labouring under the Purported Mistake (which they were not), for the same reasons as set out in paragraphs [109] to [111] above, Acuity could not possibly have had actual and/or constructive knowledge of the same. There was no reason for Acuity to have believed or even suspected that the Respondents were labouring under the Purported Mistake (which again they were not).

114. Third, and in the premises, the Respondents assertion that Acuity had engaged in unconscionable conduct in relation to the Mistake is plainly false. In particular, and as shown in Section II above, Acuity did not seek to pressure the Respondents into accepting the Conditional Offer.

### E. There was no misrepresentation, much less fraudulent misrepresentation, by Acuity to the Respondents

115. Generally, for the tort of misrepresentation to be established, a false representation must have been communicated from the representor to the representee, who then relied on the false representation to his detriment.

116. Specifically, For the tort of fraudulent misrepresentation to be established, the following elements must be satisfied:[84]

   a.   There must be a representation of fact by words or conduct;

   b.   The representation must be made with the intention that it should be acted on by the plaintiff;

   c.   The plaintiff had acted upon the false statement;

   d.   The plaintiff suffered damage by so doing; and

   e.   The representation must be made with the knowledge that it is false; it must be wilfully false, or at least made in the absence of any genuine belief that it is true.

117. Fraudulent misrepresentation requires a high standard of proof to be satisfied by the representee, before it can be established against the representor. This is because the allegation of fraud is a serious one, and if an allegation of fraud is successfully made, the representor would be justifiably found to have been guilty of dishonesty. Dishonesty is a grave allegation requiring a high standard of proof.[85]

---

[84] **CL-009**, *Broadley Construction Pte Ltd v Alacran Design Pte Ltd* [2018] 2 SLR 110 at [26].
[85] **CL-010**, *Wee Chiaw Sek Anna v Ng Li-Ann Genevieve (sole executrix of the estate of Ng Hock Seng, deceased) and another* [2013] 3 SLR 801 at [32].

118. The Respondents have not met this high standard of proof. As can be seen from paragraph 5.4 of the Respondents' Defence, their defence in this regard is based on nothing more than speculation and a baseless conspiracy theory. As has already been shown above, Acuity's dealings with its previous clients do not show that Acuity had a purported "*modus operandi*" of luring its clients to enter into agreements and then make claims for fees without regard for whether the loan or funds sought actually materialised. In any case and in its dealings with its clients, Acuity is only responsible for "*introducing, organising, arranging or obtaining loan funds*", and is not obliged to ensure that its clients actually receive funds. This is not commercially unreasonable and paragraphs 19, 20 and 25 above are repeated.

119. Further, Acuity did not make any representation (much less false representation) to the Respondents that any lender that it introduced to them would be ready, willing and able to provide funds (although it certainly was not Acuity's intention to introduce a lender to the Respondents who was not capable of doing so). The "*Representation*" as pleaded at paragraph 4.1.5 of the Respondents' Defence does not include any words to the effect that any lender that Acuity introduced to the Respondents would be ready, will and able to provide funds. In fact, that it is the Respondents' case that this is an Implied Term in the LTS&CA directly contradicts the Respondents' assertion that Acuity had made any such representation to the Respondents.

120. The "*Representation*" as pleaded at paragraph 4.1.5 of the Respondents' Defence was also not false in any way. Acuity had in fact introduced a lender to the Respondents. This was Global Wise who had issued the Conditional Offer to the Respondents.

121. In any case, as also shown above, Global Wise was ready, willing and able to provide funds for Project Tribeca.

122. In the premises, there is no basis for the Respondents' assertion that LTS&CA is voidable and/or has been rescinded by reason of fraudulent misrepresentation, and the Respondents' defence in this regard should be dismissed.

## IV.  **CONCLUSION**

123. Acuity respectfully requests that the Tribunal dismiss the Respondents' Defence and grant the claims and reliefs sought by Acuity in this arbitration.

Dated this 24th day of March 2025

_____

**Counsel for the Claimant**

**WongPartnership LLP**