# Exhibit H

<u>**IN THE MATTER OF AN ARBITRATION UNDER THE ARBITRATION RULES OF**</u>
<u>**THE SINGAPORE INTERNATIONAL ARBITRATION CENTRE**</u>
<u>**(6TH EDITION, 1 AUGUST 2016)**</u>

SIAC Arbitration No. 162 of 2024

Between

**BERHERO PTY LIMITED (T/A ACUITY FUNDING)**
(Australian Business No. 32 060 065 821)

*…Claimant*

And

1.   **THE ROE CORPORATION**
     (DOS ID No. 2859163)

*…1st Respondent*

2.   **267 PARTNERS LLC**
     (DOS ID No. 5606747)

*…2nd Respondent*

3.   **BUHM JUNG ROE**
     (United States of America Passport No. 570672279)

*…3rd Respondent*

═══════════════════════════════════════════

**WITNESS STATEMENT OF BUHM JUNG ROE**

═══════════════════════════════════════════

<u>**COUNSEL FOR THE CLAIMANT**</u>       <u>**COUNSEL FOR THE RESPONDENTS**</u>

**WONGPARTNERSHIP LLP**                 **SHOOK LIN & BOK LLP**

12 Marina Boulevard                      1 Robinson Road
#28-01 MBFC Tower 3                       #18-00 AIA Tower
Singapore 018982                         Singapore 048542

Tiong Teck Wee / Samuel Teo / Frederick    David Chan / Daryl Fong / Denise Yong /
Teo / Donny Trinh                          Yang Zhuoyan

File ref: TITW/STWK/DTBD/202400005       File ref: DCN/DYF/DYY/YZY/2241019

<u>**SOLE ARBITRATOR**</u>

**Stuart Isaacs, KC**
9 Raffles Place, Level 57 and 58 Republic Plaza
Singapore 048619

Dated this 20th day of June 2025

**TABLE OF CONTENTS**

1. **INTRODUCTION** ......................................................................................... **3**
   1.1. Preliminaries ........................................................................................ 3
   1.2. Summary of dispute in this Arbitration ........................................... 4
   1.3. The Respondents' position .................................................................. 5

2. **EVENTS LEADING UP TO THE EXECUTION OF THE LTS&CA** ........................... **7**
   2.1. My relationship with Acuity ............................................................... 7
   2.2. The Project ............................................................................................ 7
   2.3. The 8 August LTS&CA ......................................................................... 8
   2.4. Execution of the LTS&CA .................................................................... 8

3. **IMPLIED TERMS OF THE LTS&CA** ........................................................... **10**
   3.1. The Implied Terms were part of the LTS&CA ................................. 10

4. **THE CONDITIONAL OFFER** ....................................................................... **11**
   4.1. Correspondence leading up to the Conditional Offer ................... 11
   4.2. Terms of the Conditional Offer ......................................................... 12
   4.3. Correspondence after the Conditional Offer .................................. 15

5. **EVENTS AFTER THE CONDITIONAL OFFER** ........................................... **20**
   5.1. Correspondence between solicitors and requests for information on Global Wise ... 20
   5.2. My termination and/or rescission of the LTS&CA .......................... 22
   5.3. Acuity and/or Global Wise's failure to satisfactorily address the Respondents' issues 23
   5.4. Suspicions regarding Global Wise ................................................... 24

6. **MY AVAILABILITY TO ATTEND FOR EXAMINATION AT AN ORAL HEARING** **29**

7. **CONCLUSION** ............................................................................................ **30**

I, **BUHM JUNG ROE**, care of 267 Broadway, 2nd Floor, New York, NY, United States, 10007, do solemnly and sincerely swear and say as follows:

1. **INTRODUCTION**

1.1. Preliminaries

1.1.1. Unless otherwise stated, I adopt all definitions used in the Respondents' Defence (Amendment No. 1) dated 20 June 2025 ("**Defence**").

1.1.2. I am the 3rd Respondent in SIAC Arbitration No. 162 of 2024.

1.1.3. I am the Chief Executive Officer ("**CEO**"), President, and 25% shareholder of the 1st Respondent, Roe Corp. Roe Corp is in the business of real estate and, amongst others, develops or redevelops real estate projects in New York for profit. The other shareholders of Roe Corp are my children, Mr. John Roe, Mr. Robert Roe and Ms. Diana Roe ("**Diana**"), who each hold 25% of the shares in Roe Corp. A copy of the shareholding information for Roe Corp is exhibited to the SOC and marked "**C-003**".

1.1.4. I am also the President and sole shareholder of the 2nd Respondent, 267LLC. 267LLC owns the land and the property situated at 267 Broadway. A copy of the shareholding information for 267LLC is also exhibited to the SOC and marked "**C-003**".

1.1.5. The matters deposed to herein are based on my personal knowledge or on documents in my possession. Insofar as they are based on my personal knowledge, they are true. Insofar as they are based on documents within my possession, they are true to the best of my knowledge, information and belief.

1.2.    <u>Summary of dispute in this Arbitration</u>

1.2.1.    The Claimant Acuity has commenced this Arbitration to claim for the Fund Arrangement Fee and Late Payment Interest purportedly due and payable by the Respondents under the LTS&CA to Acuity, on the basis of Acuity having arranged the issuance of the Conditional Offer by Global Wise ([14] of the SOC).

1.2.2.    The Respondents are disputing Acuity's claim on the basis that ([3.2.1] of the Defence):

(a)    The Conditional Offer is not issued in accordance with the terms of the LTS and Acuity and Acuity's procurement of the Conditional Offer does not discharge its obligations pursuant to Clause 4 of the CA. Acuity is therefore not entitled to the Fund Arrangement Fee and Late Interest Payment under the LTS&CA;

(b)    Acuity is in breach of and/or has not fulfilled its contractual obligations under terms implied in fact into the LTS&CA, such that: (i) Acuity is not entitled to the Fund Arrangement Fee and Late Payment Interest; and (ii) Acuity has breached conditions of the LTS&CA, and the breaches have caused the Respondents to be deprived of substantially the whole of the benefit of the LTS&CA, such that the Respondents are entitled to and have validly terminated the LTS&CA;

(c)    Further and/or in the alternative, the LTS&CA are void due to a unilateral mistake at common law on the Respondents' part as to a fundamental term of the LTS&CA of which Acuity had actual knowledge;

(d)    Further and/or in the further alternative, the LTS&CA are voidable and the Respondents have rescinded the LTS&CA due to a unilateral mistake in equity on the Respondents' part as to a fundamental term of the LTS&CA, of which Acuity had

constructive knowledge and in relation to which Acuity has engaged in unconscionable conduct; and

(e)      Further and/or in the further alternative, the LTS&CA are voidable and the Respondents have rescinded the LTS&CA by virtue of Acuity's fraudulent misrepresentation.

1.2.3.   In this witness statement, I will be giving evidence on:

(a)      The background to the parties' dispute, in particular the events leading up to and context behind the execution of the LTS&CA;

(b)      The Implied Terms of the LTS&CA;

(c)      Why the Respondents could not accept the Conditional Offer; and

(d)      Events after the issuance of the Conditional Offer, including the Respondents' termination and/or rescission of the LTS&CA.

1.3.   <u>The Respondents' position</u>

1.3.1.   I/the Respondents will also establish through our evidence in these proceedings that:

(a)      Acuity and/or Global Wise are perpetrators of a fraud targeting victims seeking to borrow monies, in which Acuity would promise to procure loans from lenders that were ready, willing and able to provide the agreed-upon loans to the victims. However, Acuity would fail to deliver on such promises and would enforce claims for fund arrangement fees despite the victims not having obtained the loans they sought.

(b)      The Respondents are victims of this fraud perpetrated by Acuity and/or Global Wise, who never had any genuine intention to provide the Intended Loan to the Respondents.

1.3.2.    The fraudulent intention is reflected in, amongst others:

(a)      Acuity's admission at a late stage of this Arbitration (on 24 Apr 2025, in the Claimant's Response to Respondents' Document Requests) that <u>Global Wise does not provide financing</u> from its own funds. Instead, Acuity changed tack (from repeatedly claiming that Global Wise would be the *lender/funds provider* as stated in, amongst others, the Conditional Offer) to claim that Global Wise would source for funds from investors which would be disbursed directly from the investors, and such <u>funds would not flow through Global Wise at all</u>

(b)      The terms of the written documentation – namely, the LTS&CA and Conditional Offer – which are commercially unreasonable and/or drafted to allow Acuity and/or Global Wise some basis to claim for large upfront payments without any loan monies being disbursed to the Respondents;

(c)      Acuity's pattern of conduct in past dealings in which it was unable to follow through on promises to procure loans from lenders that were ready, willing and able to provide the loans sought; and/or

(d)      The limited / lack of publicly available and/or objectively verifiable information on Acuity's and/or Global Wise's track record of providing loans of a similar size to the Intended Loan.

