# Exhibit L

# Malini Ventura
v
# Knight Capital Pte Ltd and others

[2015] SGHC 225

High Court — HC/Suit No 792 of 2015 (HC/Summons Nos 3763 and 3844 of 2015)
Judith Prakash J
11, 27 August 2015

*Arbitration — Stay of court proceedings — Mandatory stay under International Arbitration Act (Cap 143A, 2002 Rev Ed) — Plaintiff denying signing arbitration agreement — Whether court should stay proceedings if existence of arbitration agreement in issue — Whether existence of arbitration agreement should be proven on* prima facie *basis in stay application — Sections 6(1) and 6(2) International Arbitration Act (Cap 143A, 2002 Rev Ed)*

Facts

The defendants agreed to grant a loan to a company ("the Borrower"), whose sole shareholder-director was the plaintiff's husband ("PV"), to partially finance the Borrower's acquisition of shares in another company ("XPL"). During negotiations for this loan, PV agreed that he and the plaintiff would guarantee the repayment of the loan. The plaintiff's and PV's guarantees were contained in a "Personal Guarantee Deed" ("the Guarantee") which was prepared in a number of counterparts. The Guarantee provided for any dispute or difference arising amongst the parties with respect to the Guarantee or "as to any matter or thing of whatsoever nature arising thereunder or in connection therewith, including any question regarding its existence, validity or termination" to be submitted to arbitration. The Guarantee which the plaintiff was supposed to execute was belatedly returned to the defendants bearing a signature next to the plaintiff's name and the signature of a witness. Subsequently, the Borrower defaulted on the scheduled repayment of the loan. Although there was a meeting between the plaintiff and third defendant arranged by PV, the loan was ultimately not repaid.

In February 2015, the defendants commenced arbitration proceedings in SIAC Arbitration No 24/2015 ("SIAC 24") against the plaintiff for payment pursuant to the Guarantee. The plaintiff applied to stay the arbitral proceedings on the ground that she had not signed the Guarantee and that the signature on it was a forgery. On 31 July 2015, the arbitral tribunal ruled that under r 25.2 of the SIAC Rules it had power to rule on its own jurisdiction "including any objections with respect to the existence, termination or validity of the arbitration agreement". It refused the plaintiff's application for a stay and stated that it would rule on the objection to its jurisdiction when delivering the award on the merits.

The plaintiff commenced the present proceedings, seeking a declaration that she had not entered into any arbitration agreement with the defendants and a further declaration that all proceedings in SIAC 24 were a nullity and of no effect. She also applied for an injunction to restrain the defendants from

continuing with SIAC 24 against the plaintiff pending the full and final disposal of the action. The defendants applied for a stay of court proceedings pending the full and final determination of SIAC 24 on the basis of s 6 of the International Arbitration Act (Cap 143A, 2002 Rev Ed) ("IAA").

Held, staying the main action in favour of arbitration and dismissing the application for an interim injunction:

(1)	Generally the court's consideration of whether an arbitration tribunal had jurisdiction or not had to come after the tribunal's own examination of the issue. The drafters of the UNCITRAL Model Law on International Commercial Arbitration ("Model Law") took care to provide this. A draft article providing that a court could concurrently determine a jurisdictional issue had been included in the draft of the Model Law but was later deleted to prevent dilatory tactics and obstruction of the arbitral process: at [27] and [28].

(2)	The party applying for a stay under s 6 of the IAA had to show on a *prima facie* basis only that the arbitration agreement existed. The IAA was enacted to incorporate the Model Law and the regime in force here gave primacy to the tribunal. In contrast, the fact that the Arbitration Act 1996 (c 23) (UK) ("the English Act") did not incorporate the Model Law wholesale and had some significantly different features indicated a somewhat different approach to the English court's involvement in arbitral proceedings. Accordingly, the English position (that the court could grant a mandatory stay under the English Act only if it was satisfied on a balance of probabilities that an arbitration agreement existed) would impose too high a burden on the party applying for a stay and should not be followed in Singapore: at [35] and [36].

(3)	The logical discomfort in the notion that an arbitral tribunal can be given authority to decide on its jurisdiction when it may end up deciding that it had no authority to decide the question had to be disregarded as the principle of "*kompetenz-kompetenz*" had been accepted and given effect to for many years. Otherwise courts might end up drawing finer and finer distinctions between situations in which the principle applied and situations in which it did not: at [37].

