# Exhibit M

# Cachet Multi Strategy Fund SPC on behalf of Cachet Special Opportunities SP *v* Feng Shi and others
# [2023] SGHCR 16

| | | |
|---|---|---|
| **Case Number** | : | Originating Claim No 10 of 2022 (Summons No 2215 of 2023) |
| **Decision Date** | : | 13 October 2023 |
| **Tribunal/Court** | : | General Division of the High Court |
| **Coram** | : | AR Perry Peh |
| **Counsel Name(s)** | : | Leow Jiamin and Nicole Seah (WongPartnership LLP) for the claimant; N Sreenivasan SC and Claire Tan (K&L Gates Straits Law LLC) (instructed) and Kelvin Lee and Samantha Ong (WNLEX LLC) for the second defendant. |
| **Parties** | : | Cachet Multi Strategy Fund SPC on behalf of Cachet Special Opportunities SP — Feng Shi — Alex SK Liu — Haven Global Network Pte Ltd |

*Civil Procedure – Striking out*

*Abuse of process –* Henderson v Henderson *doctrine*

13 October 2023

Judgment reserved.

**AR Perry Peh:**

**Introduction**

1       HC/SUM 2215/2023 ("SUM 2215") is the second defendant's application to strike out the claimant's claims in HC/OC 10/2022 ("OC 10") pursuant to O 9 r 16 of the Rules of Court 2021 ("ROC 2021"). One ground relied on by the second defendant for striking out is that the claimant's claims against him, which overlap in subject matter with claims previously pursued by the claimant against other parties in arbitration, could and should have been pursued in the arbitration and are therefore an abuse of process. The second defendant, however, was neither a party to the previous arbitration, nor was he a party to the arbitration agreement pursuant to which the previous arbitration had been constituted. While it appears that the extended doctrine of *res judicata* would operate to preclude the reopening in subsequent court proceedings of matters dealt with in an earlier arbitration, it is not so clear whether the same could be said of a situation like the present, where the party seeking to invoke the extended doctrine of *res judicata* was *not* a party to the earlier arbitration and had *not* been a party to the underlying arbitration agreement pursuant to which that arbitration had taken place.

**Background**

2       The claimant, Cachet Multi Strategy Fund SPC ("Cachet"), is a hedge fund incorporated in the Cayman Islands. The second defendant, Alex SK Liu ("Liu"), is the co-founder and director of a Singapore-incorporated company in the business of financial and management consultancy services, Haven Global Network Pte Ltd ("Haven"). Haven, on the other hand, is the third defendant in OC 10. The first defendant, Feng Shi ("Shi"), is

the other co-founder and director of Haven. Shi is also a majority shareholder of Haven. Judgment in default of a notice of intention to contest or not contest has been granted in respect of Shi and Haven and so the proceedings in OC 10 now only concern Liu.

***The previous arbitration proceedings***

3       Cachet's claims in OC 10 relate to an investment it made in Haven, which subsequently transpired to have been fraudulently induced by certain representations made by Shi, and in connection with which an arbitral award was obtained against Haven and another was obtained against Shi.

4       In September 2018, Cachet entered into a "Subscription Agreement" with Haven, under which it invested a sum of US$20m ("the Investment Sum") in Haven in exchange for a 10% shareholding[note: 1] and Cachet's then-Chief Executive Officer Angela Chow ("Chow") was also made a director of Haven pursuant to the investment.[note: 2] Cachet says that it was induced to enter into the Subscription Agreement as a result of various representations made by Shi ("the Representations"),[note: 3] which it believed to be true. Cachet subsequently discovered that the Representations were false, and that Shi had made them fraudulently.[note: 4] When its demand to Haven for a return of the Investment Sum was refused, on 2 September 2019, Cachet commenced an arbitration against Haven ("the Haven Arbitration") in the Singapore International Arbitration Centre ("SIAC").[note: 5] The Haven Arbitration was eventually determined in Cachet's favour. In an interim award delivered on 17 March 2021 ("the Haven Interim Award"), the tribunal found that all of the Representations save for one were false and fraudulently made by Shi.[note: 6] The tribunal declared that the Subscription Agreement had been validly rescinded on 18 April 2019, which was the day Cachet made its demand for a return of the Investment Sum, and further ordered Haven to repay the Investment Sum within 21 days of the Haven Interim Award.[note: 7] In a final award delivered on 26 November 2021 ("the Haven Final Award"), the tribunal ordered Haven to pay Cachet's legal costs of the arbitration and interest, as well as interest on the Investment Sum for the period while it remained unpaid.[note: 8]

5       One of the representations made by Shi was that he had, as of 30 June 2018, already made a capital contribution of US$1.15m in cash to Haven.[note: 9] This is one of the Representations that was later found by the tribunal in the Haven Arbitration to be untrue.[note: 10] Cachet, after discovering that this representation was false and that Shi did not make any capital contribution to Haven, issued repeated chasers for Shi to do so, which eventually led to Shi executing a "Deed of Undertaking" in favour of Cachet and Haven ("the Deed"), pursuant to which he undertook to contribute the full amount of his capital contribution by 30 June 2019.[note: 11] However, by 9 July 2019, Shi only paid US$200,000 as capital contribution, and so on 2 October 2019, Cachet commenced another arbitration against Shi in the SIAC to enforce the Deed ("the Deed Arbitration"). The Deed Arbitration was eventually determined in Cachet's favour, and in the award ("the Deed Award"), and Shi was ordered to pay into Haven his outstanding capital contribution as well as pay Cachet's legal costs.[note: 12]

***Cachet's attempts to enforce the arbitral awards***

6       Cachet says that it was compelled to commence proceedings in Hong Kong and the United States to enforce the arbitral awards obtained respectively against Haven and Shi, because they both failed and refused to comply with the terms of these awards.[note: 13] The enforcement proceedings in Hong Kong, commenced in March 2021, were in respect of the Haven Interim Award. Cachet did eventually obtain recovery of the Investment Sum, but that was only after it had expended HK$352,431.33 in legal costs and disbursements.[note: 14] The enforcement proceedings in California, commenced in October 2020, were in respect of the Deed Award. Despite having expended US$13,295.65 in the Californian enforcement proceedings, Cachet says that it has not been able to recover anything from Shi.[note: 15]

***The claims in OC 10***

7       Cachet advances mainly two sets of claims in OC 10. While not explicitly said so in the section summarising the reliefs claimed, the first set of claims concerning fraudulent misrepresentation appears to be pursued against Shi only.[note: 16] In respect of these claims, Cachet relies on the findings in the Haven Arbitration that the Representations (save for one) were false and that Shi had made them fraudulently, both of which Cachet says are binding as against Shi.[note: 17]

8       The second set of claims is for *unlawful* means conspiracy and is pursued against all three defendants. Cachet's case is that since in or around April 2018, the defendants (*ie*, Shi, Liu and Haven)[note: 18] conspired to: (a) defraud and/or mislead Cachet into investing in Haven; and (b) thereafter fraudulently or wrongfully siphon or use the Investment Sum for their self-enrichment ("**the Conspiracy**").[note: 19] Cachet pleads that the Conspiracy was brought about by unlawful means, namely, the following: (a) the Representations, which were false and made fraudulently by Shi, and which Liu and Haven were aware of; (b) Liu's and Shi's breaches of their fiduciary duties to Haven; (c) Haven's breaches of the Subscription Agreement, which were procured and/or induced by Shi and Liu; and (d) Shi's breach of a "Shareholders' Agreement" entered into between Shi, Cachet and other of Haven's shareholders.[note: 20] Cachet further pleads that these facts constitute evidence that the defendants had combined to carry out the Conspiracy for the predominant purpose of causing injury and/or loss to Cachet, and it also pursues a claim for *lawful* means conspiracy against Shi and Liu, in the alternative to its claim for unlawful means conspiracy.[note: 21]

9       In its Statement of Claim ("SOC"), Cachet cites the following incidents in support of its case on the Conspiracy. First, Cachet says that Haven had refused to comply with its demand for the return of the Investment Sum under the influence of Shi and Liu as part of the Conspiracy.[note: 22] Secondly, Cachet cites various acts which the defendants had engaged in, which Cachet pleads showed that the defendants were siphoning out monies from Haven (including the Investment Sum) for illicit self-enrichment. These included: (a) the making of numerous suspicious payments from Haven's bank account for purported "business expenses" or "salary payments" in or around December 2018; (b) causing Haven to repeatedly refuse disclosure of its employment contracts despite being called by Cachet to disclose them; (c) the payment of significant "sign-on" bonuses and salary to Shi and Liu without obtaining Haven's board approval; (d) surreptitious attempts to remove Chow as an authorised signatory of Haven's bank account, and the making of numerous payments totalling over HK$1.6m from Haven's bank account in the period when Chow was removed as an authorised signatory; (e) the making of numerous payments totalling HK821,540.56 from Haven's bank account without Chow's approval, in circumvention of the required approval procedures; and (f) persisting and/or participating in Shi's refusal to contribute the outstanding capital contribution, resulting in the Investment Sum being used for Haven's purported expenses.[note: 23] Thirdly, Cachet pleads that both Haven and Liu were aware, at the material time, that the Representations had been made fraudulently by Shi to induce Cachet's investment.[note: 24] Fourthly, Cachet pleads that the defendants caused Haven to vigorously contest Cachet's claim in the Haven Arbitration, in an attempt to cover up and conceal the fraud and the Conspiracy.[note: 25] Finally, Cachet also attributes the failure of Haven and Shi to comply with the terms of the respective arbitral awards against them to the influence and direction of the other defendants in OC 10, as part of and in furtherance of the Conspiracy.[note: 26]