**2.      EVENTS LEADING UP TO THE EXECUTION OF THE LTS&CA**

2.1.      My relationship with Acuity

2.1.1.      I did not have any relationship with Acuity prior to the signing of the LTS&CA.

2.1.2.      Acuity was introduced to me by Mr. Park. At the material time, I had engaged Mr. Park for his consultancy services and/or assistance in carrying out my work at *inter alia* Roe Corp and 267LLC as an independent contractor. He was not employed directly by either company. Since the commencement of this Arbitration, I have terminated my engagement of Mr. Park and he no longer works for me.

2.2.      The Project

2.2.1.      In or around July 2023, I had plans for Roe Corp to be the developer of the Project, which was to demolish the existing property at 267 Broadway owned by 267LLC to make way for the construction of a large-scale super luxury condo at the premises with both retail units and residential apartments. A screengrab of Roe Corp's website which includes a short section on the Project is exhibited to the Defence and marked "**R-005**".

2.2.2.      I was therefore seeking funding for the Project and estimated that the Project would require a construction loan. I therefore orally instructed Mr. Park to source for a lender.

2.2.3.      On or about 26 July 2023, Dr. Hwang emailed Mr Park (copying me)  to state that "*We are studying the documents and we think it can be enough for us to issue 'Loan Term sheet' with the related documents, Once the chairman of Acuity Funding reviews and signs it.*" Dr. Hwang's email also introduced Mr. Nguyen as "*director of Vietnam*" to me. Copies of the aforesaid emails are exhibited to the SOC and marked "**C-002**".

2.3.    The 8 August LTS&CA

2.3.1.    On or about 8 August 2023, Mr. Nguyen sent an email to Mr. Park and I enclosing *inter alia* a "Loan Term Sheet and Cost Agreement" which would lapse in 10 working days (the "**8 August LTS&CA**"). A copy of the aforesaid email is included in the email thread exhibited to the SOC and marked "**C-014**".

2.3.2.    On or about 6 September 2023, Mr. Park sent 2 emails to Mr. Nguyen and Dr. Hwang:

(a)    The first email (time-stamped 04:53) stated that the Respondents could not proceed with the 8 August LTS&CA as I had to "*invest the cash for another project*".

(b)    The second email (time-stamped 09:50) stated that I "[didn't] *have enough money to take a control both project simultaneously*". A copy of Roe Corp's PowerPoint presentation (exhibited hereto and marked "**R-028**") was attached to this email as well.

Notwithstanding that Mr Park's emails purported to convey my statements, the emails were **not** sent pursuant to my instructions and Mr Park was acting of his own accord at the material time. Copies of the 2 emails referred to above are included in the email thread exhibited to the Reply and marked "**C-015**".

2.4.    Execution of the LTS&CA

2.4.1.    On or about 24 September 2023, Mr. Nguyen emailed Mr. Park (with me in copy) attaching a letter dated 24 September 2023 from Mr. Thambyrajah to the Respondents enclosing the draft LTS&CA and stating that the "*offer* [would] *only remain open for 10 working days from the date of this letter.*" A copy of the aforesaid email is included in the email thread exhibited to the Reply and marked "**C-015**", while a copy of the aforesaid letter is exhibited to the SOC and marked "**C-005**".

2.4.2.    There was no discussion between Acuity and the Respondents as to the exact terms of draft LTS&CA either before or after 24 September 2023, i.e. the draft LTS&CA sent on 24 September 2023 is the first and only draft of the LTS&CA.

2.4.3.    On or about 29 September 2023, I signed and executed the LTS&CA on behalf of the Respondents. Mr. Park then proceeded to email the executed copy of the LTS&CA to Mr. Nguyen. A copy of this email is included in the email thread exhibited to the Reply and marked "**C-015**". In signing the LTS&CA, I had in mind and relied on:

(a)    The fact that Acuity was aware that the Project could not proceed without the Intended Loan of USD 280 million ([1.1.1] above); and

(b)    Acuity's acknowledgement that the LTS&CA was entered into for the express purpose of funding the Project, which could not proceed without the Respondents procuring the Intended Loan, at Clause 3 of the CA read with Clause 5 of LTS.

**LTS**

| | | |
|---|---|---|
| 5 | Purpose: | A loan to assist The Roe Corporation (DOS ID: 2859163) and 267 Partners, LLC, (DOS ID: 5606747) for the development of the Project Tribeca Manhattan Super Luxury Condo Project, 265-267 Broadway, New York, NY United States 10007 [i.e. the Purpose] |

**CA**

| | | |
|---|---|---|
| 3. | Exclusive Agency | **The Applicants [the Respondents] engage the facilitator [Acuity] to the exclusion of all others** unless otherwise stated in this document, **for the purposes of either introducing, organising, arranging or obtaining loan funds** in the sum described in clause 3 of the Loan Term Sheet, ('the advance') **for the purpose as set forth in clause 5 of the Loan Term Sheet ('the purpose'). …** |

(emphasis added)

3.      **IMPLIED TERMS OF THE LTS&CA**

3.1.    The Implied Terms were part of the LTS&CA

3.1.1.  I am advised that the Respondents have pleaded at [4.3.1] of the Defence that the following Implied Terms have been implied in fact into the LTS&CA:

>       (a)     That Acuity would procure a conditionally-approved loan, or a discussion paper or a terms sheet or a loan proposal in the terms of the LTS from a lender that was ready, willing and able to provide the Intended Loan to the Respondents;

>       (b)     At the time that the conditionally-approved loan, discussion paper or terms sheet or loan proposal in the terms of the LTS was procured by Acuity, the lender would be in a position to demonstrate or prove to the Respondents that they were ready, willing and able to provide the Intended Loan; and/or

>       (c)     That the Fund Arrangement Fee would only become due and payable to Acuity upon Acuity procuring a conditionally-approved loan, or a discussion paper or a terms sheet or a loan proposal in the terms of the Loan Term Sheet from a lender that was ready, willing and able to provide the Intended Loan to the Respondents.

3.1.2.  The Implied Terms were not specifically discussed by the parties and, as I had not applied my mind to it at the relevant time, I did not think it was necessary to include them as further express terms of the contract. Instead, it was my mistaken understanding, as is typical in contracts of this nature, that the LTS&CA would already contain the Implied Terms, or language to that effect, given that the terms were so fundamental to the parties' relationship as contemplated under the LTS&CA.

3.1.3.    If I had been asked about the Implied Terms at the relevant time, I would have said that the Implied Terms are necessary and fundamental terms of the contract, in order to make the contract viable from a business perspective.

3.1.4.    If the Implied Terms had been raised to me prior to the execution of the LTS&CA, I would have immediately instructed that they be included in the express terms of the LTS&CA. I verily believe that a reasonable person acting in good faith in Acuity's position would not have objected to the inclusion of the Implied Terms as well.

4.    **THE CONDITIONAL OFFER**

4.1.    Correspondence leading up to the Conditional Offer

4.1.1.    By way of email correspondence from about 6 October 2023 to about 17 October 2023, Acuity requested for, and the Respondents provided, information and documents for "*credit submission*" so that Acuity could procure an offer for the Intended Loan. The emails from 6 October 2023 to 13 October 2023 are included in the email thread exhibited to the Reply and marked "**C-015**", and the emails from 16 October 2023 to 18 October 2023 are exhibited hereto and marked "**R-029**".

4.1.2.    On or about 18 October 2023, Mr. Nguyen sent Mr. Park an email to which I was copied ("**18 Oct Email**") stating that:

> The shareholder listing for the borrower shows that there are 4 individuals each with a shareholding greater than 9%. The 3 additional shareholders (Mr John Roe, Mr Robert Roe and Ms Diana Roe) will also need to provide a personal guarantee in addition to the one from Mr Buhm Jung Roe. We will also need ID for each of these guarantors.
>
> Alternatively they would need to surrender their shares prior to drawdown and confirm this in writing now.

> Please be advised that we will also need to do an amendment to the Loan
> Term Sheet and Costs Agreement to reflect the addition of these parties if
> they are retained as shareholder of the borrower.

> (emphasis added)

4.1.3.    This was entirely unexpected and was not provided for in the terms of the LTS.

4.2.    <u>Terms of the Conditional Offer</u>

4.2.1.    On or about 24 October 2023, Mr. Nguyen sent an email to Mr. Park to which I was copied to provide a copy of the Conditional Offer from Global Wise dated 20 October 2023. Mr. Nguyen also stated in his email that Acuity's representatives would be in New York, where I reside, from 29 to 31 October 2023. A copy of the aforesaid email is exhibited to the Defence and marked "**R-009**"; and a copy of the Conditional Offer is exhibited to the SOC and marked "**C-008**".

4.2.2.    I had not replied, or instructed Mr. Park to reply, to the 18 Oct Email when the Conditional Offer was issued.

4.2.3.    I wish to categorically state at the outset that I did not accept or execute and have never accepted or executed the Conditional Offer. The Conditional Offer remains unsigned to-date.