(4)	The defendants made out a *prima facie* case that the Guarantee was signed by the plaintiff despite her protestations otherwise. First, the signed copy of the Guarantee was provided to the defendants by solicitors representing PV and the Borrower. Second, PV and the Borrower were not strangers to the plaintiff and it would not have been irrational or completely abnormal or unusual for her to provide a guarantee of the Borrower's obligations. Third, after the defendants first indicated to the plaintiff that there had been an event of default by the Borrower, her response was not to deny any knowledge of the transaction or that she had signed the Guarantee but to indicate an interest in taking over XPL. The fact that her current position was taken belatedly and that she was capable of misrepresenting the true position casted doubt on her position. Finally, there was independent evidence that the signature on the Guarantee could be hers but the plaintiff's claim to the contrary was a bare assertion: at [40].

(5)	As a *prima facie* case was shown that the arbitration agreement existed, the court had to grant the stay application unless it was satisfied that the arbitration agreement was null and void, inoperative or incapable of being

performed. None of those situations existed here. "Null and void" meant "devoid of legal effect" which would be the result of the agreement being procured by duress, mistake, fraud or waiver; it did not apply to a situation in which no agreement had been concluded at all. Further, for an arbitration agreement to be "inoperative", it had to have been concluded but for some reason ceased to have legal effect: at [42].

**Case(s) referred to**

*Ahmad Al-Naimi v Islamic Press Agency Inc* [2000] 1 Lloyd's Rep 522 (distd)
*Nigel Peter Albon v Naza Motor Trading Sdn Bhd* [2007] 2 All ER 1075 (distd)
*PT First Media TBK v Astro Nusantara International BV* [2014] 1 SLR 372 (refd)
*Tjong Very Sumito v Antig Investments Pte Ltd* [2009] 4 SLR(R) 732; [2009] 4 SLR 732 (refd)

**Legislation referred to**

International Arbitration Act (Cap 143A, 2002 Rev Ed) ss 6(1), 6(2) (consd); s 6
Arbitration Act 1996 (c 23) (UK) ss 9(1), 9(4) (consd); ss 9, 30, 32

*Christopher Anand s/o Daniel and Harjean Kaur (Advocatus Law LLP) for the plaintiff;*
*Nakul Dewan (instructed by Franca Ciambella and Aishah Winter of Consilium Law Corporation) for the defendants.*

[Editorial note: The plaintiff's appeals to this decision in Civil Appeals Nos 179 and 180 of 2015 are scheduled for hearing by the Court of Appeal in the week beginning 28 March 2016. (The hearing date is subject to change. For the most updated hearing dates, please refer to www.supcourt.gov.sg.)]

27 August 2015                                                          Judgment reserved.

**Judith Prakash J:**

Introduction

1    The issue posed by the two applications before me is akin to the old and familiar brain teaser contained in the question: Which came first, the chicken or the egg?

2    The plaintiff started this action on 3 August 2015 seeking a declaration that she had not entered into any arbitration agreement with the defendants and a further declaration that all proceedings in the arbitration known as SIAC Arbitration No 24/2015 ("SIAC 24") are a nullity and of no effect. On the same day, she filed an application for an injunction to restrain the defendants, as claimants, from continuing with SIAC 24 against the plaintiff, as respondent, pending the full and final disposal of the action. The defendants' response, a few days later, was to file

a summons for all proceedings in this action to be stayed pending the full and final determination of SIAC 24. The defendants invoked s 6 of the International Arbitration Act (Cap 143A, 2002 Rev Ed) ("the IAA").

3      I heard both applications on an urgent basis on the same day. In essence, the defendants' contention is that there is an arbitration agreement to which the IAA applies and therefore, under s 6(2) of the IAA, I must stay this action and dismiss the plaintiff's application for an interim injunction. The plaintiff contends that the court is not bound to stay the proceedings under s 6(2) because, due to her position that she never signed any arbitration agreement and that the purported signature that appears on the document on which the defendants rely is not her signature but a forgery, no arbitration agreement exists and therefore the defendants have no standing to make an application under s 6 of the IAA.

4      The plaintiff says that the question as to whether a valid arbitration agreement exists so as to confer jurisdiction on the tribunal in SIAC 24 is an issue for the court. The defendants on the other hand argue that under the regime set up by the IAA and the UNCITRAL Model Law on International Commercial Arbitration ("the Model Law"), the existence of an arbitration agreement is pre-eminently an issue which comes within the jurisdiction of the arbitral tribunal and only after the tribunal has rendered its decision on its issue can the court play a role.