10       Cachet claims the following reliefs from the defendants, whom it says are jointly and severally liable to Cachet as co-conspirators: (a) a sum of S$1,260,338.58 and interest, representing the legal costs of the Haven Arbitration which it has not been able to recover from Haven;[note: 27] (b) a sum of US$2,470,783.56, being the interest remaining payable on the Investment Sum, and which it has not been able to recover from Haven;[note: 28] (c) a sum of S$170,351.66, representing the legal costs of the Deed Arbitration which Cachet has not been able to recover from Shi;[note: 29] (d) a sum of HK$352,431.33 and interest, being the sum that Cachet has expended in enforcement proceedings in Hong Kong in respect of the Haven Interim Award;[note: 30] and (e) a sum of US$13,295.65 and interest, being the sum that Cachet has expended in enforcement proceedings in California in respect of the Deed Award.[note: 31] The impression conveyed by the reliefs claimed is that the *outcome* which Cachet seeks in OC 10 is to recover from the defendants what it had not yet been able to recover from the Haven Arbitration and the Deed Arbitration.

**The submissions**

11     The main point made by Liu in SUM 2215 is that the conspiracy claims in OC 10 are an abuse of process and ought to be struck out pursuant to O 9 r 16(1)(*b*) of the ROC 2021. First, the conspiracy claims, which essentially rely on the same facts and allegations that had been raised by Cachet in the Haven Arbitration and overlaps with the subject matter of the Haven Arbitration, ought to have been raised by Cachet in the Haven Arbitration.[note: 32] Secondly, looking at the complexion of the reliefs claimed in OC 10, it becomes clear that OC 10 has been brought for a collateral purpose by Cachet to recover what it had not been able to recover from Haven and/or Shi through the arbitral awards and the subsequent enforcement proceedings.[note: 33] Thirdly, there is also no "fresh evidence" that Cachet intends to rely on in its conspiracy claims in OC 10 which warrants re-litigation.[note: 34] In closing, Liu's counsel emphasised that OC 10 would reopen the entire dispute previously resolved in the Haven Arbitration and require the court to traverse those issues that have been determined in the Haven Arbitration, and is therefore oppressive to Liu and also strikes at the public interest of efficiency and economy in the conduct of the litigation, both of which underlie the extended doctrine of *res judicata*. As counsel put it, "the war had been fought and done in 2019 but now it is commenced again – that is precisely the oppression".

12     Further or in the alternative, Feng argues that the conspiracy claims are legally unsustainable and thus ought to be struck out pursuant to O 9 r 16(1)(*c*) of the ROC 2021. For the claim in unlawful means conspiracy, Liu says that he would be afforded immunity from tortious liability in respect of the actions alleged by Cachet as giving rise to the Conspiracy, by virtue of the principle in *Said v Butt* [1920] 2 KB 497. In *PT Sandipala Arthaputra and others v STMicroelectronics Asia Pacific Pte Ltd and others* [2018] 1 SLR 818 ("*PT Sandipala*") (at [62]), the Court of Appeal explained that the *Said v Butt* principle exempted directors from personal liability for the contractual breaches of their company if their acts, in their capacity as directors, were not in themselves in breach of any fiduciary or other personal legal duties owed to the company. Liu acknowledges that Cachet does rely on his alleged breach of fiduciary duty to Haven as part of the acts constituting the claim for unlawful means conspiracy, but he argues that this does not bring Cachet's case within the exception of the *Said v Butt* principle because Cachet has only provided a "bare pleading" that he had acted in breach of fiduciary duties to Haven, without any further particulars.[note: 35] Liu also argues that the *Said v Butt* principle affords him immunity from the claim for lawful means conspiracy, and Cachet's bare allegation in the SOC that he had acted with a predominant purpose of causing injury and loss to Cachet does not suffice to bring this case within the exception of the *Said v Butt* principle.[note: 36]

13     Finally, Liu also argues that the conspiracy claim is factually unsustainable and ought to be struck out pursuant to O 9 r 16(1)(*c*) of the ROC 2021. Liu relies on evidence that he has deposed to in his supporting affidavit for SUM 2215 as contradicting what Cachet has pleaded in the SOC in support of the Conspiracy. In support of his contention that the conspiracy claims are factually unsustainable, Liu also argues the facts as pleaded in the SOC do not disclose a conspiracy, and that the SOC is deficient in terms of particulars as to how exactly he had been involved in the Conspiracy.

14     Cachet denies any abuse of process in its conspiracy claims, for the following reasons. First, the conspiracy claims in OC 10 are a result of *bona fide* case management decisions on its part. At the material time, it had to act with urgency to recover the Investment Sum from Haven, and so it commenced an interim application before the tribunal adjudicating the Haven Arbitration to protect the Investment Sum from being depleted pending the determination of the Haven Arbitration,[note: 37] and in conjunction with the interim application, it commenced the Haven Arbitration, to which only Haven and itself could have been parties because they were the only parties to the arbitration agreement in the Subscription Agreement.[note: 38] Cachet explains that under the SIAC Rules, which governed the Haven Arbitration, a third party can only be joined to an arbitration if all parties consented to the joinder, and in these circumstances, it proceeded first with the Haven Arbitration rather than seek to join Liu to the Haven Arbitration to avoid parties engaging in a jurisdictional fight over whether the tribunal had jurisdiction over Liu.[note: 39] Secondly, the conspiracy claims in OC 10 does not seek to relitigate the tribunal's findings in the Haven Arbitration.[note: 40] Thirdly, a significant portion of the events forming the basis of the conspiracy claims only came to Cachet's knowledge after the commencement of the Haven Arbitration, whether in the course of evidence given in the Haven Arbitration or in the enforcement proceedings concerning the Haven Interim Award and/or Deed Award.[note: 41]

15      Cachet also argues that its conspiracy claims against Liu are legally sustainable because if all the pleaded facts in the SOC were proven, it would be entitled to the remedies sought.[note: 42] It argues that the *Said v Butt* principle is engaged only where the wrongs underlying the claim against the defendant-director involve contractual breaches by the company. The *Said v Butt* principle therefore does not apply in the present case because the conspiracy claims are also premised on grounds other than Haven's contractual breaches, including Shi and Liu's breaches of fiduciary duties to Haven. Finally, Cachet also argues that the conspiracy claims are factually sustainable. It argues that the contentions raised by Liu on this point are mere bare assertions which are contradicted by the evidence that it has adduced in response, and at best, they only demonstrate that there are disputes of fact which ought to be resolved at trial.[note: 43]

**The applicable principles**

16      Order 9 r 16 of the ROC 2021 provides three grounds pursuant to which "any or part of any pleading" may be struck out. Liu confirmed in his submissions for SUM 2215 that he is only relying on two of these three grounds: (a) that the claimant's claims are an abuse of process (O 9 r 16(1)(*b*)); and (b) that it is in the interests of justice for the claimant's claims to be struck out (O 9 r 16(1)(*c*)).[note: 44] In *Iskandar bin Rahmat and others v Attorney-General and another* [2022] 2 SLR 1018 (at [16]–[19]), the Court of Appeal explained the tests applicable to each of these limbs:

(a)      Under O 9 r 16(1)(*b*), the question is whether the judicial process is being used as a means of vexation and oppression in the process of litigation. The inquiry includes considerations of public policy and the interests of justice. This limb also signifies that the process of the court must be used *bona fide* and must not be abused.

(b)      Under O 9 r 16(1)(*c*), the question is whether the case is one where the court should exercise its inherent jurisdiction to prevent injustice, such as where the claim is "plainly or obviously unsustainable".

17      In connection with O 9 r 16(1)(*b*), the term "abuse of the process of the Court" is given a wide interpretation, and the categories of conduct rendering a claim an abuse of process are not closed and will depend on all the relevant circumstances of the case (see *Gabriel Peter & Partners (suing as a firm) v Wee Chong Jin and others* [1997] 3 SLR(R) 649 ("*Gabriel Peter*") at [22]). While it is not clear whether the extended doctrine of *res judicata* is a procedural or substantive rule (see, for example, *AKN and another v ALC and others and other appeals* [2016] 1 SLR 966 ("*AKN (No 2)*") at [59]; *Virgin Atlantic Airways Ltd v Zodiac Seats UK Ltd (formerly Contour Aerospace Ltd)* [2013] 3 WLR 299 at [17] and [24]; David Williams QC and Mark Tushingham, "The Application of the *Henderson v Henderson* Rule in International Arbitration" (2014) 26 SAcLJ 1036 ("*Henderson v Henderson Rule in International Arbitration*") at paras 38–39), for present purposes, in so far as Liu's complaint of abuse of process is that the conspiracy claims are oppressive to him and so the court should not permit Cachet to proceed with those claims in OC 10, he is invoking the court's procedural powers to police Cachet's use of the judicial process. It is therefore correct that Liu's arguments on the extended doctrine of *res judicata* come under the abuse of process limb in O 9 r 16(1)(*b*).