4.2.4.    It was upon my subsequent review of the Conditional Offer, that it became apparent to me that the terms of the Conditional Offer appeared to be unreasonable and/or unworkable.

(a)    The Conditional Offer requiring upfront cash payment of USD 450,000, part of the 'Establishment Fee' fixed at 1% of the loan amount i.e. USD 2.8 million ("**Establishment Fee**"), upon acceptance of the Conditional Offer without any formal loan documentation or drawdown/disbursement of loan funds is commercially unreasonable.

(b)    As such, the Conditional Offer would have required the Respondents to pay USD 2,800,000 to Global Wise, on top of the Fund Arrangement Fee and Late Payment Interest to be paid to Acuity, without having obtained any loan monies from Global Wise.

4.2.5.    Subsequently, upon obtaining legal advice, it became apparent to me that other terms of the Conditional Offer are similarly commercially unreasonable and/or unworkable:

(a)    Seven of the Conditions Precedent were to be unilaterally satisfied by Global Wise as the "Lender/Funds Provider" and/or external third parties, i.e. the Respondents would not have control over when and how these Conditions Precedent would be satisfied:

(i)    The valuation report would need to be prepared and found to be satisfactory by Global Wise in all respects;

(ii)    The loan/security documentation would need to be perfected or executed to the full satisfaction of Global Wise and/or its legal advisers;

(iii)    Global Wise would need to conduct satisfactory credit reference checks;

(iv)    Global Wise would need to be satisfied with all relevant consultants, contractors, sub-contractors and all associated contractual arrangements, presumably in respect of the Project;

(v)    Global Wise would need to accept and appoint a quantity surveyor and its report would need to be vetted and found to be acceptable by Global Wise in all respects;

(vi)     The builder would need to be approved by Global Wise after further due diligence on the building company; and

(vii)    Third party civil and structural engineering reports would need to be provided and accepted by Global Wise.

(b)      However, Roe Corp as the borrower under the Conditional Offer would have been required to draw down on the loan within only 90 days of the date of acceptance or the Conditional Offer would be withdrawn.

4.2.6.   In respect of the Condition Precedents identified in [4.2.5(a)] above, it is apparent that the satisfaction of many of these Condition Precedents were entirely in Global Wise's discretion. This only exacerbates the absurdity of the Fund Arrangement Fee under the LTS&CA and Establishment Fee under the Conditional Offer. The Respondents were, if they had signed the Conditional Offer and if the Implied Terms were not present in the LTS&CA, entirely in Global Wise's hands as to whether the Condition Precedents were fulfilled. Should Global Wise decide that they were not so fulfilled and thereby refused to disburse the loan, the Respondents would nevertheless be on the hook for the Fund Arrangement Fee and the Establishment Fee. This is clearly commercially unworkable.

4.2.7.   In view of the above, I did not accept and to date have not accepted the Conditional Offer.

4.2.8.   I also had my suspicions about Global Wise, based on the lack of publicly available information on this lender which was purportedly able to lend USD 280 million and the terms of the Conditional Offer. I elaborate on this at [5.4.1] below.

4.3.    Correspondence after the Conditional Offer

4.3.1.    It came to my attention upon obtaining legal advice that the Conditional Offer contained terms which were not present in the LTS.

(a)    Sixteen different Conditions Precedent would have to be fulfilled "*prior to provision of funding*".

(b)    Several Drawdown Conditions would need to be met for each drawdown on the loan, i.e. requirements for the loan monies to be disbursed.

(c)    As mentioned at [4.2.5(b)] above, the Conditional Offer requires the Respondents to drawdown on the loan within 90 days of the date of acceptance (i.e. the Conditions Precedent and Drawdown Conditions would need to be satisfied within 90 days) or the Conditional Offer would be withdrawn.

(d)    As Mr. Nguyen had raised in the 18 Oct Email (see [4.1.2] above), the Conditional Offer also required personal guarantees from any shareholders of Roe Corp with a shareholding greater than 9% of its total shares.

A comparison of the terms of the Conditional Offer and the LTS is appended to the Defence at **Annex A**.

4.3.2.    It is therefore apparent to me that the Conditional Offer was not "*issued in the terms of the* [LTS]" as required by Clause 4 of the CA.

4.3.3.    It is also my view the revised terms render the Conditional Offer significantly more onerous than the LTS such that, notwithstanding Clause 4 of the CA which provides that the Conditional Offer may include "*any further condition or covenant that the lender/underwriter*

*may deem applicable*", the Conditional Offer can no longer be said to be "*in the terms of the [LTS]*".

4.3.4.    Despite the significant differences between the LTS and the Conditional Offer, Acuity attempted to pressure the Respondents to accept the Conditional Offer. Mr. Nguyen emailed Mr. Park and I on or about 31 October 2023, attaching the Draft DOA dated 23 October 2023 and the Draft Addendum dated 1 November 2023. Copies of the aforesaid email and attachments are exhibited to the Defence and marked "**R-016**".

(a)    Mr. Nguyen's email stated that the Draft DOA and Draft Addendum "[were] *ready to execute later today should there is not any* [sic] *other issues.*" This was effectively pressuring us to execute the Draft DOA and Draft Addendum on the very same day without the opportunity of a detailed review and/or legal advice.

(b)    The Draft DOA provided for the Respondents to, *inter alia* ,"*acknowledge and accept the terms and conditions precedent contained in the* [Conditional Offer]" and "*acknowledge that if there exist any difference in the terms, conditions or nature of the funding between the* [Conditional Offer] *and the* [LTS&CA] *that these are acceptable to* [the Respondents] *and both documents remain valid and enforceable.*" This reflected that Acuity was keenly aware of the differences between the LTS and the Conditional Offer but refused to address them and was instead attempting to procure a waiver of the Respondents' rights to refuse the Conditional Offer on the basis of the differences.

(c)    The Draft Addendum *inter alia* (i) required the Respondents to undertake the "*immediate resignation of all other parties other than* [myself] *as Directors of all companies associated with*" the Project and "*the shares of any other parties be transferred back to* [me]" and (ii) provided for "*The* [Draft DOA] *being executed immediately*".

4.3.5.    I was not prepared to execute the Draft DOA and Draft Addendum without reviewing and obtaining advice on the same. As such:

(a)    On or about 4 November 2023, Mr. Park emailed Mr. Thambyrajah and Mr. Nguyen requesting "*more time for BJ's lawyer to review the addendum docs*." I had not instructed Mr Park to send this email and he was acting of his own accord at the material time.

(b)    On or about 7 November 2023, I emailed Mr. Nguyen stating that "*We are in the middle of discussing the Agreement and the Addendum with our lawyer. I would appreciate if you could give your lawyer contact information, so our lawyer can communicate with your lawyer*."

(c)    On or about 14 November 2023, Mr. Park emailed Mr. Thambyrajah and Mr. Nguyen stating that "[I needed] *more time to discuss about this deal with* [my] *family and lawyer*." I had not instructed Mr Park to send this email and he was acting of his own accord at the material time. This is reflected in how Mr Park stated that "[he would] *email* [Acuity] *on Thursday when BJ let me know what to do.*"

Copies of the above-stated emails are included in the email thread exhibited to the Reply and marked "**C-020**".

4.3.6.    When I/the Respondents did not execute the Draft DOA and Draft Addendum as demanded, despite our emails on requiring more time to take legal advice, Acuity continued to pressure me/the Respondents to accept the Conditional Offer, Draft Addendum and/or Draft DOA as follows:

(a)     On or about 6 November 2023, Acuity's Ms. Christine Stephens sent an email to me attaching a tax invoice for a sum of USD 11,200,000, representing the Fund Arrangement Fee. A copy of the aforesaid email from Ms. Stephens is included in the email thread exhibited to the Reply and marked "**C-020**". I did not reply to this email directly, but sent the email referred to at [4.3.5(b)] above thereafter.

(b)     By way of an email dated 23 November 2023, Mr. Nguyen wrote to the Respondents to state that "*a Letter of Demand for fee payment and the cancellation of [the Conditional Offer] will be issued…To avoid the event, we must receive a copy of a fully signed [Conditional Offer]*". A copy of the aforesaid email is exhibited to the Defence and marked "**R-017**".

(c)     By way of a letter dated 29 November 2023 to the Respondents, Acuity demanded, amongst others, that the Respondents confirm that they would be proceeding by *inter alia*:

    (i)     "*signing the lapsed* [Conditional Offer] *with a written request for an extension of time*"; and

    (ii)    "*signing the* [Draft DOA] *or make* [sic] *full payment of Acuity's fees and transfer of the shares now due to* [Acuity]".

A copy of the aforesaid letter is exhibited to the Defence and marked "**R-018**".