Background

*The Personal Guarantee Deed*

5      The first defendant is a Singapore incorporated company and the second to fifth defendants are individuals. In December 2013, all the defendants agreed to grant a loan to a Singapore incorporated company (which I shall refer to as "the Borrower") in the aggregate principal amount of US$2.3m to partially finance the Borrower's acquisition of all the shares in another company which I shall refer to as "XPL". The plaintiff's husband ("PV") was the sole shareholder and director of the Borrower.

6      During the negotiations for the loan to the Borrower, PV agreed that he and the plaintiff would guarantee the repayment of the loan as part of the security for it. The loan agreement and various security documents were signed on 28 December 2013. The guarantee of the plaintiff and PV were contained in a "Personal Guarantee Deed" ("the Guarantee") which was prepared in a number of counterparts and supposed to be executed on the same day. PV apparently executed one counterpart of the Guarantee on 28 December 2013 but the plaintiff did not sign any.

7      The loan moneys were disbursed to the Borrower in various tranches between 30 December 2013 and 3 January 2014. In late February 2014, the defendants were informed by their solicitors that as the plaintiff was

travelling she would only be able to provide the executed counterpart of the Guarantee on her return. Eventually, on 24 March 2014, the Borrower's solicitors, M/s Allen & Gledhill LLP ("A&G"), sent the defendants' solicitors a letter which stated "Enclosed please find the Personal Guarantee Deed executed by [the plaintiff]". The copy of the Guarantee attached to that letter bore a signature next to the plaintiff's name and also bore the signature of a witness. It appeared to the defendants that the plaintiff had signed the Guarantee in the presence of a witness.

8    The Guarantee provided, by cl 7.7 thereof, for any dispute or difference arising amongst the parties with respect to the Deed or "as to any matter or thing of whatsoever nature arising thereunder or in connection therewith, *including any question regarding its existence, validity or termination*" [emphasis added] to be submitted to a single arbitrator to be appointed by the parties or, failing agreement, to a single arbitrator to be appointed on the request of any party by the President of the Court of Arbitration of the Singapore International Arbitration Centre ("the SIAC").

*Events leading to this action*

9    On 29 April 2014, the Borrower defaulted on the scheduled repayment of the loan thus giving rise to an event of default under the loan documentation. On 2 June 2014, the defendants, through their solicitors, gave notice to the Borrower, PV and the plaintiff of the event of default and demanded payment from the Borrower and PV. The plaintiff was informed that if proceedings had to be commenced against the Borrower to enforce recovery, the plaintiff may be liable as guarantor for the loan. A few days later, the defendants received a letter from solicitors acting for the plaintiff and a company named Colloso Limited stating that their clients were considering purchasing XPL. At about the same time, there was a meeting between the plaintiff and the third defendant arranged by PV. It is not clear from the defendants' evidence what was discussed at the meeting.

10   The loan was not repaid. On 11 November 2014, the defendants' solicitors made a written demand on the plaintiff via a letter to her then solicitors, M/s Oon & Bazul LLP ("O&B"), for the sum of US$2.76m plus late interest and costs. The plaintiff did not make payment. However, subsequently there were attempts to mediate the dispute in which her solicitors participated. In the event, no mediation took place.

11   On 4 February 2015, the defendants issued a "Notice of Arbitration under the Singapore International Arbitration Centre" ("the Notice") in respect of their claim against the plaintiff for payment pursuant to the Guarantee. By the Notice, the claimant nominated one Mr Ben Giaretta as sole arbitrator. A copy of the Notice was sent to the plaintiff at an address in Kuala Lumpur.

12    The plaintiff did not respond directly to the Notice. However, on 14 April 2015, she sent an e-mail to the SIAC stating that she had received some letters which stated something about "ARBITRATION no.024 of 2015" and wanted to know what it was about. She said that she would send the matter to an attorney. The SIAC replied to the plaintiff by e-mail the same day informing her that she had been named the respondent in SIAC 24.

13    The plaintiff did not indicate any agreement to Mr Giaretta being appointed sole arbitrator. Thus, on 5 May 2015, the SIAC appointed another person, one Ms Caroline Kenny QC, as the sole arbitrator ("Tribunal") for SIAC 24.

14    On 13 May 2015, M/s Drew & Napier, acting as the plaintiff's solicitors, informed the Tribunal that, since 2012, the plaintiff had not resided at the Kuala Lumpur address to which the Notice had been sent and did not have a copy of the Notice. Therefore, M/s Drew & Napier asked for a month to obtain the Notice and take instructions on the proposed timelines for the arbitration. On 18 May 2015, the Tribunal sent out a draft Procedural Order which contained the proposed timelines for the arbitration.