18      In connection with O 9 r 16(1)(*c*), a claim is plainly or obviously unsustainable either where it is "legally unsustainable" or "factually unsustainable" (see *The "Bunga Melati 5"* [2012] 4 SLR 546 at [39]–[40]). A claim is "legally unsustainable" where it would be clear as a matter of law that a party would not be entitled to the remedy sought even if it were to succeed in proving all the facts he offers to prove. A claim is "factually unsustainable" where it could be said with confidence before trial that the factual basis for the claim is entirely without substance, which can be the case if it were clear beyond question that the facts pleaded are contradicted by all the documents or other material on which it is based.

**The issues**

19      Before turning to the issues, I make two preliminary observations. First, while it is relatively settled law that the extended doctrine of *res judicata* can operate to preclude the reopening in subsequent court proceedings of subject matter properly belonging to or which have been dealt with in an earlier arbitration (see

*AKN (No 2)* ([17] above) at [57]–[58]), it would appear from the case law in which this principle has been applied that those cases dealt with a situation where the parties to the subsequent court proceedings had *also* been parties to the previous arbitration (see [25] below). In so far as both the conspiracy claims *and* the Haven Arbitration dealt with the Investment Sum and Cachet's investment in Haven pursuant to the Subscription Agreement, it cannot be seriously disputed that there is an overlap in subject matter between the conspiracy claims and the Haven Arbitration. However, the *applicability* of the extended doctrine of *res judicata* in this case cannot be presupposed because Liu was neither a party to the Haven Arbitration nor a party to the arbitration agreement in the Subscription Agreement. The question of principle raised is whether the extended doctrine of *res judicata* is even of any application in a situation like the present.

20      Secondly, one of the grounds on which Liu seeks to attack Cachet's claims as being factually unsustainable is that the pleaded facts in the SOC do not disclose a conspiracy to which Liu had been a party in that it lacks particulars as to how Liu had been involved in the Conspiracy. This appears to be an argument that the SOC is deficient and that the pleaded facts therein do not disclose a complete cause of action in conspiracy against him, which are grounds for striking out under O 9 r 16(1)(*a*) of the ROC 2021. However, Liu has confirmed in his written and oral submissions that he is not relying on O 9 r 16(1)(*a*). Given the position that Liu has taken, I am left with considering this argument in the context of O 9 r 16(1)(*c*), and specifically, the question raised is whether any inadequacy in the pleaded facts can have the effect of rendering the conspiracy claims factually unsustainable for the purposes of O 9 r 16(1)(*c*).

21      Accordingly, the following issues arise for determination in SUM 2215:

(a)      Where a claimant's claims in subsequent court proceedings overlaps with the subject matter belonging to or which have been dealt with in an earlier arbitration, can the extended doctrine of *res judicata* be of any application, if the defendant in the subsequent court proceedings was not a party to the previous arbitration, and had not been a party to the arbitration agreement pursuant to which the previous arbitration had been constituted?

(b)      In view of the above, whether the conspiracy claims in OC 10 attract the extended doctrine of *res judicata* and are an abuse of process?

(c)      Whether the claims for unlawful means and lawful means conspiracy are legally unsustainable because Liu would have been entitled to the protection of the *Said v Butt* principle and thus immune from liability in respect of these claims?

(d)      Whether the conspiracy claims are factually unsustainable because: (i) the pleaded facts are contradicted by the evidence adduced by Liu; and/or (ii) the pleaded facts are inadequate in showing Liu's involvement in the Conspiracy?

**Whether the extended doctrine of *res judicata* can be of any application where the defendant in the subsequent court proceedings was not a party to the previous arbitration and had not been a party to the underlying arbitration agreement?**

22      The extended doctrine of *res judicata*, also known as the defence of abuse of process, is one of three interrelated but distinct principles coming within the umbrella doctrine of *res judicata*, the other two being the principles of cause of action estoppel and issue estoppel (see *Goh Nellie v Goh Lian Teck and others* [2007] 1 SLR(R) 453 ("*Goh Nellie*") at [17]–[19]). Unlike cause of action estoppel and issue estoppel, which is engaged where a party seeks to re-argue points which were the subject of a previous judicial decision in earlier proceedings between the same parties, the extended doctrine of *res judicata* prevents a party from raising certain points in later proceedings even when they had not been raised in the earlier proceedings, provided that these points properly belonged to the subject of the earlier proceedings and which the parties exercising reasonable diligence could and should have raised in the earlier proceedings (see *The Royal Bank of Scotland NV (formerly known as ABN Amro Bank NV) and others v TT International Ltd (nTan Corporate Advisory Pte Ltd*

*and others, other parties and another appeal*) [2015] 5 SLR 1104 ("*TT International Ltd*") at [101]–[102]). Underlying the entire umbrella doctrine of *res judicata* is the policy that litigants should not be twice vexed in the same matter, and that the public interest requires finality in litigation (see *TT International Ltd* at [98]).

23      The public interest in finality is of no lesser importance in arbitration (see *AKN (No 2)* ([17] above) at [57]–[59]). The court may therefore disallow a party to raise certain points in subsequent court proceedings which it could and should have raised in the earlier arbitration, whether in the form of fresh allegations that seeks to undermine the arbitral award (see, for example, *CLX v CLY and another and another matter* [2022] SGHC 17 at [110]–[112]) or in the form of fresh claims canvassing the same subject matter as that dealt with in the arbitration (see *AKN (No 2)* at [58]). There are two cases illustrative of the latter. The first is *Denmark Skibstekniske Konsulenter A/S I Likvidation (formerly known as Knud E Hansen A/S) v Ultrapolis 3000 Investments Ltd (formerly known as Ultrapolis 3000 Theme Park Investments Ltd)* [2011] 4 SLR 997 ("*Ultrapolis*"). There, the High Court held that the defendant was precluded by the extended doctrine of *res judicata* from asserting a cross-claim in resisting a winding-up application brought by the plaintiff. The court reasoned that the cross-claim ought to have been raised as a counterclaim by the defendant in previous arbitration proceedings brought by the plaintiff against the defendant, in which the defendant had chosen to not participate and had allowed for the hearing to proceed by default, because the counterclaim arose out of the same facts and transactions that were the subject matter of that arbitration (see *Ultrapolis* at [6]–[7], [37] and [41]).

24      The second case is *Dallal v Bank Mellat* [1986] QB 441 ("*Dallal*"), which was cited by the High Court in *Ultrapolis*. That case concerned claims brought by the plaintiff against the defendant in the Iran-United States Claims Tribunal, which was an adjudication body established pursuant to an international treaty entered into between the US and Iran for claims by the nationals of one government against the government or national corporations of the other to be determined, and which would operate as a final resolution and discharge of the claim for all purposes. The plaintiff commenced a claim in the tribunal for the recovery of $400,000, which were damages he claimed to have suffered as a result of a dishonoured cheque issued by the defendant. The tribunal by a 2:1 majority dismissed the plaintiff's claims. Dissatisfied, the plaintiff commenced proceedings in the English courts pursuing those very same claims (see *Dallal* at 450). The court found that the plaintiff's claims were an abuse of process and ordered that they be struck out. The court reasoned that the proceedings before the tribunal had been intended to be proceedings in which the plaintiff's rights in respect of all material matters were to be decided, and the plaintiff ought to have in those proceedings presented all the ways in which he sought to sustain his claims, and furthermore, the plaintiff did not cite any special circumstances which prevented him from properly presenting his case before the tribunal (see *Dallal* at 463). The court held that the plaintiff's subsequent claims in the court proceedings therefore fell squarely within the type of mischief that targeted by the extended doctrine of *res judicata*, which was referred to in that judgment as the principle in *Henderson v Henderson* (1843) 3 Hare 100 (see *Dallal* at 463).

25      Both *Ultrapolis* and *Dallal* involved a situation where the parties to the subsequent court proceedings and the previous arbitration were the same. In this case, the parties have not cited to me any authority in which the extended doctrine of *res judicata* has been directly considered and applied in a situation where the parties to the subsequent court proceeding were not identical to those in the previous arbitration. The issue of whether the extended doctrine of *res judicata* can be of any application in the present situation therefore needs further examination. In my view, this engages three considerations:

(a)     is the absence of an identity of parties in the subsequent court proceedings and the previous arbitration an impediment to the application of the extended doctrine of *res judicata*;

(b)     do the differences between arbitration and litigation as methods of dispute resolution call for a different approach to the application of the extended doctrine of *res judicata* in a situation like the present; and

(c)     is there any justification for the policy underlying the extended doctrine of *res judicata* to operate where the defendant in the subsequent court proceeding seeking to invoke the extended doctrine to prevent the claim against him from proceeding had neither been a party to the previous arbitration nor a

party to the underlying arbitration agreement?