4.3.7.  It is my view that the terms of the Draft Addendum and Draft DOA and Acuity's subsequent conduct in pressuring me/the Respondents suggest that Acuity had no genuine intention to assuage my/the Respondents' concerns and simply wanted me/the Respondents to agree to the Conditional Offer.

4.3.8.    Acuity's failure to address my/the Respondents' concerns continued even after parties had engaged solicitors, which I elaborate on at [5.1] and [5.3] below. The lack of satisfactory answers and unconscionable conduct in pressuring me/the Respondents to accept an offer on terms which were clearly onerous for me/the Respondents raised my suspicions about Acuity.

4.3.9.    Insofar as Acuity appears to claim that I had implicitly accepted the Conditional Offer on the basis of Mr. Park's emails addressed to Mr. Nguyen and Mr. Thambyrajah sent on or about 20 and 23 November 2023 stating that I was working on a new developer based on the existing Conditional Offer:

> (a)    I emphasise that it was never my intention, and I did not communicate (and have never communicated) as such to either Mr Park or Acuity, that I was going to accept the Conditional Offer.

> (b)    In respect of Mr. Park's email sent on or about 20 November 2023, I did not authorise Mr. Park to communicate that the joint venture which I was negotiating at that time was "*based on your conditional offer*". It is abundantly clear from the email that Mr. Park was not acting on my instructions, e.g. "***BJ will*** *email you*" "***I am*** *very sorry to delay on signing*" "***I am*** *sure* ***BJ will*** *keep the deal with your team for both profitable partnership*" (emphasis added).

> (c)    Similarly in respect of Mr. Park's email sent on or about 23 November 2023, Mr. Park's statements are personal and not made pursuant to my instructions – "***BJ is*** *still working on making JV with the developer*" and "***I hope*** *the deal reach out the goal … **I will** do my best for it and let you know as soon as deal done*".

Copies of Mr. Park's emails referred to above are included in the email thread exhibited to the Reply and marked "**C-020**".

4.3.10.   I had also not authorised Mr. Park to send the emails which he addressed to Mr. Thambyrajah and Mr. Nguyen and sent on or about 4 and 7 December 2023, copies of which are included in the email threads exhibited to the Reply and marked "**C-018**" and "**C-021**". I had not seen drafts of the emails before they were sent out and did not instruct Mr Park to send them out. It is apparent from those emails that Mr Park was acting of his own accord.

4.3.11.   I did not execute, and to date have not executed, the Draft Addendum and Draft NOA.

5.   <u>**EVENTS AFTER THE CONDITIONAL OFFER**</u>

5.1.   <u>Correspondence between solicitors and requests for information on Global Wise</u>

5.1.1.   By way of a letter from Amini (the Respondents' counsel) to WongPartnership (counsel for both Acuity and Global Wise) dated 29 January 2024 ("**29 Jan Letter**"), the Respondents communicated their position that "[w]*ithout any visible business or activity that justifies the arrangement Global Wise is allegedly claiming to have the wherewithal for, much more would be required in due diligence before* [the Respondents] *would entertain any proposal from them, much less pay in advance*". A copy of the 29 Jan Letter is exhibited to the Defence and marked "**R-020**". In the 29 Jan Letter, the Respondents also raised preliminary objections, including:

(a)   The terms of the Conditional Offer "*are impossible to comply with as written, … By way of a simple example only, the "Conditions Precedent" are by their nature impossible of completion in 90 days (even plus two weeks) or less, yet the "Conditional Letter of Offer" was by its terms only open for acceptance for two weeks from October 20, 2023, and requires a first drawdown within ninety days of acceptance or is withdrawn.*";

(b)   There was a "*lack of any apparent due diligence of or by Global Wise*";

(c)     There was a "*complete lack of any commitment for the sums already paid, and now being further requested*" by either Acuity or Global Wise; and

(d)     That Acuity "[e]*arning a commission before a "Conditional Offer" is approved or loan funds are made available is commercially unreasonable.*"

5.1.2.   Amini requested for the Requested Information, namely:

(a)     "a *detailed history of Global Wise's business and activities, with specific references to verifiable comparable lending arrangements to the one it has proposed*" to the Respondents for the Project; and

(b)     "*proof that* [Global Wise] *has the funds it claims*".

5.1.3.   By way of a letter from WongPartnership to Amini dated 14 February 2024 ("**14 Feb Letter**"), Acuity reasserted its claims for the Fund Arrangement Fees and Late Payment Interest but claimed that it was "*prepared to engage* [the Respondents] *in further negotiations*" and requested for *inter alia* "*A detailed list of the information that* [the Respondents] *require from* [Acuity]". A copy of the 14 Feb Letter is exhibited to the Reply and marked "**C-025**".

5.1.4.   However, the 14 Feb Letter also states that the "*detailed list*" was "*for* [Acuity] to *carry out due diligence on Global Wise*" – which indicated to me that Acuity had not conducted any due diligence on Global Wise and that it did not have a strong case for its position that Global Wise was ready, willing and able to provide the Intended Loan.

5.2.    <u>My termination and/or rescission of the LTS&CA</u>

5.2.1.    On or about 16 February 2024, I instructed Mr. Park to inform Acuity that the Respondents intended to proceed on the basis that the LTS&CA would be null and void and to request for a cancellation letter confirming the same. Mr. Park proceeded to email Dr. Hwang ("**Termination Email**") stating that:

(a)    I could "*reconsider getting a new loan that would be mutually beneficial if* [Acuity] *provide*[d me with] *its track record and sources of fund*[s]"; and

(b)    Mr. Park "[thought] *it is good for Acuity Fund and B. J. Roe to proceed with the deal and make the loan happen*"; however

(c)    I needed "*a Cancellation Letter signed by Ranjit Thambyrajah that states that the Loan Term Sheet and Costs Agreement, that B. J. Roe signed on 09/29/2023, is null and void.*"; and

(d)    Mr. Park "*would like to start again*".

A copy of the Termination Email is included in the email thread exhibited to the Defence and marked "**R-019**".

5.2.2.    I came to this decision because:

(a)    It was clear that Acuity was in breach of and/or had failed to fulfill the Implied Terms and the Purpose of the LTS&CA. As such, I wished to terminate the LTS&CA, but was open to negotiating a new arrangement.

(b)    In any event, it was clear to me that the omission of the Implied Terms from the LTS&CA was a mistake, and Acuity ought to have known of the same, yet it had attempted to pressure me into accepting the Conditional Offer with its unworkable terms.

5.2.3.    Further, for the reasons given at [4.3.1] to [4.3.35.2.2] above, I believe that Clause 4 of the CA has not been satisfied (and indeed, remains unsatisfied) and the Fund Arrangement Fees were not immediately due and payable to Acuity.

5.2.4.    As these are legal issues that are to be properly addressed by way of legal submissions, I will leave it to my solicitors to elaborate on the same at the appropriate juncture. I also highlight that my subsequent investigation(s) into Acuity gave me even more reason to believe that Acuity had no intention following through on its promise to procure the Intended Loan for the Respondents, and that I had been the victim of a fraud perpetrated by Acuity and/or Global Wise.

5.3.    Acuity and/or Global Wise's failure to satisfactorily address the Respondents' issues

5.3.1.    By way of a letter from Amini to WongPartnership dated 20 February 2024, the Respondents reiterated their request for the Requested Information. A copy of the aforesaid letter is exhibited to the Defence and marked "**R-020**".

5.3.2.    By way of a letter from WongPartnership to Amini dated 18 March 2024 ("**18 Mar Letter**"), Acuity stated *inter alia* that:

(a)    Mr Lankan, who is the Chairman of Global Wise, is also a Director of Elite Crown Diamond Ltd, a corporation registered in the United Kingdom ("**ECD**"), and the Chief Strategy Officer of Elite Global Equity Fund, an entity regulated by the Cayman Monetary Authority ("**EGEF**") (collectively, "**Elite**");

(b)      Mr Lankan and Global Wise have been responsible for introducing and managing more than 70% of projects funded by Elite and with the support of ECD and EGEF, Global Wise had a robust track record and the necessary funds to provide financing for the Project. However, this only suggested that Global Wise did not itself have the funds to provide the Intended Loan and only intended to apply for the same from ECD and/or EGEF;

(c)      Global Wise provided two sets of presentation slides exhibiting the credentials of *inter alia* ECD and EGEF. However, the documents provided have not been, and could not be, objectively verified; and

(d)      As for proof of funds, Global Wise enclosed "*a letter from Elite to Acuity showing that Elite Crown Diamond Ltd and the British Jordanian Group Ltd have entered into joint venture with a combined capital base of EUR 10 billion.*" However, the aforesaid letter (i) does not evidence any a joint venture, (ii) does not provide any information on British Jordanian Group Ltd, (iii) only included a screenshot of a purported Deutsche Bank tear sheet (the authenticity of which cannot be ascertained) and (iv) in any event, the tear sheet purportedly stated that the funds were held by British Jordanian Group Ltd and not ECD, EGEF or any other related entity.