15    On 21 May 2015, M/s Drew & Napier responded to the Tribunal's letter by informing it that the plaintiff's position was that SIAC 24 had been improperly commenced by the defendants. Their letter further stated that the plaintiff had not entered into any agreement, deed or contract with the defendants, including the Guarantee. The signature appearing on p 23 of the defendants' statement of case in the arbitration was not her signature and in the premises there was no valid arbitration agreement between her and the defendants. The letter emphasised that it was not a submission to jurisdiction in respect of the arbitral proceedings.

16    On 25 May 2015, the Tribunal issued Procedural Order No 1 which, among other things, required the plaintiff to file her statement of defence ("Statement of Defence") on or before 15 June 2015. She did not do so. On 17 June 2015, M/s Drew & Napier discharged themselves from acting for her and, on 23 June 2015, the plaintiff herself asked the Tribunal to give her some time as she was looking for another attorney. She subsequently appointed her present solicitors, Advocatus Law LLP ("Advocatus"), and on 16 July 2015 they asked the Tribunal to let them have two weeks to take instructions. The Tribunal responded the same day and extended the time for delivery of the Statement of Defence to Friday, 24 July 2015.

17    Ultimately, the Statement of Defence was served on 27 July 2015. In it the plaintiff made the following main points:

    (a)    The Statement of Defence was filed without prejudice to her right to object to the Tribunal's jurisdiction on the ground that there

was no valid arbitration agreement in existence between her and the defendants.

(b) The plaintiff did not sign or otherwise enter into the Guarantee. The signature purporting to be that of the plaintiff in that document is not hers.

(c) The plaintiff's challenge to the validity of the Guarantee on the ground that her signature was forged directly impeached the validity of the arbitration agreement.

(d) Accordingly, the Tribunal had no jurisdiction over the plaintiff including to rule on its own jurisdiction and the appropriate forum to determine whether the purported signature was indeed that of the plaintiff and if she is bound by the arbitration agreement was the Singapore court.

18    On 28 July 2015, the Tribunal requested the parties to indicate their availability for hearing from 21 to 28 August 2015. The plaintiff's solicitor responded by asking the Tribunal to stay the proceedings. On 31 July 2015, the Tribunal ruled that under r 25.2 of the SIAC Rules the Tribunal had power to rule on its own jurisdiction "including any objections with respect to the existence, termination or validity of the arbitration agreement". The Tribunal refused the application for a stay and stated that it would rule on the objection to its jurisdiction when delivering the award on the merits. Three days later, the plaintiff commenced the present proceedings.

How should section 6 of the IAA be applied?

19    This is where the chicken and the egg question arises. Mr Nakul Dewan, counsel for the defendants, says that the international arbitration regime in place in Singapore gives primacy to the Tribunal and it is the Tribunal that has the first bite at deciding whether or not there is an arbitration agreement which confers jurisdiction on it. The defendants further say that under s 6 of the IAA I have no choice but to refer the question of the existence, validity or termination of an arbitration agreement to the Tribunal. The plaintiff's riposte is that s 6 would only apply to an "arbitration agreement" and that since she did not sign the Guarantee, neither she nor the defendants are parties to an "arbitration agreement" within s 6(1) and therefore the defendants are not allowed to apply to court for a stay of this action. It is for the court to decide whether there is an arbitration agreement or not.

20    Essentially, my dilemma is how to apply s 6 of the IAA in the circumstances of this case. The first two subsections of that provision read:

Enforcement of intentional arbitration agreement

6.—(1) Notwithstanding Article 8 of the Model Law, where any party to *an arbitration agreement* to which this Act applies institutes any proceedings in

any court against any other party to the agreement *in respect of any matter which is the subject of the agreement*, any party to the agreement may, at any time after appearance and before delivering any pleading or taking any other step in the proceedings, apply to that court to stay the proceedings so far as the proceedings relate to that matter.

(2)　　*The court* to which an application has been made in accordance with subsection (1) *shall make an order*, upon such terms or conditions as it may think fit, *staying the proceedings* so far as the proceedings relate to the matter, *unless it is satisfied that the arbitration agreement is null and void*, inoperative or incapable of being performed.