26     I begin with the first consideration. In the context of cases where the previous and subsequent proceedings are both litigation, the extended doctrine has been applied, even where the parties to the previous and subsequent proceedings were not the same (see, for example, *Antariksa Logistics Pte Ltd and others v Nurdian Cuaca and others* [2018] 3 SLR 117 at [74]; *Kwa Ban Cheong v Kuah Boon Sek and others* [2003] 3 SLR(R) 644 ("*Kwa Ban Cheong*") at [32]; *Hunter v Chief Constable of the West Midlands Police* [1982] AC 529, considered in *Goh Nellie* at [20]–[22]). It is not difficult to see why that has been so. The question of whether there is an abuse of process requires the court to look at "all the circumstances of the case", and the court should not adopt an "inflexible or unyielding attitude" in this inquiry (see *Goh Nellie* ([22] above) at [53]). Given the nature of this inquiry, it would generally be unwise to define fully the circumstances which can be regarded as an abuse of process or to fix categories of abuse (see *Kwa Ban Cheong* at [27]). Whether the parties in the previous and subsequent proceedings were the same therefore cannot be conclusive as to whether the extended doctrine of *res judicata* applies because that must turn on a consideration of all other relevant factors in the case. Of course, that there is no requirement of identity of parties in the litigation context does not mean that the same conclusion should necessarily be reached in the present situation where the previous and subsequent proceedings involve arbitration and litigation respectively. Whether the earlier conclusion can be extrapolated will turn on whether the differences between arbitration and litigation as methods of dispute resolution are material for present purposes, to which I next turn.

27     The distinction between arbitration and litigation lies in the source from which their authority as binding and effectual methods of dispute resolution is derived. The foundational principle in arbitration is the notion of party autonomy and it is manifested in how parties have a choice over their adjudicators, what claims that they submit for adjudication, and the procedural rules that apply to the adjudication process, all of which are matters dealt with in the arbitration agreement (see generally *AKN and another v ALC and others and other appeals* [2015] 3 SLR 488 at [37]). The jurisdiction of the arbitral tribunal over the parties and the subject matter of the dispute flows none other than from the consent of the parties to have their dispute resolved by the arbitrator. The outcome of the arbitration also affects the parties' legal rights and obligations, because of their agreement to have the dispute adjudicated by arbitration (see, for example, s 19B(1) of the International Arbitration Act 2002 (2020 Rev Ed) and s 44(1) of the Arbitration Act 2002 (2020 Rev Ed)). On the other hand, in the context of litigation, the court's jurisdiction over the dispute and the authority associated with any of its judgments and/or orders is an incident of its judicial power, as vested in the court pursuant to Art 93 of the Constitution (see *Nagaenthran a/l K Dharmalingam v Public Prosecutor and another appeal* [2019] 2 SLR 216 at [72]).

28     In my view, however, this distinction does not call for a different approach to the application of the extended doctrine of *res judicata* in the present situation. Of course, since the defendant in the subsequent court proceeding had not been a party to the arbitration agreement pursuant to which the previous arbitration was constituted, he could not be said to have submitted to the jurisdiction of the arbitral tribunal. The absence of any consent to jurisdiction by the defendant also means that the decision of the arbitral tribunal cannot have any effect on him. However, a defendant who invokes the extended doctrine of *res judicata* to prevent the claimant's subsequent claims in court against him from proceeding on the basis of an *abuse of process* does not *rely* as against that claimant rights or liabilities established in the previous arbitration (for an example of the latter, see *Lincoln National Life Insurance Co v Sun Life Assurance Co of Canada and others* [2004] EWCA Civ 1660). Since the defendant is not *substantively* relying on the *outcome* of the previous arbitration *against* the claimant, the fact that the defendant had not submitted to the jurisdiction and authority of the arbitral tribunal is inconsequential. Therefore, as a matter of principle, there is nothing precluding the defendant in the subsequent court proceeding from invoking the extended doctrine of *res judicata* on the basis of a previous arbitration, even if it had not been a party to the previous arbitration or the underlying arbitration agreement.

29     I turn now to the third consideration, which is whether there is any *justification* for the extended doctrine of *res judicata* to operate in a situation like the present. What the extended doctrine of *res judicata* seeks to do is to incentivise a claimant to bring *all* his claims against *all* relevant parties in a single forum, where all those claims share a common subject matter and properly belong to the same proceeding. Our courts have given this rationale equal weight in the arbitration context (see, for example, *AKN (No 2)* ([17] above) at [57]–[59]). If arbitration is to achieve the objective of a speedy, final resolution of disputes in a single forum, and if a

multiplicity of dispute resolution proceedings is to be avoided (see *The Application of the* Henderson v Henderson *Rule in International Arbitration* ([17] above) at [10]), arbitration claimants should be encouraged to pursue *all* claims within the scope of the arbitration agreement in a single arbitration, and this in principle ought to apply with equal force even to those claims against parties who are not privy to the arbitration agreement. It should be noted that most arbitral rules, including those which applied to the Haven Arbitration, provide for the joinder of such parties to the arbitration where all parties consent (see, for example, r 7.1(b) of the SIAC Rules 2016 and Art 27.1(b) of the 2018 Hong Kong International Arbitration Centre Administered Arbitration Rules; see also Art 22.1(x) of the London Court of International Arbitration Rules 2020). Our judicial policy is one of supporting and facilitating the arbitral process (see, in a different context, *Tjong Very Sumito and others v Antig Investments Pte Ltd* [2009] 4 SLR(R) 732 ("*Tjong Very Sumito*") at [29]) and it is consistent with this to encourage an arbitration claimant to pursue and raise *all* his claims in the arbitration if he views them as forming part of the subject matter of the arbitration, even if those claims were held against parties not privy to the arbitration agreement. The arbitration claimant should be encouraged to avail himself of the mechanisms (if available) that allow for these claims to be also resolved in the arbitration, where they properly belong. For completeness, I add that the above would apply with equal force to counterclaims advanced by a respondent in arbitration, since the considerations I have cited above should be given no less weight in the context of counterclaims.

30      Therefore, in my judgment, the extended doctrine of *res judicata* can apply to prevent claims in subsequent court proceedings where those claims overlap with subject matter that belonged to or which have been dealt with in a previous arbitration, even if the defendant in the subsequent court proceedings had neither been a party to the previous arbitration nor a party to the arbitration agreement pursuant to which the previous arbitration had been constituted, provided *however* that those claims in the subsequent court proceedings fall within the scope of the arbitration agreement. I emphasise, the fact that the claims in the subsequent court proceeding fall within the scope of the arbitration agreement only means that the extended doctrine of *res judicata* is *relevant*; the question of whether the claimant is precluded by the extended doctrine of *res judicata* from advancing those claims requires the court to consider all the circumstances of the case and determine if the claims in the subsequent court proceeding are indeed an abuse of process, as in any other case where the extended doctrine of *res judicata* is to be applied. The High Court in *Goh Nellie* ([22] above) (at [53]) set out a list of non-exhaustive factors that are relevant to this analysis, which I respectfully reproduce here: (a) whether the later proceedings in substance is nothing more than a collateral attack upon the previous decision; (b) whether there is fresh evidence that might warrant litigation; (c) whether there are *bona fide* reasons why an issue that ought to have been raised in the earlier action was not; and (d) whether there are some other special circumstances that might justify allowing the case to proceed.

31      Factor (c), applied in the present context, would be concerned with whether there were any reasons why the claimant omitted to pursue its claims against the defendant as part of the previous arbitration. Of relevance would be any perceived difficulties on the claimant's part in seeking the joinder of the defendant to the arbitration, or if the defendant had in fact objected to be joined as a party to the arbitration. As the High Court emphasised in *Goh Nellie* (at [53]), the inquiry as to whether there is an abuse of process is not directed at the *theoretical* possibility that the issue raised in the later proceedings could conceivably have been taken in the earlier, but whether, having regard to the *substance and reality* of the earlier proceeding, it reasonably ought to have been. Therefore, if the claimant had omitted to take steps to have the claims in the subsequent court proceeding also adjudicated in the previous arbitration and then furnishes explanations as to why that had been the case, the court must also assess its explanations with reference to the *substance and reality* of the situation.

32      Therefore, where a defendant relies on the extended doctrine of *res judicata* to strike out court proceedings on the basis of a previous arbitration to which it was not a party and where it was not privy to the underlying arbitration agreement, it bears the legal burden of demonstrating how the claims in the court proceedings come within the scope of the arbitration agreement. The claimant in resisting the striking-out application must then explain why the claims in the subsequent court proceedings could not have been brought as part of the arbitration, whether because the claims do not come within the scope of that arbitration agreement, or if they did so, that there was good reason why those claims could not have been pursued as part of the arbitration.