Copies of the letter and its enclosures referred to above are exhibited to the Defence and marked "**R-008**".

5.4.     Suspicions regarding Global Wise

5.4.1.   Throughout the events outlined above, from the issuance of the Conditional Offer to date, I have several suspicions about Global Wise raised by the following facts:

(a)      Global Wise was and remains an unknown entity with an extremely limited online presence, yet it was purportedly able to provide a loan of USD 280 million.

(b)      The commercially unreasonable and/or unworkable terms of the LTS&CA and the Conditional Offer suggested that Acuity and/or Global Wise did not intend for the Respondents to be able to draw down on the Intended Loan pursuant to the Conditional Offer (if accepted), and was not a lender which was ready, willing and able to provide the Intended Loan to the Respondents;

(c)      Acuity and/or Global Wise were unable to satisfactorily address my/the Respondents' concerns regarding Global Wise's ability to fund the Intended Loan and/or its track record of project financing; and

(d)      It was subsequently admitted by Acuity in their Claimant's Response to Respondents' Document Requests dated 24 April 2025 that Global Wise indeed did not have the ability to provide the Intended Loan. I elaborate on this below.

5.4.2.    Throughout my interactions with them up to the commencement of this Arbitration, Acuity had consistently held itself out as being able to procure a lender, i.e. an entity which would lend the Respondents the funds it required in the Intended Loan:

(a)      As set out at [1.1.1]-[2.3.2] above, Acuity was aware that the Respondents required a loan to finance the Project and was not looking to engage another broker to obtain a loan;

(b)     The Conditional Offer specifies that Global Wise would be the "*Lender/Funds Provider*". Acuity's email to the Respondents enclosing the Conditional Offer also describes it as a "*Letter of Conditional Offer for Mortgage Finance from our lender*" (emphasis added). Copies of the Conditional Offer and the email enclosing the same are exhibited to the SOC marked "**C-008**" and to the Defence marked "**R-009**" respectively;

(c)     WongPartnership's letter to the Respondents dated 16 January 2024 refers to the Conditional Offer which was "*to provide financing for the development of* [the Project]" and stated that "*Global Wise remains willing and able to provide financing for* [the Project]" (emphasis added). A copy of this letter is exhibited to the Reply and marked "**C-024**". I highlight this as *providing* financing is very different from *procuring* financing;

(d)     WongPartnership's letter to Amini dated 14 February 2024 states that "*Acuity was engaged by* [the Respondents] *to organise, arrange, and/or obtain loan financing for the Project …. Acuity is an independent contractor and an agent for your clients solely for the purpose of securing financing for the Project.*" (emphasis added) The aforesaid letter also refers to "*terms on which Global Wise will provide financing for the Project*". A copy of this letter is exhibited to the Reply and marked "**C-025**";

(e)     WongPartnership's 18 Mar Letter states that Global Wise "*has … the necessary funds to provide financing for the Project.*" (emphasis added) A copy of this letter is exhibited to the Defence and marked "**R-008**"; and

(f) WongPartnership's letter to Amini dated 14 April 2024 disagreed with Amini/the Respondents' assertion that the 18 Mar Letter confirmed that Global Wise had no funds, reasserting that Global Wise "*has the necessary funds to provide financing for the Project*" and that the Conditional Offer "*shows that funds were conditionally approved for the financing of the Project*" (emphasis added). A copy of this letter is exhibited to the Reply and marked "**C-030**".

5.4.3. I am advised that Acuity:

(a) continued to make similar representations about Global Wise's ability to lend the Intended Loan to the Respondents in its pleadings in this Arbitration; but

(b) subsequently, in their Claimant's Response to Respondents' Document Requests dated 24 Apr 2025, Acuity admitted that "*Global Wise does not provide financing from its own funds, but funds sourced from its investors*" and "*Global Wise's investors will usually disburse funds directly to the lender and the funds do not flow through Global Wise.*" This was a complete *volte-face* from what Acuity had been claiming up to that point in time.

5.4.4. I will leave my solicitors to address the above in submissions and/or at an appropriate juncture.

5.4.5. I have also engaged forensic investigators Grant Thornton Singapore Private Limited ("**Grant Thornton**") to investigate:

(a) Global Wise;

(b) Global Wise's executive director and sole shareholder Mr. Bal Lankan;

(c) Acuity;

(d)     Acuity's managing director and sole shareholder Mr. Thambyrajah;

(e)     ECD;

(f)     EGEF;

(g)     Don Nissanka, CEO of EGEF and director of ECD; and

(h)     Elite Crown Cayman Limited, a purported entity associated / affiliated with Elite.

5.4.6.     I shall leave it to Grant Thornton's witness to give evidence on their investigative findings, which are set out in a report. However, I wish to highlight in my witness statement that Grant Thornton's findings buttress my/the Respondents' views that:

(a)     Acuity's *modus operandi* in respect of its past dealings with previous clients demonstrate that Acuity and/or Global Wise were perpetrators of a fraud in which Acuity would promise to procure loans from lenders that were ready, willing and able to provide the agreed-upon loans to the victims and would claim for exorbitant fees from the would-be borrowers even when it failed to deliver on such monies and/or no loan monies were disbursed;

(b)     Global Wise was never ready, willing or able to provide the Intended Loan; and

(c)     Acuity's representation to the Respondents that it would introduce, organise, arrange or obtain loan funds to fund the Project in accordance with the purpose stated in clause 5 of the LTS i.e. the Representation was made with the knowledge that it was false, or without belief in its truth, or with recklessness as to whether it was true or false.

6. **MY AVAILABILITY TO ATTEND FOR EXAMINATION AT AN ORAL HEARING**

6.1.1.  I have been advised by my doctor, Dr. Saad Mir, that in his opinion, due to my left basal ganglia intracerebral hemorrhage and prior ischemic strokes:

(a)  I cannot understand information relevant to a question raised in an oral examination;

(b)  I cannot retain information long enough to answer a question raised in an oral examination;

(c)  I cannot weigh information as part of the process of answering a question raised in an oral examination;

(d)  I cannot communicate my answer to a question raised in an oral examination; and

(e)  I do not have mental capacity in respect of being a witness put under oral examination.

6.1.2.  Exhibited hereto and marked "**R-030**" is a medical report dated 17 June 2025 signed by Dr. Saad Mir.

6.1.3.  For these reasons, I am **not** able to attend for examination at the scheduled oral hearing if required to do so.

## 7. CONCLUSION

7.1.1. For the reasons set out above, I humbly pray that the Tribunal dismisses Acuity's claim(s) against Roe Corp, 267LLC and I in its entirety.

Signed by **BUHM JUNG ROE**

Dated this 20th day of June 2025

R-028



# TRIBECA MANHATTAN SUPER LUXURY TOWER PROJECT



THESE MATERIALS MAY NOT BE USED OR RELIED UPON FOR ANY PURPOSE OTHER THAN AS SPECIFICALLY CONTEMPLATED BY A WRITTEN AGREEMENT WITH ROE CORPORATION.



# Development Cost / Net Income

| Development Costs | SF | Projected $ / SF | Projected Data |
|---|---|---|---|
| Land, Air Rights & Predevelopment Costs | 131,000 | 534.35 | 70,000,000 |
| Professional Fees | 131,000 | 8.40 | 1,100,000 |
| Construction Cost | 185,627 | 700.00 | 129,938,900 |
| Soft Cost included Loan Interest | 185,627 | 438.25 | 81,351,608 |
| Contingency Cost | 185,627 | 34.15 | 6,338,715 |
| Total Development Cost | 185,627 | 1,555.42 | 288,729,223 |
| Total Sales Value | 185,627 | 2,202.30 | 408,806,760 |
| Gross Income | 185,627 | 646.87 | 120,077,537 |
|  |  |  |  |
| - Sales Fee (5% = Sales Value X 0.05) | 185,627 | 110,11 | 20,440,338 |
|  |  |  |  |
| Net Income | 185,627 | 536.76 | 99,637,199 |



# Project Return On Investment ($30M)

## Tribeca Super Luxury Tower Project IRR

265-267 Broadway, New York, NY 10007

| Project Finishing Time (Years) | 3.0 | 2024-01-01 | 2026-12-31 |
|---|---|---|---|
| Project Finishing Time (Years) | 4.0 | 2024-01-01 | 2027-12-31 |

| | | | |
|---|---|---|---|
| Estimated Sales | | | $408,806,760 |
| Building Costs | | | $288,729,223 |
| Equity Investment | 24.24% | $70,000,000 | |
| Preferred Equity | 15.76% | $45,491,689 | |
| Costruction Loan | 60.00% | $173,237,534 | |
| Sub Total | | $288,729,223 | |
| Selling Fee (5%) | | | $20,440,338 |
| Estimated Profit | | | $99,637,199 |

| IRR/Year | Finishing 3.0 Years | 32.00% |
|---|---|---|
| IRR/Year | Finishing 4.0 Years | 23.00% |

| Project Equity Investment | Ownership | Estimated Profit | | Profit Percentage | Total |
|---|---|---|---|---|---|
| $70,000,000 (Total) | 100 % | $99,637,199 | | 242.34% | $169,637,199 |
| $25,000,000 (Roe) | 35.70% | $35,584714 | | 242.34% | $60,584,714 |
| $45,000,000 | 64.29% | $64,052,485 | | 242.34% | $109,052,485 |