[emphasis added]

21　　The plaintiff relies on s 6(1) to argue that where the existence of an arbitration agreement is challenged, until that challenge is resolved by the court, there can be no "arbitration agreement" which permits the opposing party to apply for a stay of the court action. The defendants, on the other hand, refer to Art 16 of the Model Law, which is part of Singapore law, and emphasise that under Art 16(1) the Tribunal may rule on its own jurisdiction including any objections with respect to the "existence or validity of the arbitration agreement". Accordingly, s 6(2) makes it plain that a stay must be issued unless the court is satisfied that the arbitration agreement is null and void or inoperative or incapable of being performed.

22　　There is no doubt that as a matter of general law, the courts have jurisdiction to decide on the existence or otherwise of a putative contract and this would include an arbitration agreement. It is the defendants who have invoked s 6 of the IAA to persuade me that in the present case the court's general jurisdiction must give way to the Tribunal's jurisdiction which is founded not only on Art 16 of the Model Law but also on r 25.2 of the SIAC Rules which specifically empowers the Tribunal to decide on the existence of the arbitration agreement. This section can only be invoked if there is an "arbitration agreement" and therefore the question is what burden of proof the defendants have to satisfy in order to persuade me of this.

23　　There is a subsidiary point which is that under s 6(1), for the application to be made, the court proceedings must be in respect "of a matter which is the subject of the agreement". The parties did not make much of this point, no doubt because they recognised that the wording of cl 7.7 of the Guarantee specifically referred to disputes about the "existence" of the arbitration agreement being among the disputes that would be referred to arbitration.

24　　The defendants' submission is that to make a determination that an arbitration agreement exists in order for a stay to be granted pursuant to s 6 of the IAA, the court is only required to be satisfied of the same on a *prima facie* basis. The plaintiff disagrees. Her counsel, Mr Christopher Daniel,

submits that in a situation where one party has denied ever entering into the alleged arbitration agreement so that its very existence is brought into question, the question as to whether any agreement was ever reached should be decided by the court on the usual civil standard after a full trial. He says there is a conceptual difficulty in referring the issue of existence to the tribunal since if no agreement was ever concluded, no tribunal can ever be constituted.

25    I should note here that the plaintiff did not dispute that if an arbitration agreement in the terms of cl 7.7 of the Guarantee existed it would give rise to an international arbitration governed by the IAA.

26    In order to decide on the applicable standard, it is necessary to look into the regime governing international arbitration. It is well-known that in this regime the role of the court has been deliberately circumscribed so as to promote the efficiency and speediness of the arbitral process. By Art 5 of the Model Law, the court is prohibited from interfering in matters governed by the Model Law except to the extent it expressly allows such intervention. Accordingly, in Singapore the court cannot interfere in this process except as specifically set out in the Model Law and the IAA.

27    In relation to jurisdictional questions, Art 16 of the Model Law, as noted earlier, confers on an arbitral tribunal a power to rule on its own jurisdiction including any objections with respect to the existence of the arbitration agreement. Under Art 16(3), a plea that the tribunal has no jurisdiction may be ruled on either as a preliminary question or in an award on the merits. The article further provides that if the tribunal makes a ruling as a preliminary question that it has jurisdiction, either party may within 30 days thereafter apply to the court to decide the matter. On the other hand, if the tribunal rules that it has jurisdiction as part of an award on the merits, the objecting party may apply under Art 34(2)(*a*)(i) to set aside the award on the ground that there was no jurisdiction because no arbitration agreement existed (see *PT First Media TBK v Astro Nusantara International BV* [2014] 1 SLR 372 at [156]). The drafters of the Model Law thus did not rule out recourse to court on the issue of jurisdiction but took care to provide that this issue would first be determined by the tribunal and would only be considered by the court after the tribunal had come to a decision. The drafters of the Model Law did consider whether court determination of the jurisdiction issue should be allowed prior to the tribunal's own decision and, at one point in time, a draft article providing for concurrent court control was included in the draft of the Model Law. Subsequently, however, this draft article was deleted for the purpose of preventing dilatory tactics and obstruction of the arbitral process (see *Yearbook of the United Nations Commission on International Trade Law, 1985, Vol XVI* at p 122 paras 12–13).

28    I therefore accept that under the regime established by the Model Law, generally the court's consideration of whether an arbitration tribunal

has jurisdiction or not must come after the tribunal's own examination of the issue. I also accept that the tribunal's powers in relation to the issue are wide because it can consider not only validity but also the very existence of the arbitration agreement. However, the true interpretation of s 6(1) impacts on whether in this case it is mandatory for me to stay the court proceedings.