33     I make three further points in connection with the proposition articulated above. First, the relevant test is whether the claims come within the scope of the arbitration agreement. This turns on what the parties had agreed to arbitrate by virtue of the arbitration agreement (which ordinarily would turn on an interpretation of the arbitration clause and/or any subsequent agreements varying it), and not what the parties had actually referred to arbitration (see, for example, *The Application of the* Henderson v Henderson *Rule in International Arbitration* ([17] above) at [9]–[11]; *cf* Michael Mustill and Stewart Boyd, *The Law and Practice of Commercial Arbitration in England* (2nd End, Butterworths, 1989) at p 413). After all, the claimant's view of what properly belonged to the subject matter of a single proceeding (being the arbitration) would be shaped by the ambit of the arbitration agreement rather than the steps that the parties had actually taken pursuant to the arbitration agreement in referring their dispute to the arbitral tribunal. Secondly, and for the avoidance of doubt, the proposition articulated above does *not* apply to a situation where the defendant in the subsequent court proceedings had been a party to the underlying arbitration agreement but was not a party to the previous arbitration proceedings because it had *refused* arbitration. Such a situation engages distinct considerations from the present because in that case, the defendant's conduct would appear to be in repudiation of the arbitration agreement. It should not lie in the mouth of that defendant to invoke the extended doctrine of *res judicata* on account of an arbitration that he could have but refused to be part of. Thirdly, and similarly for the avoidance of doubt, a situation where the defendant was a party to the arbitration agreement but was not made a party to the arbitration because the claimant chose not to pursue certain claims against it in that arbitration, obviously does not fall within the ambit of the proposition above. A case like this would *prima facie* attract the extended doctrine of *res judicata* because it is a classic example of one where the claims in the subsequent court proceeding could and should have been advanced in the arbitration (see *AKN (No 2)* (17) above) at [59]).

**Whether the conspiracy claims attract the extended doctrine of *res judicata***

34     I now turn to consider whether Cachet's claims for lawful means and unlawful means conspiracy attract the extended doctrine of *res judicata*. The starting point of the analysis is whether these claims come within the scope of the arbitration agreement underlying the Haven Arbitration. For completeness, I should add that it is not Liu's case that these claims are an abuse of process because they should have been pursued in the Deed Arbitration,[note: 45] and so the corresponding arbitration agreement in that arbitration need not be considered.

35     The arbitration agreement underlying the Haven Arbitration is contained within cl 15.18 of the Subscription Agreement, the relevant part of which states:[note: 46]

> The law in force in Singapore governs this document. *Any dispute arising from, out of or in connection with this Agreement* shall be settled by friendly consultations between the Parties. Consultations shall begin immediately upon one Party delivering to the other Party a written request for such consultation.
>
> If within 30 (thirty) days following the date on which the request is given, the dispute cannot be settled through consultation, the dispute (including any question regarding its existence, validity or termination) shall be referred to and finally resolved by arbitration in Singapore in accordance with the Arbitration Rules of the Singapore International Arbitration Centre …
>
> [emphasis added]

36     It is trite that arbitration clauses should be generously construed such that all manner of claims, whether common law or statutory, should be regarded as falling within their scope unless there is good reason to conclude otherwise (see *Larsen Oil and Gas Pte Ltd v Petropod Ltd (in official liquidation in the Caymand Islands and in compulsory liquidation in Singapore)* [2011] 3 SLR 414 ("*Petropod Ltd*") at [19]). Therefore, the words "any dispute" have been held to be wide enough to cover claims involving the tort of conspiracy, breach of fiduciary duty and fraud *etc*, in addition to claims under the contract in which the arbitration clause is contained (see *Petropod Ltd* at [13]). Our courts have also held that the phrase "arising out of or in connection

with" (which appears in a similar form in the arbitration clause above) is to be given a generous interpretation so that it extends to all manner of issues that have a relationship with the contract in which the arbitration clause is contained (see *Tjong Very Sumito* at [50]).

37     Applying the principles above, I am of the view that the conspiracy claims come within the scope of the arbitration clause in the Subscription Agreement. Since Cachet cites in support of the Conspiracy the defendants' failure (which would include Haven) to return the Investment Sum on demand and how the defendants had misused the Investment Sum, the dispute underlying the conspiracy claims pertains to the Investment Sum and Cachet's investment in Haven pursuant to the Subscription Agreement, both of which are the subject of the Subscription Agreement. To the extent the Conspiracy relies on the Representations and the defendants' role in causing Shi's refusal to pay up his outstanding capital contributions, that too arises from Haven's investment under the Subscription Agreement, which was said to have been induced by the Representations, where one of them dealt with Shi's promise of capital contributions to Haven. The dispute underlying the conspiracy claims is therefore clearly related to the Subscription Agreement. I accept that the conspiracy claims are also pursued against *other* parties like Shi and Liu in addition to Haven, but what matters for present purposes is that the subject matter of those claims are related to the Subscription Agreement. The fact that there are *other* parties to the claim does not bring the dispute outside of the scope of the arbitration agreement, so long as the dispute between them relates back to the Subscription Agreement.

38     I accept that some parts of the Conspiracy alleged by Cachet strictly speaking pertain to matters unrelated to its investment its Haven, such as the defendants causing Haven to vigorously contest the Haven Arbitration, as well as their role in causing Shi and Haven's failure to comply with the terms of the previous arbitral awards. These issues are obviously unrelated to the Subscription Agreement, and therefore fall outside the scope of the arbitration agreement. However, that is of no consequence because the events to which these parts of the conspiracy claims relate would have taken place *after* the Haven Arbitration was commenced. As a matter of logic, the exercise of determining whether the claimant's claims come within the scope of the arbitration agreement for the purposes of determining if the extended doctrine of *res judicata* can be of any application need only be carried out with respect to claims that relate to events predating the commencement of the relevant arbitration. It would be odd for the court to undertake this analysis with respect to claims arising from events that took place *after* the arbitration had been commenced because these claims by definition could not have been raised by the claimant in the arbitration even if it wished to.

39     Having concluded that the conspiracy claims come within the scope of the arbitration clause in the Subscription Agreement, the next question is whether the conspiracy claims are an abuse of process in the light of all the circumstances of the case. I answer this in the negative. I agree with Cachet that there were good reasons why it had not advanced the conspiracy claims as part of the Haven Arbitration. In this regard, it must be borne in mind that the court must consider the substance and reality of the situation in determining if the conspiracy claims could have been brought as part of the Haven Arbitration (see *Goh Nellie* ([22] above) at [53]). Cachet, I accept, was acting with urgency in commencing the Haven Arbitration as to prevent a further dissipation of the Investment Sum, a risk which became imminent after it came to learn that the Representations were untrue and when Haven refused its demand for the return of the Investment Sum. The urgency is evidenced by the interim application that Cachet had brought before the tribunal seeking to restrain Haven and/or its agents or servants from disposing of, dealing with, or diminishing the Investment Sum, which the tribunal granted in the event.[note: 47] In these circumstances, it would have been reasonable for Cachet to proceed on with the Haven Arbitration in an expeditious manner, rather than to insist on the joinder of Shi and Liu, *both* of whom are necessary parties if the conspiracy claims were to be pursued in the Haven Arbitration, a point of significance to which I return later.

40     Cachet did seek to have Shi joined to the Haven Arbitration on the basis that the Representations made by Shi were the subject of the Haven Arbitration, but Shi refused joinder.[note: 48] In connection with this, Liu argues that Cachet had not even made any attempts to join him as a party to the Haven Arbitration, a point which he says refutes Cachet's claim that there were good reasons why Cachet had not advanced the conspiracy claims in the Haven Arbitration. I am not persuaded by Liu's arguments. The fact that Shi refused joinder would have made it clear to Cachet that there was no point in seeking Liu's joinder, and in those circumstances, it was reasonable for Cachet to have proceeded with the Haven Arbitration in the way they did. This follows from two reasons.

41     First, Shi and Liu's positions would obviously have been aligned from the point of the view of Cachet, given that they were both Haven's directors and co-founders. In view of Shi's refusal to joinder, a reasonable person in the position of Cachet would have come to the view that it was most unlikely that Liu would have agreed to be joined to the Haven Arbitration. Secondly, the conspiracy claims had to be pursued against *both* Liu and Shi. If Shi refused a joinder, then that was the end of it, and it made little to no sense for the conspiracy claims to be pursued against Liu alone. Put another way, the circumstances then were such that Cachet would not have saw any utility or purpose in seeking the joinder of Liu to the Haven Arbitration.