# Financial Structure

| Total Investment | $288.7 Million |

**Building Cost**



Equity Investment(Roe)
$25,000,000
8.66%

Equity Investment
$45,000,000
15.59%

Eb5/CPACE Preferred
Equity $45,491,689
15,76%

Construction Loan
$173,237,534
60,00%



## **Equity Investments**

| Sources | | |
|---|---|---|
| Roe Group | $25,000,000 | Existing Land Value & Predevelopment Expenses (25M) |
| New Investors | $45,000,000 | |
| **Total** | **$70,000,000** | **75M Land Value & Predevelopments Cost with $45M Debt** |

| Uses | | |
|---|---|---|
| Signature Bank Mortgage Payoff | $25,000,000 | Pay at Closing |
| Air Rights | $13,000,000 | Pay at Closing |
| Inclusionary Air Rights | $7,000,000 | Pay at Closing |
| Sub Total | $45,000,000 | |
| JV Account Balance | $25,000,000 | Existing Land Value |
| **Total** | **$70,000,000** | **75M Land Value & Predevelopments Cost with $0 Debt** |



# DEVELOPMENT / SALES PLAN (HOTEL 1 – 14 FL)

265-267 BROADWAY, NEW YORK, NY 10007

| Sales | SF | Projected $ / SF | Projected Data |
|---|---|---|---|
| Residential Lobby   20 FT | 1,531 | | |
| Commercial Lobby | 1,249 | | |
| Cellar  and Sub-Cellar - 2 Floors | 8,264 | | |
| Ground Fl - Hotel | 1,400 | 2,000.00 | 2,800,000 |
| Mezzanine - Hotel | 1,030 | 1,200.00 | 1,236,000 |
| 2nd Floor - Hotel | 3,480 | 1,200.00 | 4,176,000 |
| 3rd Floor -  Hotel | 3,480 | 1,200.00 | 4,176,000 |
| 4th Floor - Hotel | 3,480 | 1,200.00 | 4,176,000 |
| 5th Floor - Hotel | 3,480 | 1,200.00 | 4,176,000 |
| 6th Floor -  Hotel | 2,786 | 1,200.00 | 3,343,200 |
| 7th Floor -  Hotel | 2,786 | 1,200.00 | 3,343,200 |
| 8th Floor -  Hotel | 2,786 | 1,200.00 | 3,343,200 |
| 9th Floor -  Hotel | 2,786 | 1,200.00 | 3,343,200 |
| 10th Floor - Hotel | 2,786 | 1,200.00 | 3,343,200 |
| 11th Floor - Hotel | 2,786 | 1,200.00 | 3,343,200 |
| 12th Floor - Hotel | 2,786 | 1,200.00 | 3,343,200 |
| 13th Floor - Hotel | 2,786 | 1,200.00 | 3,343,200 |
| 14th Floor - Hotel | 2,786 | 1,200.00 | 3,343,200 |
| Total Hotel  38,994 SF (2nd Fl - 14th Fl) | | | |
| Hotel Sub Total | | | 50,828,800 |



| | | | |
|---|---|---|---|
| 15th Floor - Mech | 3,212 | | |
| 16th Floor - Recrational Sky Lobby | 3,212 | | |
| PH1    17th Fl - 12 FT HT- 3 Side View + 521 SF Terrace | 2,456 | 2,500.00 | 6,140,000 |
| PH2    18th Fl - 12 FT HT - 4 Side View + 521 SF Terrace | 2,456 | 2,580.00 | 6,336,480 |
| PH3    19th Fl - 12 FT HT - 4 Side View + 521 SF Terrace | 2,456 | 2,660.00 | 6,532,960 |
| PH4    20th Fl - 12 FT HT - 4 Side View + 521 SF Terrace | 2,456 | 2,740.00 | 6,729,440 |
| PH5    21st Fl - 12 FT HT - 4 Side View + 521 SF Terrace | 2,456 | 2,820.00 | 6,925,920 |
| PH6    22nd Fl - 12 FT HT - 4 Side View + 521 SF Terrace | 2,456 | 2,900.00 | 7,122,400 |
| PH7    23rd Fl - 12 FT HT - 4 Side View + 521 SF Terrace | 2,456 | 2,980.00 | 7,318,880 |
| PH8    24th Fl - 12 FT HT - 4 Side View + 521 SF Terrace | 2,456 | 3,060.00 | 7,515,360 |
| PH9    25th Fl - 12 FT HT - 4 Side View + 521 SF Terrace | 2,456 | 3,140.00 | 7,711,840 |
| PH10   26th Fl - 12 FT HT - 4 Side View + 521 SF Terrace | 2,456 | 3,220.00 | 7,908,320 |
| PH11   27th Fl - 12 FT HT - 4 Side View + 521 SF Terrace | 2,456 | 3,300.00 | 8,104,800 |
| PH12   28th Fl - 12 FT HT - 4 Side View + 521 SF Terrace | 2,456 | 3,380.00 | 8,301,280 |
| PH14   29th Fl - 12 FT HT - 4 Side View + 521SF Terrace | 2,456 | 3,460.00 | 8,497,760 |
| PH15   30th Fl - 12 FT HT - 4 Side View + 521 SF Terrace | 2,456 | 3,540.00 | 8,694,240 |
| PH16   31st Fl - 12 FT HT - 4 Side View + 521 SF Terrace | 2,456 | 3,620.00 | 8,890,720 |
| PH17   32nd Fl - 12 FT HT - 4 Side View + 521 SF Terrace | 2,456 | 3,700.00 | 9,087,200 |
| PH18   33rd Fl - 12 FT HT - 4 Side View + 521 SF Terrace | 2,456 | 3,780.00 | 9,283,680 |
| PH19   34th Fl - 12 FT HT - 4 Side View + 521 SF terrace | 2,456 | 3,860.00 | 9,480,160 |
| 35th Fl - Mech | | | |
| PH20   36th Fl - 12 FT HT - 4 Side View + 267 SF Terrace | 2,583 | 3,940.00 | 10,177,020 |
| PH21   37th Fl - 12 FT HT - 4 Side View + 267 SF Terrace | 2,583 | 4,020.00 | 10,383,660 |
| PH22   38th Fl - 12 FT HT - 4 Side View + 267 SF Terrace | 2,583 | 4,100.00 | 10,590,300 |
| PH23   39th Fl - 12 FT HT - 4 Side View + 267 SF Terrace | 2,583 | 4,180.00 | 10,796,940 |
| PH24   40th Fr - 12 FT HT - 4 Side View + 270 SF Terrace | 2,583 | 4,260.00 | 11,003,580 |
| PH25   41st Fr - 12 FT HT - 4 Side View + 270 SF Terrace | 2,583 | 4,340.00 | 11,210,220 |
| PH26   42nd Fl - 12 FT HT - 4 Side View + 521 SF terrace | 2,456 | 4,420.00 | 10,855,520 |
| PH27   43rd Fl - 12 FT HT - 4 Side View + 521 SF terrace | 2,456 | 4,500.00 | 11,052,000 |
| PH28   44rd Fl - 12 FT HT - 4 Side View + 521 SF terrace | 2,456 | 4,580.00 | 11,248,480 |
| PH29   45th Fl - 12 FT HT - 4 Side View + 521 SF terrace | 2,456 | 4,660.00 | 11,444,960 |
| PH30   46th Fl - 12 FT HT - 4 Side View + 521 SF terrace | 2,456 | 4,740.00 | 11,641,440 |
| PH31   47th Fl - 12 FT HT - 4 Side View + 521 SF terrace | 2,456 | 4,820.00 | 11,837,920 |
| PH32   48th Fl - 12 FT HT - 4 Side View + 521 SF terrace | 2,456 | 4,900.00 | 12,034,400 |
| PH33   49th Fl - 12 FT HT - 4 Side View + 521 SF terrace | 2,456 | 4,980.00 | 12,230,880 |
| PH34   50th Fl - 12 FT HT - 4 Side View + 521 SF terrace | 2,456 | 5,060.00 | 12,427,360 |
| PH35   51st Fr - 12 FT HT - 4 Side View + 270 SF Terrace | 2,456 | 5,140.00 | 12,623,840 |
| | | | |
| SPH    PHI - 20 FT HT - 4 Side View + 521 SF terrace | 2,456 | 6,000.00 | 14,736,000 |
| SPH    PH - 20  FT H  - 4 Side View + 567 SF Terrace | 2,442 | 6,000.00 | 14,652,000 |
| SPH    Next FL - 20 FT HT - 4 Side View + 500 SF Terrace | 1,075 | 6,000.00 | 6,450,000 |
| Average | 2,439 | 3,997 | 9,675,080 |
| Residential Sub Total | 96,663 | | 357,977,960 |
| Roof - Mech | 909 | | |
| Bulkhead - Mech | 909 | | |
| Common Space | 34,678 | | |
| | | | |
| Total Sales Value | | | 408,806,760 |