29     Mr Daniel seeks to persuade me that if the very existence of an arbitration agreement is in question, it must be the court that considers this issue first. He drew my attention to a commentary in *Russell on Arbitration* (Sweet & Maxwell, 23rd Ed, 2007) at para 2-012, which reads:

> … By contrast, where it was alleged that the signature of one of the parties to the matrix contract had been forged, and hence no matrix contract or agreement to arbitrate had been reached, then this was a question going to whether there was any agreement ever reached and would be decided by the court.

30     The plaintiff says that this principle was applied by the English High Court in *Nigel Peter Albon v Naza Motor Trading Sdn Bhd* [2007] 2 All ER 1075 ("*Albon*") where the respondent contended that a purported joint venture agreement with the claimant was a forgery and, on that ground, refused to participate in the arbitration proceedings which were commenced by the claimants. It was stated in *Albon* at [20] that "[w]hilst the doctrine of '*Kompetenz-Kompetenz*' … provides that the arbitral tribunal shall have jurisdiction to determine whether the arbitration agreement was ever concluded, it does not preclude the court itself from determining that question".

31     Mr Daniel also noted that a local author has argued that "[i]f the facts and legal arguments impinge directly on the validity of the arbitration agreement, [for example], forgery of the main contract that contains the arbitration agreement – there is no *a priori* reason why the courts should defer entirely to the principle of *kompetenz-kompetenz*" (see Nicholas Poon, "The Use and Abuse of Anti-Arbitration Injunctions: A Way Forward for Singapore" (2013) 25 SAcLJ 244 at para 18).

32     The *Albon* case requires a closer look. It was decided in the English High Court by Lightman J on the issue of whether to grant a stay of court proceedings an application made under s 9(1) of the Arbitration Act 1996 (c 23) (UK) ("English Act"). Although the language is not identical, s 9 of the English Act is the equivalent of s 6 of the IAA and s 9(1) allows a party to an arbitration agreement against whom legal proceedings are brought in respect of a matter which under the agreement is to be referred to arbitration to apply for a stay of the court proceedings. Under s 9(4), on an application being made, the court "shall grant a stay unless satisfied that the arbitration agreement is null and void …".

33    Lightman J considered that on an application for a stay under s 9(1) if the issue arose whether the arbitration agreement was ever concluded and that issue could not be resolved on the written evidence before the court, the question was whether the court can or should give directions for the resolution of that issue by the court or can or should grant the stay so as to enable the issue to be resolved in the arbitration (at [13]). In his judgment, the language of s 9(1) established two threshold requirements. The first was that there had been concluded an arbitration agreement and that the second was that the issue in the proceedings was a matter which under the arbitration agreement was to be referred to arbitration. Unless the court was satisfied that both these conditions were satisfied, the court could not grant a stay under s 9 (at [14]). The judge noted that the English Court of Appeal in the case of *Ahmad Al-Naimi v Islamic Press Agency Inc* [2000] 1 Lloyd's Rep 522 ("*Al-Naimi*") had ruled that in a case where the conclusion of the arbitration agreement was an issue, there were four options open to the court:

(a)    (where it is possible to do so) to decide the issue on the available evidence presently before the court that the arbitration agreement was made and grant the stay;

(b)    to give directions for the trial by the court of the issue;

(c)    to stay the proceedings on the basis that the arbitrators will decide the issue; and

(d)    (where it is possible to do so) to decide the issue on the available evidence that the arbitration agreement was not made and dismiss the application for a stay.

These guidelines established that on an application under s 9(1) of the English Act, the court can try to and should decide the issue whether the arbitration agreement was concluded, but if it was not able to resolve the issue on the available evidence, the court could still stay the proceedings so that the arbitrators could decide the issue but only by exercising its inherent jurisdiction and not by exercising any jurisdiction under s 9.

34    Accordingly, it appeared to Lightman J that the English position was that if there was not sufficient evidence before the court to decide the issue of whether an arbitration agreement had been concluded, one way or the other, there was no room for the grant of a mandatory stay under s 9(4). Jurisdiction under s 9 to grant a stay would only arise if and when the issue was resolved in favour of the conclusion of the arbitration agreement (at [23]). In the case before him, he was not able to resolve the issue of the genuineness of the joint venture agreement containing the purported arbitration agreement on the evidence before the court. He held, therefore, that he had no jurisdiction to grant a stay under s 9. The judge did not state expressly what standard of proof he was applying in order to arrive at his conclusion but it can be inferred that it was the usual civil standard of the

balance of probabilities. Thus, at that stage, the evidence adduced by the applicants for the stay did not establish that the respondent had signed the arbitration agreement and that his signature was not a forgery (as he contended).