42     For completeness, I note that in Liu's affidavits for SUM 2215,[note: 49] he appears to take the position that he would have agreed to be joined if Cachet had sought his joinder at the material time. I do not find this to be of much assistance to the present analysis. The question of whether Cachet could have raised the conspiracy claims in the Haven Arbitration requires the court to consider the circumstances as it existed *then*, *ie*, at the time the Haven Arbitration was commenced. A party's assertion, after the event, that it would have agreed to be joined to the arbitration, is of little to no value in this analysis.

43     There are two further considerations which in my view weigh against the characterisation of the conspiracy clams as an abuse of process. First, it is significant that parts of the conspiracy claims – specifically, those pertaining to how the defendants had caused Haven to vigorously defend the Haven Arbitration, and how the defendants had caused Shi and Haven to fail to comply with the arbitral awards against them – are premised upon events occurring subsequent to the commencement of the Haven Arbitration. I note that Liu attacks the merits of these claims, but that is not a relevant consideration in determining if these claims are an *abuse of process*. The fact is, because these claims arise from events occurring after the Haven Arbitration, they could not have been brought as part of the arbitration, even if Cachet had wished to (see also [38] above).

44     Secondly, and importantly, the conspiracy claims in OC 10 are not a collateral attack on the outcome of the Haven Arbitration. The presence of a collateral attack is one which will render the subsequent proceedings "much more obviously abusive" (see *Johnson v Gore Wood & Co (a firm)* [2002] AC 1 at 31, cited in *Goh Nellie* ([22] above) at [52]). No part of the conspiracy claims in OC 10 challenges what has been determined in the Haven Arbitration, which might otherwise be the case, for example, if Cachet had relied in support of the Conspiracy on those representations that the tribunal in the Haven Arbitration had found to not have been made by Shi or which were not fraudulently made. To this end, it is significant that the scope of the "fraudulent misrepresentations"[note: 50] which Cachet relies on in support of the Conspiracy appears to exclude one of the Representations which the tribunal did not determine in the Haven Arbitration as being false. This is because the scope of the "fraudulent misrepresentations" constituting the Conspiracy are pleaded in the SOC as being coterminous with the findings of misrepresentation made in the Haven Arbitration.[note: 51]

45     Liu also argues that the conspiracy claims in OC 10 are oppressive because Cachet would be relying in OC 10 on the findings of the tribunal in the Haven Arbitration about the Representations, which he did not have an opportunity to contest by virtue of not having been a party to the Haven Arbitration. He argues that it would be unfair to allow Cachet to hold him to the outcome of the Haven Arbitration as such, and this inevitably meant that the findings in the Haven Arbitration about the Representations would have to be re-litigated in OC 10.[note: 52] I disagree with this submission. First and foremost, given the absence of an identity of parties, there can be no issue estoppel and/or cause of action estoppel arising as between Liu and Cachet in so far as the Representations are concerned. Secondly, I do not see why OC 10 will necessarily involve a re-litigation of the tribunal's findings about the Representations. Of course, it is not in dispute that the conspiracy claims in OC 10 are premised in part on the Representations (see [8] above). However, it is no part of the conspiracy claims that Liu had *made* the Representations or had been responsible in any way for the Representations. Cachet's case is simply that Liu *knew* of the Representations and that he *knew* they were false. In other words, to the extent that the conspiracy claims are made against Shi, and in so far as they are premised upon the Representations, the main dispute between Cachet and Shi that will come to be tried in OC 10 is what he personally *knew* in respect of both the Representations and their falsity.

46     I next consider *Fortune Pharmacal Co Ltd v Falcon Insurance Company (Hong Kong) Limited and another* [2023] HKCA 66 ("*Fortune Pharmacal*"), a decision of the Hong Kong Court of Appeal cited by Liu in support of his position that the extended doctrine of *res judicata* applied to cases involving related litigation and arbitration even where the parties to both had not been identical.[note: 53] In that case, the plaintiff, who was the employer of a construction project, employed the second defendant as the main contractor pursuant to a contract between them, which provided for an arbitration clause. The first defendant was the issuer of a surety bond, which the second defendant had been required to obtain to guarantee the due performance of its obligations under the contract. For a claim to be made under the bond, the plaintiff had to prove breach by the second defendant and damages suffered. The plaintiff commenced an action for damages against the defendants for breach of the bond and/or the second defendant's breach of the contract and negligence in carrying out the construction works. The second defendant subsequently applied for a stay of the action pending the outcome of an arbitration that the second defendant had commenced against the plaintiff *prior* to the commencement of the court action. The High Court granted a case management stay against *both* defendants. The plaintiff took issue with the case management stay granted against the first defendant, who was not a party to the contract and the arbitration agreement. One of the reasons the High Court cited in granting the case management stay was a real risk of inconsistent findings if the court action against the first defendant was not stayed (see *Fortune Pharmacal* at [20]). In arriving at that finding, the court considered it significant that the first defendant had already given a written undertaking to be bound by the outcome of the arbitration, which was presented to the court as part of the case management stay application. Further, the first defendant's liability to the plaintiff under the bond – which was conditional upon the second defendant's breach and the plaintiff's proof of damages – turned precisely on issues that were to be determined in the arbitration.

47     The plaintiff, dissatisfied with the case management stay granted in favour of the first defendant, sought leave to appeal from the Hong Kong Court of Appeal. One of the arguments made by the plaintiff was that the High Court had erred in law by holding that the plaintiff would also be bound as against the first defendant in court proceedings in respect of any findings in the arbitration between itself and the second defendant by virtue of the first defendant's undertaking (see *Fortune Pharmacal* at [21]). The plaintiff argued that it could only come to be bound by cause of action and/or issue estoppel, both of which were inapplicable on the facts. The undertaking was at most a promise by the first defendant that it would refrain from advancing a different position from determinations made in the arbitration. The plaintiff argued that it therefore ought to be free to take whatever position it wished in the court action, irrespective of the findings made in the arbitration. Therefore, inconsistent findings were unavoidable.

48     The Hong Kong Court of Appeal rejected this submission. It held that the High Court correctly found that the plaintiff would be bound in the court action, as against the first defendant, by findings made in the arbitration, and so inconsistent findings could be avoided by a case management stay (see *Fortune Pharmacal* at [29]). The court noted that the underlying issues between the plaintiff and the first defendant in the court action were the same as those between the plaintiff and the second defendant in the arbitration, and so if the plaintiff prevailed in the arbitration, it necessarily would also prevail in the court action as against the first defendant because of the latter's undertaking. The court added that, if the plaintiff did not succeed in the arbitration, it should not be permitted to have a second bite of the cherry against the first defendant and run a case in court that is contrary to the findings made in arbitration, and if it did so, that would constitute abusive litigation that is liable to be struck out (see *Fortune Pharmacal* at [27]–[29]). In the event, the court refused the plaintiff leave to appeal (see *Fortune Pharmacal* at [37]).

49     I make the following observations. First, the outcome in *Fortune Pharmacal* would appear consistent with the decision I have reached above, namely, that the extended doctrine of *res judicata* can still apply even where the parties to the previous arbitration and subsequent court proceedings are not identical, provided that the claims in the court proceedings come within the scope of the underlying arbitration agreement (see [30] above). On the facts of *Fortune Pharmacal*, any such claim that the plaintiff pursued against the first defendant – which would be premised on the second defendant's liability under the contract – would have come within the scope of the arbitration agreement, since that is clearly a dispute "arising from", or "arising out of or in connection with" the second defendant's breaches (though I should caveat that the exact wording of the arbitration clause in the contract was not recited in the judgment). Secondly, the facts of *Fortune Pharmacal* are readily distinguishable from the present because any subsequent court action that the plaintiff commences

in that case would involve a collateral attack on the outcome of the already decided arbitration. Given that the first defendant had already given an undertaking to be bound by the findings in the arbitration, the plaintiff would pursue the court action *only* if it was dissatisfied with the findings in the arbitration and wanted to take positions in the action that were inconsistent with those findings. This in and of itself would make the subsequent court proceeding "much more obviously abusive" (see [43] above). That is not the case here because no part of the claims in OC 10 (whether against Liu only or against the other defendants or them as a whole) are inconsistent with the findings made in the Haven Arbitration.

50     Finally, let me address the argument by Liu's counsel that the conspiracy claims in OC 10 are an abuse of process because they appear to have been brought with the collateral purpose of enabling Cachet to recover whatever it had not been able to recover from Haven and/or Shi through the arbitral awards and subsequent enforcement proceedings. I reject this submission. As I have observed earlier, given the reliefs sought, the objective which Cachet seeks to achieve through OC 10 does appear to be that of recovering from the defendants what it had not yet been able to recover from the Haven Arbitration and the Deed Arbitration (see [10] above). However, why should that in and of itself be objectionable? These are sums which Cachet is of the view it is entitled to recover from the defendants because of the wrongs that they have perpetrated against it, as alleged in the SOC. Cachet is fully entitled to mount a claim against the defendants recovering these sums, provided that it has the requisite legal and factual grounds to do so, a matter which would eventually be ventilated at the trial of OC 10, and it should not be prevented from doing so at this stage of the proceedings by way of striking out unless those claims plainly lack legal or factual basis. There is accordingly nothing objectionable with the "collateral purpose" which the defendants have identified. In any event, it is questionable whether this "collateral purpose" that Liu has identified comes within the scope of the concept of abuse of process. "Collateral purpose" giving rise to an abuse of process typically refers to a situation where a claim is brought to use the judicial or litigation process as a means of vexation and oppression (see *Gabriel Peter* ([17] above) at [22]); in other words, it is where the claimant seeks to achieve some objective against the defendant *other* than what had been prayed for as reliefs in its claim. Quite evidently, that is not the case here.