267 Broadway Vs. 262 5th Ave

August 2023


## Location









ROE CORPORATION



Today





# Comparison



| S/N | Item | | Unit | 267 Broadway | 262 5th Ave |
|---|---|---|---|---|---|
| 1 | Site Area | | SQFT | 5,173 | 4,942 |
| 2 | Site Dimension | | FT | 116.6 x 49.4 | 100.0 x 49.4 |
| 3 | Height | | FT | 808 | 860 |
| 4 | # of Storey | | | 55 | 54 |
| 5 | # of Residential Unit | | | 35 | 26 |
| 6 | GFA | Residential | SQFT | 92,671 | 139,168 |
| 7 | | Commercial | SQFT | 37,634 | 10,850 |
| 8 | | Total | SQFT | 130,305 | 150,018 |
| 9 | Price | Lot | $ | | 101,800,000 |
| 10 | | Air Rights | $ | | 5,800,000 |
| 11 | | Total | $ | 70,000,000 | 107,600,000 |
| 12 | Price/GFA | | $ | 537 | 717 |





**1 Bedroom Apartments**
Starting at **$2,800,000**
Floorplans **A B C D**
**2 Bedroom Apartments**
Starting at **$5,000,000**
Floorplans **A B C D**
**3 Bedroom Apartments**
Starting at **$6,750,000**
**Average Price: 10.5 M**







# COMPARATIVE MARKET ANALYSIS (56 LEONARD)

| unit | price/sf | price ($) | area (ft²) | recorded date | unit | price/sf | price ($) | area (ft²) | recorded date | unit | price/sf | price ($) | area (ft²) | recorded date |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 27ae | 2,472 | 5,550,000 | 2,245 | 02/15/2017 | 33aw | 2,832 | 4,600,000 | 1,624 | 09/12/2016 | 43ae | 3,361 | 8,900,00 | 2,648 | 06/05/2017 |
| 27be | 2,622 | 4,375,000 | 1,668 | 07/06/2016 | 33aw | 2,832 | 4,600,000 | 1,624 | 09/12/2016 | 43be | 3,599 | 5,500,000 | 1,528 | 08/26/2022 |
| 27aw | 2,572 | 4,350,000 | 1,691 | 06/28/2016 | 33bw | 3,193 | 6,950,000 | 2177 | 2/19/2021 | 43w | 3,810 | 13,000,000 | 3,412 | 10/13/2016 |
| 27bw | 3,097 | 6,975,000 | 2,252 | 11/16/2017 | 34ae | 3,126 | 6,800,000 | 2,175 | 05/09/2017 | 44ae | 3,848 | 10,500,000 | 2,728 | 02/08/2020 |
| 28aw | 3,104 | 5,250,000 | 1,691 | 06/02/2019 | 34be | 2,937 | 4,900,000 | 1,668 | 11/15/2021 | 44be | 3,526 | 5,000,000 | 1,418 | 09/20/2016 |
| 28ae | 2,984 | 6,700,000 | 2,245 | 05/04/2017 | 34aw | 2,986 | 4,850,000 | 1,624 | 08/01/2016 | 44w | 3,298 | 11,750,000 | 3,562 | 05/08/2019 |
| 28be | 2,458 | 4,100,000 | 1,668 | 07/14/2016 | 34bw | 2,951 | 6,425,000 | 2,177 | 08/15/2016 | 45e | 3,233 | 10,900,000 | 3,371 | 04/05/2017 |
| 28bw | 2,797 | 6,300,000 | 2,252 | 07/12/2016 | 35aw | 3,171 | 5,350,000 | 1,624 | 09/10/2021 | 45w | 4,194 | 15,000,000 | 3,576 | 06/07/2017 |
| 29bw | 2,810 | 6,330,000 | 2,252 | 11/13/2019 | 35ae | 3,287 | 7,150,000 | 2,175 | 05/19/2017 | 46e | 3,544 | 11,950,000 | 3,371 | 03/11/2022 |
| 29ae | 3,057 | 6,650,000 | 2,175 | 02/08/2017 | 35bw | 3,284 | 7,500,000 | 2,177 | 11/19/2018 | 46w | 3,984 | 14,250,000 | 3,576 | 11/16/2016 |
| 29be | 2,667 | 4,450,000 | 1,668 | 12/03/2020 | 35be | 2,817 | 4,700,000 | 1,668 | 10/06/2016 | 47e | 3,633 | 12,250,000 | 3,371 | 03/15/2017 |
| 29aw | 3,140 | 5,100,000 | 1,624 | 07/15/2016 | 38ae | 2,851 | 8,200,000 | 2,648 | 8/28/2017 | 47w | 4,194 | 15,000,000 | 3,576 | 12/02/2016 |
| 30ae | 3,057 | 6,650,000 | 2,175 | 05/12/2017 | 38be | 2,750 | 3,900,000 | 1,418 | 08/18/2016 | 48e | 4,003 | 13,495,000 | 3,371 | 01/17/2022 |
| 30be | 2,862 | 4,775,000 | 1,668 | 10/08/2019 | 39ae | 3,162 | 8,375,000 | 2,648 | 04/07/2021 | 48w | 3,984 | 14,250,000 | 3,576 | 03/15/2017 |
| 30aw | 3,201 | 5,200,000 | 1,624 | 06/30/2017 | 39be | 3,420 | 4,850,000 | 1,418 | 02/01/2021 | 49e | 3,782 | 12,750,000 | 3,371 | 03/20/2017 |
| 30bw | 2,859 | 6,225,000 | 2177 | 07/11/2016 | 39w | 3,518 | 12,000,000 | 3,411 | 06/29/2017 | 49w | 4,194 | 15,000,000 | 3,576 | 11/16/2016 |
| 31ae | 3,448 | 7,500,000 | 2,175 | 08/10/2022 | 40ae | 3,191 | 8,450,000 | 2,648 | 06/05/2017 | 50e | 3,856 | 13,000,000 | 3,371 | 05/11/2017 |
| 31bw | 2,916 | 6,350,000 | 2,177 | 09/19/2020 | 40w | 3,808 | 12,995,000 | 3,412 | 08/09/2018 | 50w | 4,404 | 15,750,000 | 3,576 | 11/16/2016 |
| 31ae | 3,080 | 6,700,000 | 2,175 | 03/03/2017 | 40be | 2,891 | 4,100,000 | 1,418 | 08/24/2016 | ph52b | 4,168 | 15,460,849 | 3,709 | 12/21/2018 |
| 31be | 2,877 | 4,800,000 | 1,668 | 07/13/2017 | 41b | 3,404 | 4,900,000 | 1,441 | 07/31/2017 | ph53 | 4,544 | 29,082,693 | 6,400 | 11/17/2020 |
| 31aw | 2,770 | 4,500,000 | 1,624 | 01/16/2020 | 41w | 3,739 | 12,760,449 | 3,412 | 03/09/2018 | ph54 | 4,366 | 23,982,850 | 5,492 | 03/11/2019 |
| 31abw | 3,538 | 13,450,000 | 3,801 | 12/18/2017 | 41e | 3,172 | 8,400,000 | 2,648 | 09/08/2017 | ph55 | 4,206 | 21,814,384 | 5,186 | 08/13/2021 |
| 31w | 3,100 | 6,750,000 | 2,177 | 04/07/2017 | 41ae | 3,247 | 8,600,000 | 2,648 | 06/29/2017 | ph56 | 4,206 | 29,075,067 | 5,858 | 04/17/2020 |
| 32bw | 3,284 | 7,150,000 | 2,177 | 11/09/2018 | 41be | 2,961 | 4,200,000 | 1,418 | 03/29/2017 | ph57 | 4,664 | 24,500,000 | 5,252 | 04/01/2020 |
| 32ae | 3,103 | 6,750,000 | 2,175 | 05/09/2017 | 42b | 3590 | 5,900,000 | 1,643 | 5/25/2016 | ph58 | 4,879 | 26,781,101 | 5,489 | 10/13/2021 |
| 32be | 2,907 | 4,850,000 | 1,668 | 08/18/2016 | 42be | 3,385 | 4,800,000 | 1,418 | 10/11/2016 | ph59 | 5,382 | 31,500,000 | 5,852 | 06/29/2017 |
| 33ae | 2,712 | 5,900,000 | 2,175 | 03/27/2017 | 42ae | 3,304 | 8,750,000 | 2,648 | 06/13/2017 | ph60 | 6,026 | 47,000,000 | 7,799 | 10/28/2021 |
| 33be | 2,607 | 4,350,000 | 1,668 | 08/11/2016 | 42w | 3,736 | 12,750,000 | 3,412 | 09/22/2016 | ph60/61 | 6,426 | 49,995,000 | 7,779 | 08/11/2021 |
| **Average** | **2,932** | **5,928,077** | **2,026** | | **Average** | **3,198** | **7,062,695** | **2,158** | | **Average** | **4,190** | **18,834,702** | **4,136** | |

| Total Ave | 3,440 | 10,622,499 | 2,773 |
|---|---|---|---|

ROE CORPORATION

# Thank You

New York Immigration Fund, LLC
Roe Corporation
267 Broadway, New York, NY 10007
(212) 766-0700, (212) 239-1400
www.nyifund.com, www.roecorp.com
bj@nyifund.com