35     Although important phrases used in ss 9(1) and 9(4) of the English Act are equivalent to phrases used in ss 6(1) and 6(2) of the IAA, the context of the two sections is not the same. As I stated above, the IAA was enacted to incorporate the Model Law as part of the law of Singapore and the Model Law strictly circumscribes court intervention in arbitral proceedings. The IAA deals solely with international arbitration and we have a separate piece of legislation dealing with domestic arbitration in which the grounds for court intervention in arbitral proceedings are somewhat wider. The English Act, however, covers both international and domestic arbitration proceedings. Whilst it was based on the Model Law, it has not incorporated the Model Law wholesale (for example, there is no equivalent to Art 5) and has some significantly different features. Relevant in this context is s 30 of the English Act which, while conferring power on the arbitral tribunal to rule on its own substantive jurisdiction, also allows the parties to the arbitration agreement to opt out of this provision. Secondly, by s 32 of the English Act, the court may, on the application of a party to arbitral proceedings, determine any question as to the substantive jurisdiction of the tribunal. Although such application will not be considered unless it is made with the agreement in writing of all the other parties to the proceedings, or with the permission of the tribunal, its presence in the English Act is indicative of a somewhat different approach to the court's involvement in arbitral proceedings.

36     Bearing in mind the differences in the regimes governing international arbitration in Singapore and in England, I do not think it will be correct for me to fully take on board the approach of the English courts as set out in *Albon* ([30] *supra*) and *Al-Naimi*. The regime in force here gives primacy to the tribunal although, of course, the court still has an important role to play. If I were to hold that, in a situation where the conclusion of the arbitration agreement is in issue, the jurisdiction in s 6(2) to stay the court proceedings would not bite unless I could conclude, on the basis of the usual civil standard, that the arbitration agreement had been entered into, I would be imposing too high a burden on the party seeking the implementation of the arbitration agreement. I consider that it would satisfy the rights of both parties if the party applying for the stay was able to show on a *prima facie* basis that the arbitration agreement existed. The matter would then go to the tribunal to decide whether such existence could be established on the usual civil standard and then, if any party was dissatisfied with the tribunal's decision, such party could come back to the court for the last say on the issue. In another case regarding a tribunal's jurisdiction, albeit a different aspect not involving the formation of the

arbitration agreement, the Court of Appeal observed that it was only in the *clearest* case that the court should decide that there was no jurisdiction instead of remitting the matter to the tribunal for an initial decision (see *Tjong Very Sumito v Antig Investments Pte Ltd* [2009] 4 SLR(R) 732 at [22]–[24]).

37　　I note that "Commentary to the UNCITRAL Model Law" by Stavros L Brekoulakis and Laurence Shore in *Concise International Arbitration*, Loukas A Mistelis (ed) (Kluwer Law International, 2010) ("the Commentary") indicates at pp 601–602 that there have been other national courts which have given priority to the arbitral tribunal to decide the issue of existence of an arbitration agreement, holding that evidence that an arbitration agreement existed *prima facie* only would be enough for the courts to refer the issue to the tribunal for final determination. The Commentary also notes (at p 602) that other national courts have taken the contrary position. Whilst I recognise that there is some degree of logical discomfort in the notion that an arbitral tribunal can be given authority to decide on its jurisdiction when it may end up deciding that because one party did not sign it, no arbitration agreement ever existed and therefore in fact the tribunal had no authority to decide the question, I think that having accepted and given effect to the principle of "*kompetenz-kompetenz*" for so many years we must disregard that discomfort. Otherwise we may find ourselves drawing finer and finer distinctions between situations in which the principle applies and situations in which it does not.

Have the defendants made out a *prima facie* case that the plaintiff signed the Guarantee?

38　　The defendants rely on the following as *prima facie* evidence that the plaintiff signed the arbitration agreement:

> (a)　The executed version of the Guarantee was forwarded to the defendants' then solicitors, M/s Lee & Lee ("L&L"), by A&G, who had acted for the Borrower and PV in relation to the loan and security documents. L&L had communicated with A&G regarding the late provision of the Guarantee signed by the plaintiff. It is not clear whether A&G were acting for the plaintiff herself but it is indisputable that they were involved in the transaction on behalf of the Borrower and PV and therefore the fact that they furnished the document ostensibly signed by the plaintiff was an assurance as to the genuineness of such document.
>
> (b)　After the Borrower defaulted in late payment of the loan, the plaintiff met with the third defendant and also communicated with her then solicitors in relation to a proposed purchase of XPL. There was no reason for the plaintiff to have such communications if she had no knowledge of the transaction.