51     Therefore, in my view, while the extended doctrine of *res judicata* can apply in a situation like the present because the conspiracy claims, in so far as they relate to events which predate the commencement of the Haven Arbitration, do come within the scope of the arbitration agreement, these claims are not an abuse of process because Cachet has good reasons for not having pursued them in the Haven Arbitration. Liu's attempt to strike out Cachet's conspiracy claims pursuant to O 9 r 16(1)(*b*) of the ROC 2021 therefore fails.

**Whether the conspiracy claims are legally unsustainable**

52     Liu's argument about the conspiracy claims being legally unsustainable is founded upon the *Said v Butt* principle, which was explained by the Court of Appeal in *PT Sandipala* ([12] above) (at [62] and [65]) in the following terms:

> … the *Said v Butt* principle should be interpreted to exempt directors from personal liability for the contractual breaches of their company (whether through the tort of inducement of breach of contract or unlawful means conspiracy) if their acts, in their capacity as directors, are not in themselves in breach of any fiduciary or other personal legal duties owed to the company.
>
> …
>
> … the principle operates as a requirement of liability and not a defence; in other words, the onus is on the plaintiff to prove that the defendant-directors' acts were in breach of their personal legal duties to the company. Such breach may be a breach of a fiduciary duty to act in the best interests of the company, or it may be a breach of his contractual duty towards the company to act within the scope of his authority as granted by the company.

53     The *Said v Butt* principle affords immunity to directors for tortious liability that is founded upon the company's breach of contract, for example, liabilities arising from the tort of inducing the breach of a contract by the company, or the tort of unlawful means conspiracy where the unlawful means pertains to a contractual breach by the company (see *PT Sandipala* at [54]). Therefore, for the *Said v Butt* principle to apply, the claim in tort against the director must be founded upon the contractual breach of the company (see *PT Sandipala* at [73]). The *Said v Butt* principle therefore delineates the circumstances in which a director can be personally held liable for the *consequences* arising from his company's breach of contract, to which only the company and not he himself is a party. Its rationale is to assure that directors are capable of directing that a contract of the company be terminated or not be performed if paying damages for the failure to performance rather than actual performance is in the company's best interests, provided that these decisions were made in the best interests of the company (see *PT Sandipala* at [50] and [64]).

54     In my view, a defendant-director seeking to strike out claims in tort against him on the basis of the *Said v Butt* principle must demonstrate the following. First, he must show that the claim against him is founded *solely* on the company's contractual breaches. If the claim in question is founded upon other elements *in addition* to the company's contractual breaches, the *Said v Butt* principle will not afford immunity to him in respect of that claim, and accordingly provides no basis for the conclusion that the claim against him is legally unsustainable. This is because, as the Court of Appeal explained in *PT Sandipala* (at [73]):

> … even if a director is entitled to the protection of the *Said v Butt* principle, this applies only in relation to his tortious liability for procuring his company's breach of contract or conspiring with the company to breach its contract. *If a plaintiff can show that the director in question authorised or procured another tort by the company or employed unlawful means other than the breach of contract to cause loss to the plaintiff, the director may still be personally liable for his company's tort*.

> [emphasis added]

55     It is therefore a threshold requirement for a defendant seeking to strike out a claim on the basis of the *Said v Butt* principle to show that the claim in question is founded solely upon the company's contractual breaches. If the defendant cannot do so, the *Said v Butt* principle cannot provide any ground on which it may be concluded that the claim is legally unsustainable, simply because the defendant-director remains liable for the claim to the extent that it is remains premised on elements other than the company's breach of contract.

56     If the defendant satisfies this first requirement, then he must next go on to show that the claimant's pleading contains no material facts relating to the defendant-director's breaches of his personal legal duties or fiduciary duties to the company. This follows because the *Said v Butt* principle operates as a requirement of liability (see *PT Sandipala* at [65]). Accordingly, where a claimant seeks to hold a company director liable for a tort premised on the company's contractual breaches, it must also be part of the claimant's case – and properly pleaded and particularised in the Statement of Claim or other pleading it relies on – that the defendant had acted in breach of his personal duties to the company so that he is not entitled to protection by the *Said v Butt* principle. To this end, it will not suffice for the claimant to merely plead a *bare allegation* of breach of fiduciary duties or other personal duties without the requisite particulars (see *OK Tedi Fly River Development Foundation Ltd and others v Ok Tedi Mining Ltd and others* [2023] 3 SLR 652 ("*OK Tedi*") at [125]).

57     With this framework in mind, I turn to consider the unlawful means conspiracy claim first. Evidently, this claim is *not* mounted on Haven's contractual breaches (namely, of the Subscription Agreement) alone. Cachet also cites three other unlawful acts pursuant to which the Conspiracy was perpetuated – the fraudulent misrepresentations by Shi, breach of fiduciary duties to Haven by Shi and Liu, and Liu's own breach of a Shareholders' Agreement entered into with Haven's various shareholders (see [8] above). Quite plainly, therefore, Liu cannot succeed in striking out the unlawful means conspiracy claim on the basis of the *Said v Butt* principle, which affords no basis for the conclusion that the unlawful means conspiracy claim is legally unsustainable.

58     Liu's counsel argued that the SOC only contains a bare allegation that Shi and Liu had acted in breach of their fiduciary duties to Haven without the requisite particulars. Without deciding the merit of that argument, I state for completeness that even if that part of the SOC lacked the requisite particulars, it is of no consequence in connection with whether the unlawful means conspiracy claim is legally unsustainable. First, it appears that Cachet's reference to Shi and Liu's breaches of fiduciary duties in the SOC is made in the context of it being an act pursuant to which the Conspiracy had been carried out. Secondly, since Liu is not entitled to strike out the unlawful means conspiracy claim on the basis of the *Said v Butt* principle, I need not concern myself with whether Cachet's pleadings are sufficient to invoke the exception in the *Said v Butt* principle for the purposes of this striking out application.

59     In *PT Sandipala* ([12] above), which was a case involving unlawful means conspiracy, the Court of Appeal expressed the view that the *Said v Butt* principle would apply equally to a lawful means conspiracy, and the relevant inquiry is similarly whether the defendant-director had acted in breach of his duties to the company (see *PT Sandipala* at [71]). It would appear that, if the *Said v Butt* principle is to apply to a claim for lawful means conspiracy, the relevant "acts" by which the conspiracy was carried out must be that involving a contractual breach by a company. Therefore, if the defendant seeks to strike out the claim for lawful means conspiracy on the basis of the *Said v Butt* principle, he must similarly show that the "acts" pursuant to which the conspiracy had been carried out is *exclusively* that of a breach of contract by the company. If, according to the claimant's pleadings, the "acts" pursuant to which the conspiracy is said to have been carried out encompass those other than the company's contractual breaches, then the *Said v Butt* principle cannot provide any ground on which it may be concluded that the claim is legally unsustainable.

60     The High Court's decision in *OK Tedi* ([56] above) illustrates this. In that case, it was pleaded that the second defendant (a company) and the third defendant (the chairman of the board of directors of the company) had conspired to engage in certain acts, which amounted to the breach of an implied term in an instrument known as the "Program Rules", which is a schedule to the articles of association of the company (see *OK Tedi* at [115]). The court accepted that the Program Rules constituted the relevant contract for the purposes of the *Said v Butt* principle, even though there was no contractual relationship between the plaintiffs and the second defendant (see *OK Tedi* at [124]). The court held that the *Said v Butt* principle was relevant and applied it in respect of the third defendant, which the court found rendered the lawful means conspiracy claim against the third defendant legally unsustainable, because the plaintiffs had merely made a bare allegation that the third defendant acted in breach of his fiduciary duties to the second defendant without any particulars (see *OK Tedi* at [125]).

61     For Liu to strike out the lawful means conspiracy claim on the basis of the *Said v Butt* principle, he must similarly show that the "acts" pursuant to which the Conspiracy was carried out is exclusively that of Haven's contractual breaches. That is not the case here. The Conspiracy, which also underlies the unlawful means conspiracy claim, relates to various acts other than Haven's breaches of the Subscription Agreement, which involved, among other pleaded acts,[note: 54] the defendants' failure to procure the return of the Investment Sum upon Cachet's demand, the defendants' siphoning of monies (which included the Investment Sum) from Haven by surreptitious means for self-enrichment, the defendants' participation in Shi's defence in the Deed Arbitration, and the defendants' vigorous defence of the Cachet's claims in the Haven Arbitration (see [9] above). Since the Conspiracy as pleaded in the SOC relates to matters other than Haven's breach of contract, the *Said v Butt* principle cannot provide any ground on which it can be concluded that the lawful means conspiracy claim is legally unsustainable.