**R-029**

| **From:** | BJ Roe <bj@northamericandevelopers.com> |
|---|---|
| **Sent:** | 24 April 2024 02:26 |
| **To:** | Daryl Fong; David Chan; Louis Lai; Denise Yong; Diana Roe |
| **Subject:** | FW: Fw: Additional Information |

**From:** Sungwoo Park <park@northamericandevelopers.com>
**Sent:** Thursday, April 18, 2024 4:21 PM
**To:** BJ Roe <bj@northamericandevelopers.com>
**Subject:** FW: Fw: Additional Information

**From:** Viet Anh Nguyen <vietanh@acuityfunding.com>
**Sent:** Wednesday, October 18, 2023 7:18 PM
**To:** Sungwoo Park <park@northamericandevelopers.com>
**Cc:** 0113044814 <0113044814@paran.com>; B J Roe <bj@roecorp.com>; Christine Stephens <christine@acuityfunding.com>; HwangGi Sun <painkill@icloud.com>; Ranjit Thambyrajah <ranjit@acuityfunding.com>
**Subject:** Re: Fw: Additional Information

Dear Mr Park,

The shareholder listing for the borrower shows that there are 4 individuals each with a shareholding greater than 9%. The 3 additional shareholders (Mr John Roe, Mr Robert Roe and Ms Diana Roe) will also need to provide a personal guarantee in addition to the one from Mr Buhm Jung Roe. We will also need ID for each of these guarantors.

Alternatively they would need to surrender their shares prior to drawdown and confirm this in writing now.

Please be advised that we will also need to do an amendment to the Loan Term Sheet and Costs Agreement to reflect the addition of these parties if they are retained as shareholder of the borrower.

Regards,

Viet Anh Nguyen

Confidentiality:This email is intended only for the use of the individual or entity named above and may contain information that is confidential and privileged. If you are not the intended recipient, you are hereby notified that any dissemination, distribution or copying of this email is strictly prohibited. No responsibility is assumed by the company or its employee to any other person for any loss or damage (whether caused by negligence or not) arising from the use of the information and advice contained herein. If you have received this email in error, please notify us immediately by return email or telephone on 61 (02) 9484 0609 and destroy the original message. Thank you.

On Tue, 17 Oct 2023 at 04:19 Sungwoo Park <park@northamericandevelopers.com> wrote:

fyi

---

**From:** Sungwoo Park
**Sent:** Monday, October 16, 2023 1:18 PM
**To:** Viet Anh Nguyen
**Cc:** 0113044814; Christine Stephens; HwangGi Sun; Ranjit Thambyrajah
**Subject:** Fw: Additional Information

Dear, Mr. Viet Anh Nguyen.

Mr. Roe will transfer the Project property, 267 Broadway, to the JV LLC at the closing day based on the attached PSA contract.

See attached files.

Sung Park

---

**From:** B J Roe <bj@roecorp.com>
**Sent:** Monday, October 16, 2023 1:07 PM
**To:** Sungwoo Park
**Subject:** Additional Information - 1

**R-030**

# <u>MEDICAL REPORT</u>

*<u>The entries in this form should be typed and not handwritten</u>*

**SECTION 1: PATIENT'S PARTICULARS**

**Full name of patient:**  Buhm Roe

**Passport no. of patient:**

**Age of patient:**    81

**SECTION 2: DOCTOR'S PARTICULARS**

**Full name of doctor:**    Saad Abdul Sami Mir, MD

**Passport no. of doctor:**    Irrelevant

**Hospital / Clinic name and address:**
   Weill Cornell Medical Center
   525 East 68th Street, Starr 6
   NYC, NY 10065

**Doctor's qualifications and experience in this area of work:**

   Associate Medical Director, NYP Mobile Stroke Unit
   Director, Teleneurology Services
   Assistant Professor of Clinical Neurology
   Weill Cornell Medical College
   Board Certified in Neurology and Vascular Neurology

**Doctor-patient relationship:**
*Please state if you have been seeing the patient regularly over a period of time (if so, please state when you first started seeing the patient and how often you see the patient) or if you saw the patient specifically for this mental capacity assessment only.*

Have known him since June 2023, last seen April 2025

## SECTION 3: PATIENT'S MEDICAL INFORMATION

**Patient's clinical history:**

*Please note that you should provide sufficient detail to support your opinion in respect of the patient's medical conditions.*

*Please also state the source of the information (e.g. from medical records, from the patient, from the applicant etc.).*

He has had two ischemic strokes and a left basal ganglia intracerebral hemorrhage in 2023. As a result, he has ongoing cognitive difficulties right sided weakness, and has to use a cane due to dragging of his leg.

**Findings from physical and mental state examination:**

*Please note that you should provide sufficient detail to support your opinion in respect of the patient's medical conditions.*

*Please also note that there should not be an overly long period between the date of examination of the patient and the date of this report.*

**Date of physical and mental state examination**: ___4/16/25_____

**Relevant investigation results:**
Slow cognition, poor recall, weakness in right arm and leg

**Diagnosis:**   left basal ganglia intracerebral hemorrhage

prior ischemic strokes

**OPINION ON PATIENT'S MENTAL CAPACITY IN RELATION TO ORAL EXAMINATION**

*If you are unable to state "Yes" or "No" in respect of a particular question, please state your opinion of the patient in respect of that item and provide sufficient supporting information.*

**In your opinion, can the patient understand information relevant to a question raised in an oral examination?**

☐ Yes  ☒ No

**In your opinion, can the patient retain information long enough to answer a question raised in an oral examination?**

☐ Yes  ☒ No

**In your opinion, can the patient weigh information as part of the process of answering a question raised in an oral examination?**

☐ Yes  ☒ No

**In your opinion, can the patient communicate his or her answer to a question raised in an oral examination?**

☐ Yes  ☒ No

**Taking into consideration the above, in your opinion, does the patient have mental capacity in respect of being a witness put under oral examination?**

☐ Yes  ☒ No

**Please state the basis of your opinion above in respect of the patient's mental capacity in respect of being a witness put under oral examination:**

**PROGNOSIS**

**In your opinion, is the patient likely to regain mental capacity in respect of being a witness put under oral examination?**

☐ Yes  ☒ No  ☐ Not Sure

**If "Yes" or "Not Sure", please suggest when another assessment of the patient's mental capacity should be carried out:**

**Are you aware of any other doctor who holds a different professional opinion regarding the patient's mental capacity?  If so, please provide details:**

*SECTION 5: OPINION ON PATIENT'S FITNESS FOR AIR TRAVEL*

**OPINION ON PATIENT'S FITNESS FOR AIR TRAVEL**

*If you are unable to state "Yes" or "No" in respect of a particular question, please state your opinion of the patient in respect of that item and provide sufficient supporting information.*

**In your opinion, based on the patient's mental and/or physical condition, is it advisable for him to take a flight of 10 hours or more?**

☐ Yes  ☒ No

**Please state the basis of your opinion above in respect of the patient's mental and/or physical condition for air travel:**

He has functional deficits making travel difficult and requires close monitoring of his blood pressure with close proximity to hospitals for urgent care.

**Are you aware of any other doctor who holds a different professional opinion regarding the patient's mental and/or physical condition in respect of travel?  If so, please provide details:**

I understand that my medical report has to contain sufficient detailed information about P's condition to support my opinion of P's health conditions referred to above.

I believe in the correctness of the opinion set out herein.

Signature: _____

Name:     Saad Mir, MD

Date:     6/17/25

*Explanatory notes:*

1.     *For the purposes of this report, "**oral examination**", in relation to a witness, means the questioning and/or examination of the witness either by the party who calls the witness or by the adverse party during a trial, hearing and/or proceedings before a court, judge or arbitral tribunal.*

2.     *When giving your opinion on the patient's mental capacity, please note that where it is not patently obvious from the clinical history and examination that the patient has or lacks capacity, you will need to explain the basis for your opinion.*