(c) When the defendants first informed the plaintiff by the solicitor's letter dated 2 November 2014 that they will enforce the Guarantee, the plaintiff did not dispute the existence of the Guarantee or her obligation to pay. Subsequently, she agreed to mediation as communicated by letter from her solicitors O&B.

(d) The defendants had obtained and adduced the expert evidence of Mr Pang Chan Kok William ("Mr Pang"), a handwriting and forensic documents expert. Mr Pang had examined eight specimen signatures of the plaintiff, including the one on the Guarantee, and had opined that there were a number of attributes within the handwriting of the questioned signature that were consistent with the specimen signatures and there was enough material to warrant undertaking further comparison of the questioned signature with other specimens of the plaintiff's signatures and handwriting.

39   The plaintiff's response was that she had not signed the Guarantee and that it was significant that the defendants had not adduced any evidence to rebut that position other than their statement of their belief that she had done so. No direct evidence of any sort had been adduced. It should be noted that the plaintiff's position that she did not sign the Guarantee was set out in the Statement of Defence in SIAC 24, in the statement of claim in this action and in an affidavit which she filed in support of her application for the injunction.

40   Evaluating the evidence, I have concluded that the defendants have made out a *prima facie* case that the Guarantee was signed by the plaintiff despite her protestations otherwise. First, the signed copy of the Guarantee was provided to the defendants by solicitors representing the plaintiff's husband PV and the Borrower. The defendants submitted that A&G were the plaintiff's solicitors as well but there is no evidence of this. Nevertheless, the fact that the signed document was provided by a firm of solicitors that was acting for parties who were definitely involved in the transaction gives the Guarantee a proper provenance. Second, the Borrower and PV are, obviously, not strangers to the plaintiff and it would not be irrational or completely abnormal or unusual for her to provide a guarantee of the Borrower's obligations. Third, after the defendants first indicated to the plaintiff that there had been an event of default by the Borrower, her response was to indicate an interest in taking over XPL. She did not at that stage deny any knowledge of the transaction or that she had signed the Guarantee. Subsequently, she met up with the third defendant. Later, after the letter of demand was issued to her, her solicitors were discussing possible mediation with the defendants' solicitors. It was not until May 2015, after SIAC 24 was started, that the assertion that she had not signed the Guarantee was made. This was extremely late for such a position to be taken and casts doubt on its truth. I have also taken into consideration that it is only the plaintiff's word that she did not sign the Guarantee and she has

shown herself to be capable of misrepresenting the true position. Further, there is some independent evidence that the signature on the Guarantee could be hers and there is no independent evidence that the signature on the Guarantee is not hers. Contrary to the plaintiff's contention, it is she rather than the defendants who desires the court to act on a bare assertion.

41     The conclusion I have come to is only a *prima facie* one. When the evidence is explored in full and the relevant persons have testified and been cross-examined, a different picture may emerge. It remains possible that the eventual conclusion reached may be that the plaintiff did not sign the Guarantee.

42     I have held, however, that at this stage it is only necessary for me to be satisfied on a *prima facie* basis that an arbitration agreement exists. Having reached that conclusion, the defendants are, *prima facie*, parties to an arbitration agreement and entitled to make an application for a stay under s 6. Further, I must grant that stay application unless I am satisfied that the arbitration agreement is null and void, inoperative or incapable of being performed. I am satisfied that none of those situations exist here. As Lightman J observed in *Albon* ([30] *supra*), the formulation "null and void" means "devoid of legal effect" which would be the result of the agreement being procured by duress, mistake, fraud or waiver. It does not apply to a situation in which no agreement was concluded at all. Further, for an arbitration agreement to be "inoperative", it must have been concluded but for some reason ceased to have legal effect (see *Albon* at [18]).

## Conclusion

43     For the reasons given above, I dismiss the plaintiff's application for an interim injunction and allow the defendants' application for a stay of this action. I therefore make an order that any and all proceedings in this court with respect to HC/Suit No 792 of 2015 and HC/Summons No 3763 of 2015 shall be stayed pending the full and final determination of SIAC 24.

44     I will hear the parties on costs.

Reported by Chua Wei Yuan.