**Whether the conspiracy claims are factually unsustainable**

62     I now turn to the last remaining ground on which Liu seeks to strike out the conspiracy claims in OC 10 – that they are factually unsustainable. As I mentioned earlier, Liu has relied on two arguments in support.

63     Liu's first argument is that the pleaded facts in the SOC do not disclose a conspiracy and they lack particulars as to how Liu had been involved in the Conspiracy. For example, in connection with the various acts which Cachet has pleaded as having been performed pursuant to the Conspiracy, Liu argues that it is not apparent from those pleaded facts that Liu had even been involved. One such instance cited by Liu's counsel is

the averment in the SOC that the defendants had caused, persisted and/or participated in Shi's defence of the Deed Arbitration and Shi's failure or refusal to comply with the Deed Award, on the face of which there is nothing indicative of how Liu had been involved in any of those acts.

64     As I mentioned earlier, I had some difficulty with Liu's first argument because Liu appears to be saying that the SOC discloses no reasonable cause of action which is premised on O 9 r 16(1)(*a*), yet Liu also explicitly confirmed that he is not seeking to rely on O 9 r 16(1)(*a*) for striking out. Liu's first argument, when transposed to the context of O 9 r 16(1)(*c*), appears to be the following: because the pleaded facts do not show how Liu had been involved in various aspects of the Conspiracy, the claim is weak and therefore factually unsustainable. A claimant seeking to sue another is obliged to plead all material facts constituting a complete cause of action and furnish sufficient particulars for the defendant to have reasonable notice of the case it has to meet (see *Chandra Winata Lie v Citibank NA* [2015] 1 SLR 875 at [34]), but its burden as a pleader does not oblige it to plead facts that disclose a strong or meritorious case. That there are insufficient facts pleaded which make the claim appear weak or unmeritorious is no ground for striking out, unless the insufficiency is of such an extent that the pleadings are defective and thereby disclose no reasonable cause of action. That, however, is not the position that Liu has taken, and he also does not go so far to say that, given that he has opted to *not* rely on O 9 r 16(1)(*a*). For the avoidance of doubt, I should add that I make no comment on whether the pleadings are deficient or whether they lack particulars since this was not the issue argued before me. The point made here is simply that Liu's first argument effectively seeks to fit a square peg in a round hole and I do not see how that can assist him for the purposes of O 9 r 16(1)(*c*).

65     I now turn to Liu's second argument, where he advances the following points in support of his position that the Cachet's claims are factually unsustainable: (a) that he was unaware of the Representations;[note: 55] (b) that he had not been involved in the siphoning out of monies from Haven, because any sums paid by Haven to him were for his salary and "sign on" bonus, both of which were commensurate to his responsibilities in Haven, and further, the making of such payments is also industry practice for high-ranking executives like him;[note: 56] (c) that he had no control over the movement of monies out of Haven as he was not a signatory of Haven's bank accounts;[note: 57] (d) he had not acted in breach of director's duties to Haven, and in any event, Haven's decision to defend the Haven Arbitration was one made by the majority of the board of directors of Haven and over which Shi had a veto, and he also believed defending the Haven Arbitration to be in the best interests of Haven;[note: 58] (e) he denies that Haven had, as Cachet alleged, persistently refused disclosure of its employment contracts;[note: 59] (f) Haven was unable to comply with the terms of the Haven Award because it had no monies, and in any event, he had resigned as a director after November 2019;[note: 60] and (g) in respect of the Deed Arbitration, he was not a party and had no control over Shi, and so should not held responsible in connection with developments arising from the Deed Arbitration.[note: 61]

66     What Liu must show for present purposes is that it is "clear beyond question" that the pleaded facts in the SOC are contradicted by the evidence he has adduced. It does not suffice for Liu to merely show that Cachet's claims are weak or that they are not likely to succeed (see *Gabriel Peter* ([17] above) at [21]). In this case, Liu is far from meeting the requisite threshold, because all he has pointed to in his affidavits for SUM 2215 is *his* own account of the relevant events, which are diametrically opposed to the pleaded facts as well as the evidence that Cachet has adduced in response for the purposes of SUM 2215.[note: 62] Save in the plainest of cases, the court should not in a striking out application choose between conflicting accounts of crucial facts (see *The Bunga Melati 5* ([18] above) at [45]). This caution applies precisely in this case given the nature of the conflicting accounts between the parties and the significant extent to which they are conflicting. It emphasises the need for the disputed issues to be determined pursuant to a full fact-finding process and that the case is not one appropriate for striking out.

**Conclusion**

67     For the reasons above, I am not satisfied that Cachet's claims against Liu in OC 10 are an abuse of process and/or that they are legally unsustainable and/or factually unsustainable. Liu has therefore not persuaded the court that these claims ought to be struck out pursuant to O 9 r 16(1)(*b*) or O 9 r 16(1)(*c*) of the ROC 2021. Accordingly, I dismiss SUM 2215. I will hear the parties on the costs of SUM 2215 separately.

[note: 1]Statement of Claim ("SOC") at para 7.

[note: 2]3rd Affidavit of Angela Chow ("Chow's Affidavit") at para 15.

[note: 3]SOC at para 6.

[note: 4]SOC at para 11.

[note: 5]SOC at paras 14–15.

[note: 6]SOC at para 18; 1st Affidavit of Alex SK Liu ("Liu's 1st Affidavit") at pp 137–138.

[note: 7]SOC at para 18.

[note: 8]SOC at para 19.

[note: 9]SOC at para 6(d).

[note: 10]Liu's 1st Affidavit at p 148.

[note: 11]SOC at para 21.

[note: 12]SOC at para 23.

[note: 13]SOC at para 25.

[note: 14]SOC at para 26.

[note: 15]SOC at para 27.

[note: 16]SOC at para 28.

[note: 17]SOC at paras 28–29.

[note: 18]SOC at para 13.

[note: 19]SOC at para 31.

[note: 20]SOC at para 33.

[note: 21]SOC at para 34.

[note: 22]SOC at paras 15 and 32(b).

[note: 23]SOC at paras 16 and 32(c).

[note: 24]SOC at para 32(a).

[note: 25]SOC at para 32(e).

[note: 26]SOC at paras 20, 24 and 32(f)–32(h).

[note: 27]SOC at paras 19(a)–19(c) and 35(a).

[note: 28]SOC at para 19(d) and 35(b).

[note: 29]SOC at paras 23(b)–(c) and 35(c).

[note: 30]SOC at para 35(d).

[note: 31]SOC at para 35(e).

[note: 32]Second defendant's written submissions at para 37.

[note: 33]Second defendant's written submissions at paras 39–41.

[note: 34]Second defendant's written submissions at para 44.

[note: 35]Second defendant's written submissions at para 59.

[note: 36]Second defendant's written submissions at para 59.

[note: 37]SOC at para 17.

[note: 38]Claimant's written submissions at paras 49(a)–(b).

[note: 39]Claimant's written submissions at paras 49(c)–(d).

[note: 40]Claimant's written submissions at para 49(e).

[note: 41]Claimant's written submissions at para 49(g).

[note: 42]Claimant's written submissions at para 75.

[note: 43]Claimant's written submissions at para 56.

[note: 44]Second defendant's written submissions at para 2.

[note: 45]Second defendant's written submissions at para 5.

[note: 46]Liu's 1st Affidavit at p 56.

[note: 47]Chow's Affidavit at para 20.

[note: 48]SOC at paras 29–30.

[note: 49]Liu's 1st Affidavit at para 33(d); 2nd Affidavit of Alex SK Liu ("Liu's 2nd Affidavit") at para 8.

[note: 50]SOC at para 33(a)

[note: 51]SOC at para 28.

[note: 52]Second defendant's supplemental written submissions at para 7.

[note: 53]Second defendant's supplemental written submissions at para 3(c).

[note: 54]SOC at para 32.

[note: 55]Liu's 1st Affidavit at para 36(a); Liu's 2nd Affidavit at paras 10–11.

[note: 56]Liu's 1st Affidavit at para 36(b); Liu's 2nd Affidavit at paras 13–14.

[note: 57]Liu's 1st Affidavit at para 36(b).

[note: 58]Liu's 1st Affidavit at para 36(c); Liu's 2nd Affidavit at para 12.

[note: 59]Liu's 2nd Affidavit at para 15.

[note: 60]Liu's 1st Affidavit at para 36(d); Liu's 2nd Affidavit at para 16.

[note: 61]Liu's 1st Affidavit at para 36(e).

[note: 62]Chow's Affidavit at paras 43–54; Claimant's written submissions at paras 60, 64–65, 67 and 68.

**BACK TO TOP**

Copyright © Government of Singapore.