P7FCroeC

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------x

The Roe Corporation, 267
Partners, LLC, and Buhm Jung
Roe,

                    Petitioners,

          v.                              25 Civ. 5485 (JLR)
                                          Telephone Conference

Berhero Pty Limited (T/A
Acuity Funding) and the
Singapore International
Arbitration Centre,

                    Respondents.

------------------------------x

                                          New York, N.Y.
                                          July 15, 2025
                                          3:00 p.m.

Before:

                    HON. JENNIFER L. ROCHON,

                                          District Judge

                         APPEARANCES

CONWAY & CONWAY
     Attorneys for Petitioners
BY:  KEVIN P. CONWAY

BAKER & HOSTETLER LLP
     Attorneys for Respondents
BY:  MARCO MOLINA
     GONZALO S. ZEBALLOS

P7FCroeC

```
1          (Case called)

2          THE COURT:  Good afternoon, everyone.  Before we

3    start, let me just place a few things on the record.

4          First, we are proceeding with this conference for an

5    expedited TRO through Microsoft Teams through videoconference.

6    That is for the convenience of all the parties and so that I

7    could get everyone here as quickly as possible.

8          Court proceedings are public proceedings.  And so

9    there is a listen-only line that's noticed on the docket for

10   anybody who wishes to join.

11         I have on the line my clerk.  I also have a court

12   reporter who is transcribing these proceedings.

13         As a reminder, no one other than court personnel are

14   permitted to record, rebroadcast, or disseminate court

15   proceedings.

16         Who do I have here on behalf of petitioner?

17         MR. CONWAY:  Good afternoon, your Honor.  My name is

18   Kevin Conway.  I'm with Conway & Conway.  In the room with me

19   is my associate Dennis McGrath, but off camera.

20         THE COURT:  Thank you.  Good afternoon.

21         Who is here on behalf of the respondent?

22         MR. MOLINA:  Good afternoon, your Honor.  This is

23   Marco Molina from Baker Hostetler.  I'm accompanied by my

24   parter, Gonzalez Zeballos.  I believe we have two client

25   representatives who called in, but I will be doing the argument
```

P7FCroeC

1    today.

2              THE COURT:  Thank you very much.

3              I'm glad to see everyone here.  I don't like to do

4    TROs unless it's warranted *ex parte*.  So Mr. Conway was very

5    accommodating in moving the TRO a bit farther out so we could

6    ensure everyone was here and could present their positions.

7              I have the papers that were submitted by petitioner

8    with respect to the order to show cause for a TRO that were

9    sent in on July 2nd, 2025.  I subsequently received the

10   response on July 14th — that's yesterday — 2025.  So I have

11   written responses from everyone, but I also want to give you

12   the opportunity to present whatever you wish to present in

13   addition to your written filings.

14             Mr. Conway, it's your request, so I will let you go

15   first and then I'll hear from Mr. Molina.  I have reviewed your

16   papers closely, but anything you wish to add, I'm always happy

17   to hear.  So, Mr. Conway.

18             MR. CONWAY:  Sure, your Honor.  Thank you.

19             I won't go over the information contained in our

20   papers again, other than to say that we brought the petition to

21   seek a temporary restraining order against the arbitration

22   that's to commence next week.  We think that it's important

23   that this Court hears this matter because there is an undue

24   prejudice that's going to happen.  We have requested an

25   adjournment because counsel in Singapore have resigned.  We

P7FCroeC

|     |                                                                      |
|-----|----------------------------------------------------------------------|
| 1   | requested an adjournment to, number one, seek counsel, but also       |
| 2   | to put the arbitration forum on notice.  We are seeking an           |
| 3   | injunction in this court.  We haven't heard from them other          |
| 4   | than the fact that they have been served and we're going             |
| 5   | forward in this proceeding.                                          |
| 6   |         We believe that the actual underlying contract and the       |
| 7   | underlying arbitration provision in the contract were procured        |
| 8   | with fraud.  We were unaware.  We were just retained in the          |
| 9   | last several weeks.  But based on the investigation that we've        |
| 10  | done, we've become aware that the underlying transaction, which       |
| 11  | was a brokerage agreement to secure funding in the amount of          |
| 12  | $290 million, I believe $280 million, which resulted in a fee         |
| 13  | to be paid to the respondent, we don't believe that was ever          |
| 14  | going to be consummated, and that the information that we have,        |
| 15  | that there was never any lender put forward that had the             |
| 16  | financial wherewithal to loan the money, as a result, our            |
| 17  | client did not go through with the transaction and it was            |
| 18  | subsequently determined that there was an arbitration commenced        |
| 19  | in Singapore and we don't believe that the arbitration itself         |
| 20  | was appropriate in light of the fact that the entire contract         |
| 21  | was procured under a misrepresentation of the fact that the           |
| 22  | lender was not ever willing, able, or going to lend the money         |
| 23  | or have the proceeds to turn over the funds to our client.  And       |
| 24  | that's true way back when we entered into the agreement and           |
| 25  | it's true today.  Therefore, that's why we're seeking the            |

P7FCroeC

1    injunction to terminate the arbitration proceeding in

2    Singapore.

3            THE COURT:  Mr. Conway, generally, when I see a TRO,

4    there's a sense of urgency, and I understand that the

5    evidentiary portion of the arbitration is scheduled to start

6    next week and a couple weeks after you filed your petition.  So

7    there was that sense of urgency.

8            However, how do you respond to the fact that your

9    client has been participating in the arbitration process for

10   quite some time, according to my notes here, back in May of

11   2024, filed their response to the notice of arbitration, never

12   sought an injunction, never said there was no jurisdiction,

13   never came here, never raised it in the arbitration, filed a

14   counterclaim, proceeded through, raised some of the same

15   arguments you're raising here, which is that the respondent

16   never had the wherewithal to make the loan, the agreement was

17   procured with fraud, et cetera, but that was months and months

18   ago, and now you're here a week, two weeks, a few weeks before

19   the arbitration is to go into the evidentiary hearing portion.

20   How does that not show that there is a lack of irreparable harm

21   or that you've waived your ability to contest the arbitration

22   by waiting so long?

23           MR. CONWAY:  Sure, your Honor.  Even though we weren't

24   involved, we made inquiry into that effort, as well.  Even

25   though the arbitration was commenced over a year ago, the

P7FCroeC

1    actual statement of claim I think wasn't filed until January of

2    this year.

3           In addition, your Honor, the client undertook an

4    investigation, a much more thorough investigation with respect

5    to the lender as well as the broker, and they just got the

6    results of the report in late June of this year, which

7    basically solidified their idea that the lender and the broker

8    were never in a position to lend the funds and never had

9    engaged in a successful loan to people, and had engaged in

10   other litigation such as the one we're in right now to seek

11   redress for acting as a broker in a loan that was never

12   consummated.

13          So the information that I have is that the clients

14   were not in receipt of the information that they felt

15   solidified that gave them the idea that the entire contract was

16   put at risk and entered into under false pretenses.

17          THE COURT:  What is your response to the argument

18   that -- well, let me ask it this way: isn't that a very good

19   argument to make before the Singapore arbitration panel?  You

20   can present all of the evidence of alleged fraud, and I think

21   that corresponds with the arguments that had been raised before

22   that arbitration forum.  Why not continue there as opposed to

23   raising it here as a ground for stopping the arbitration,

24   especially given the doctrine, which I think you even

25   acknowledge, which is that the fraud has to be, if there's

P7FCroeC

 1    fraudulent inducement, it has to be fraudulent inducement of

 2    the arbitration clause of the contract as opposed to the

 3    contract overall?

 4              MR. CONWAY:  Sure, your Honor.  We think there are two

 5    prongs to the fraud.  One is that there was fraud in the

 6    inducement to enter into the contract itself, but the second

 7    was to have an arbitration provision, which was ultimately to

 8    be heard in Singapore.  And if you look at the -- and we

 9    haven't presented it yet, but if you look at our investigative

10    file, you're going to see that there have been over 10 cases --

11    11 cases that have gone to trial with respect to the very same

12    issues that are before this Court.  And the only successful

13    case that was brought by the respondents has been in the

14    arbitration forum in Singapore.

15              The fact of the matter is all of the information that

16    we have, the fact that they haven't been given an opportunity

17    to seek new counsel, they don't have counsel now, counsel

18    literally terminated their relationship last week after we

19    asked them to help us serve the respondents, so we don't have

20    counsel, we don't have fair representation, and we believe the

21    appropriate forum for these claimants is in the federal courts

22    in the Southern District here of New York who has experience

23    doing it.  Therefore, we think this is the appropriate forum

24    and that's why they're here.

25              THE COURT:  And then finally, is it correct what I

P7FCroeC

1    have read from the respondents' papers that Mr. Roe's testimony

2    is going to be allowed to be presented remotely, and so he does

3    not need to travel to Singapore; is that correct?

4        MR. CONWAY:  Well, let me take a step back, your

5    Honor.

6        As I understand it, there was some communication

7    between the arbitrator and Mr. Roe directly subsequent to the

8    law firm terminating their relationship.  Evidently, there is a

9    significant language and medical barrier to any testimony that

10   Mr. Roe will give.  We're in the process of hiring a Korean

11   interpreter that could hopefully decipher what Mr. Roe says.  I

12   know I have spoken to him, and I can tell this Court that I can

13   only understand about 20 percent of what he says.  So he can't

14   travel there, and his participation, even if on a

15   videoconference, I don't believe will be decipherable to an

16   arbitrator in Singapore.

17       THE COURT:  Well, he submitted a written statement, a

18   written witness statement, correct?

19       MR. CONWAY:  He did.  I haven't seen it, but he did

20   submit it.  I saw parcels of it.  And he also --

21       THE COURT:  Thank you.

22       MR. CONWAY:  -- a statement as to his medical

23   condition to give the forum an idea of his ability to

24   communicate and provide information.

25       THE COURT:  Thank you very much.

P7FCroeC

1          Mr. Molina.

2          MR. MOLINA:  Thank you, your Honor.

3          Let me start with irreparable harm because I think

4    that usually tends to be the most crucial element in these sort

5    of applications.

6          As your Honor already pointed out, and I'm not going

7    to rehash what your Honor already said, this has been going on

8    15 months.  So any idea that they would be harmed, let alone

9    irreparably harmed, by participating in an arbitration, they've

10   known about it for 15 months, an arbitration where they, as

11   your Honor pointed out --

12         One thing I want to note, your Honor, when this

13   arbitration was commenced in April of last year, 15 months ago,

14   they had a two-week period went by where then the petitioners

15   here had a chance to respond to that notice of arbitration —

16   and this is in the record, I think it's exhibit C — and that's

17   typically where whenever a party is saying I'm in the wrong

18   forum, I'm being hailed here against my will, I never agreed to

19   arbitrate, that's when you typically raise it.  Then the rules

20   say if for some reason you miss it there, when you do your

21   statement of defense, which is your first major submission

22   where you present all the witness statements and expert

23   reports, you definitely have to submit it there because if you

24   don't do it there, it's waived.  And this is the case that we

25   cited in our papers.  This is the *Opals* case, Second Circuit

P7FCroeC

| | |
|---|---|
| 1 | case that says that when you, you know, when you bring your |
| 2 | first sort of answer to the statement of claim, if you don't |
| 3 | raise it there, it's waived. |
| 4 | And so, again, this idea that -- and sorry.  Taking a |
| 5 | step back.  Your Honor already mentioned this.  They didn't |
| 6 | just participate, they submitted counterclaims, evidence, |
| 7 | testimony.  And so now -- so what's happening here, your Honor, |
| 8 | it's this idea that they never intended to arbitrate, that |
| 9 | they'll be harmed if they were forced to proceed.  It doesn't |
| 10 | bear out.  What we believe is happening, simply, they're seeing |
| 11 | the writing on the wall, they think they're not going to |
| 12 | succeed on their case, their hearing is next week, their expert |
| 13 | withdrew its report, their main witness, Mr. Roe, doesn't want |
| 14 | to travel and doesn't want to present testimony.  So that's |
| 15 | really what's happened here.  It's not an issue of irreparable |
| 16 | harm. |
| 17 | On the point that your Honor made, I do want to note |
| 18 | for the record that we have an Exhibit I to the declaration |
| 19 | that we filed with our opposition.  We have the ruling from the |
| 20 | tribunal that said Mr. Roe, we take at face value that you have |
| 21 | a medical condition that might impair your ability to travel to |
| 22 | Singapore.  We'll make accommodations for you.  We'll let you |
| 23 | appear remotely.  We'll schedule it for a time that makes sense |
| 24 | to you given the time difference.  So this idea that they'll be |
| 25 | harmed because the hearing will go forward without the |

P7FCroeC

1    participation of their main witness is just not supported by

2    the record here.

3            If I could now pivot, your Honor, to likelihood of

4    success on the merits, I think it's just three quick points.

5    Your Honor already hit on one of them, which is waiver.  Again,

6    how could they succeed on a claim that they never intended to

7    arbitrate this dispute when they participated for 15 months,

8    submitted counterclaims, and submitted evidence.

9            The second point, your Honor, is we're just in the

10   wrong forum.  To the extent the petitioners want their day in

11   court and they want to say wait a second, I need a court to

12   weigh in and intervene, the New York Convention provides that

13   you go to the court of the seat of the arbitration.  The seat

14   here, indisputably, is Singapore.  There, the courts of

15   Singapore have primary jurisdiction over any procedural matter

16   that arises out of this arbitration.  So to the extent they

17   want judicial intervention, their recourse isn't to come here

18   to the SDNY, to can go to the courts of Singapore.  This is

19   laid out in decades of case law under the New York Convention.

20           And then the point I'll make, your Honor, is the

21   severability point, which your Honor was also discussing

22   earlier with my colleague.  I think, you know, just today,

23   Mr. Conway gave a recitation of what he believes the fraud is.

24   And as he pointed out, the fraud has very little, if anything,

25   to do with the arbitration agreement and a lot of it to do with

P7FCroeC

1    the other provisions of the contract, the loan, the promise to

2    secure financing, et cetera.

3           And I think I heard Mr. Conway say, when your Honor

4    asked him what is your response to the lack of a nexus to the

5    arbitration agreement, and he said, well, the fraud of the

6    arbitration agreement was that it was supposed it to be -- was

7    that they wanted it to go to Singapore because they knew it

8    would be far away.  Your Honor, how could that be a fraud?

9    It's on the face of the provision.  They weren't hiding or

10   omitting or trying to sneak one past anyone.  They put it on

11   the face of the contract, the other side is sophisticated with

12   real estate developers, they have lawyers, they consider them,

13   and they cited the contract.

14          Your Honor, with that, I don't want to rehash too much

15   more what's in the papers, but I'm happy to answer any

16   questions.

17          THE COURT:  No, that is all I need.  Thank you very

18   much.

19          Mr. Conway, because it's your application, is there

20   any response you want to raise or anything you'd want to add to

21   your papers?

22          MR. CONWAY:  No.  I just submit the papers as is to

23   your Honor and hopefully we'll get a ruling from you as soon as

24   possible.

25          THE COURT:  I'm going to give you a ruling today.  So

P7FCroeC

```
1   if you would be patient with me, I'm going to read it on the

2   record right now so that you have that ruling as soon as

3   possible.

4            Let me give some background first.

5            On July 2, 2025, Petitioners, The Roe Corporation, 267

6   Partners LLC, and Buhm Jung Roe (collectively, the

7   "Petitioners") filed a petition to stay an ongoing arbitration

8   between the parties before Respondent the Singapore

9   International Arbitration Center, initiated by Respondent

10  Acuity Funding ("Acuity"), and currently scheduled for the

11  evidentiary portion on July 21, 2025.

12           Roe Corp. is a New York real estate business and

13  Acuity is an Australian financial brokerage company that holds

14  itself out as working with parties that need to obtain external

15  funding.

16           The parties' arbitration proceedings arise from a Loan

17  Term Sheet and Cost Agreement (LTS & CA) between Petitioners

18  and Acuity, dated September 24, 2023.  Petitioners maintain

19  that Acuity fraudulently induced them to execute an agreement

20  under the pretense that Acuity would facilitate Petitioners'

21  receipt of a $280 million loan for the development of a luxury

22  condo project in Tribeca, New York.  Under the terms of the LTS

23  and CA, Petitioners were to pay Acuity a Fund Arrangement Fee

24  of 4 percent of the total loan amount upon a conditional offer

25  from a legitimate lender.
```

P7FCroeC

1          Pursuant to the LTS and CA, Petitioners paid $100,000

2     as a non-refundable processing fee to Acuity on the basis that

3     Acuity would facilitate the loan.  Acuity subsequently issued a

4     Conditional Letter of Offer for the amount of $280 million,

5     citing Global Wise Investment Pty Ltd. ("Global Wise") as the

6     lender or fund provider.  On March 18, 2024, Petitioners

7     received a letter from counsel for Global Wise indicating that

8     Global Wise did not have adequate capital to fund the loan, and

9     that the loan funding would instead be provided by the Elite

10    Crown Diamond Ltd.

11         Pursuant to the LTS and CA, any dispute between the

12    parties arising out of the agreement was subject to arbitration

13    before the Singapore International Arbitration Centre.

14    Specifically, the LTS and CA provides:  "Any dispute arising

15    out of or in connection with this contract, including any

16    question regarding its existence, validity, or termination,

17    shall be referred to and finally resolved by arbitration

18    administered by the Singapore International Arbitration Centre

19    — the SIAC — in accordance with the Arbitration Rules of

20    Singapore International Arbitration Centre — the SIAC Rules —

21    for the time being in force, which rules are deemed to be

22    incorporated by reference in this clause."  Dkt. 1-1 at 6.

23         On April 24, 2024, Acuity initiated an arbitration

24    proceeding in Singapore before the SIAC against Petitioners,

25    and on May 29, 2024, the Roe Parties filed their Response to

P7FCroeC

1   the Notice of Arbitration and counterclaim, but made no

2   objection to arbitral jurisdiction either there or in the

3   United States.  On January 13, 2025, Acuity filed its Statement

4   of Claim, seeking $11,200,000 from Petitioners for the Fund

5   Arrangement Fee contemplated in the LTS and CA.  On  February

6   24, 2025, Petitioners filed their Statement of Defense, arguing

7   that the "LTS and CA are voidable and that the Respondents have

8   rescinded the LTS and CA by virtue of Acuity's fraudulent

9   misrepresentation."  Petitioners' Statement of Defense did not

10  raise any objections to the jurisdiction of the Arbitrator, and

11  a final evidentiary hearing in the Singapore Arbitration is

12  scheduled to commence during the week of July 21, 2025.

13          In other words, Petitioners assert many of the same

14  arguments in the Singapore Arbitration proceedings as they now

15  assert before this Court, including with respect to Acuity's

16  alleged fraud and the commercial unworkability of the

17  conditional offer letter.

18          Petitioners maintain that because Acuity fraudulently

19  induced Petitioners to enter the LTS and CA and pay a $100,000

20  deposit to Acuity, the arbitration clause contained therein is

21  not a valid and binding agreement.

22          As I said before, On July 2, 2025, Petitioners filed a

23  petition to stay arbitration between the parties before the

24  SIAC.  Dkt. 1 ("Pet.")

25          Petitioners now move pursuant to Federal Rule of Civil

P7FCroeC

 1    Procedure 5 for an Order to Show Cause to Stay the Singapore

 2    Arbitration initiated by Respondent Dkt. 7 ("Br.").

 3          Petitioners specifically seek a TRO staying the

 4    Singapore Arbitration until such date as the Court reaches a

 5    decision as to the merits of Petitioners' Petition to Stay

 6    Arbitration.

 7          On July 2, 2025, Petitioners filed a letter with the

 8    Court indicating that they had provided copies of their

 9    Petition and Proposed Order to Show Cause and supporting papers

10    to their arbitration counsel, and requested that that counsel

11    provide documents to Respondents, at Dkt. 12.  Respondents

12    ultimately received this documentation.  However, it may not

13    have been through Petitioners' arbitration counsel, but in any

14    event, they received the information.

15          On July 8, 2025, the Court held a hearing by

16    videoconference on the Petitioners' emergency motion.

17    Respondents were not present.  It was unclear whether they had

18    notice yet; they likely did not.  Therefore, the Court

19    adjourned the hearing, on consent, until July 15, 2025 at 3:00

20    p.m.  That's at Dkt. 14.

21          On July 14, 2025, Petitioners filed a letter with the

22    Court notifying the Court that the Singapore Arbitration forum

23    denied a requested adjournment of the pending arbitration

24    proceeding, despite the fact that Petitioners' Singapore

25    counsel had resigned.  Dkt. 18.  Petitioners then confirmed

P7FCroeC

that Respondents had been served with the relevant papers in

support of their TRO, and that all parties were now on notice

of the petition before the Court, and that same day,

Respondents filed their opposition to Petitioners' emergency

relief motion, at Dkt. 19, which is the opposition, as well as

accompanying declarations.

So now the Court turns to Petitioners' motion for an

emergency stay of the arbitration proceeding and set forth the

legal standard.

"The standards for granting a temporary restraining

order and a preliminary injunction pursuant to Rule 65... are

identical." *Sterling v. Deutsche Bank Nat'l Tr. Co. as Trs.*

*for Femit Tr. 2006-FF6,* 368 F. Supp. 3d 723, 726 (S.D.N.Y.

2019) (quoting *Spencer Trask Software & Info. Servs., LLC v.*

*RPost Int'l Ltd.*, 190 F. Supp. 2d 577, 580 (S.D.N.Y. 2002)).  A

plaintiff requesting a temporary restraining order "must show,

one, irreparable harm; two, either a likelihood of success on

the merits or both serious questions on the merits and a

balance of hardships decidedly favoring the moving party; and

three, that the requested relief is in the public interest."

*Nat'l Coal. on Black Civic Participation v. Wohl*, 498 F. Supp.

3d 457, 469 (S.D.N.Y. 2020) (citation and quotation omitted).

"Both remedies are extraordinary ones that will be granted only

upon a showing that the alleged threat of irreparable harm is

not remote or speculative, but actual and imminent." *Leibowitz*

P7FCroeC

*v. Smith Barney, Inc.*, 863 F. Supp. 2d 171, 173 (S.D.N.Y. 1994).

The Court will first turn to the temporary restraining order factors, starting first with irreparable harm.

Demonstrating irreparable harm requires that a party show "they will suffer an injury that is neither remote nor speculative, but actual and imminent, and one that cannot be remedied if a court waits until the end of trial to resolve the harm." *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009).

Here, Petitioners argue that they will suffer irreparable harm absent a stay of the Singapore Arbitration because any evidentiary hearing will result in the issuance of an award that is not enforceable because there is no valid arbitration agreement between the parties.  Petitioners maintain that Acuity, on the other hand, will not be prejudiced by the issuance of an injunction, "which would simply delay the Singapore arbitration hearing while this Court determines the merits of Petitioners' underlying petition."

It is true that "being forced to arbitrate a claim one did not agree to arbitrate constitutes an irreparable harm for which there is no adequate remedy at law." *UBS Secs., LLC v. Voegeli*, 405 F. App'x 550, 552 (2d Cir. 2011).  But there are at least two reasons why Petitioner is not at risk of immediate irreparable harm, but justifies a TRO.  First, Petitioners'

P7FCroeC

1    delay in bringing this motion cuts against their argument that

2    arbitration inflicts an "irreparable" injury.   Petitioners

3    have affirmatively engaged in arbitration for over a year.  On

4    May 29, 2024, Petitioners filed their Response to the Notice of

5    Arbitration and filed a counterclaim.  They did not seek an

6    injunction, but rather affirmatively asserted counterclaims for

7    fraudulent misrepresentation and breach of contract.   On

8    February 24, 2025, Petitioners filed their Statement of Defense

9    with the SIAC, which again contained no objection to the

10    tribunal's jurisdiction.  See Dkt. 6-3.  Petitioners thereafter

11    continued to follow the general procedural calendar set forth

12    in the Arbitrator's Procedural Order No. 1.  At no point did

13    Petitioners raise issues with respect to the Arbitrator's

14    jurisdiction before the arbitrator or here, and to the

15    contrary, in their response to the Notice of Arbitration,

16    Petitioners agreed that the arbitration clauses referred to in

17    the Acuity Notice of Arbitration were "applicable to the

18    present dispute" and that the seat of the arbitration should be

19    Singapore.  Dkt. 20-3 at  paragraphs 6.1.1, 8.1.1.  Nor did

20    Petitioners at any point otherwise suggest that the July 21 to

21    26 hearing dates were objectionable.

22         Moreover, the dates for the arbitration evidentiary

23    proceeding that Petitioners now seek to enjoin were set months

24    ago on December 16, 2024.  See Dkt. 20-4.  Petitioners then

25    waited until the eve of the evidentiary hearing to bring this

P7FCroeC

motion after having asserted counterclaims, filed legal

arguments, submitted witness statements, and gone through the

entire arbitral process consistent with the arbitrator's

procedural order. *See, e.g., Shenzhen Chengront Tech. Co.,*

*Ltd. v. Besign Direct*, No. 1:22-cv-10281 (JLR), 2022 WL

17741496, at *1 (S.D.N.Y. Dec. 9, 2022) ("A plaintiff's delay

in seeking a TRO after being put on notice of the alleged harm

is 'compelling evidence' that there is no irreparable harm*."); *

*Citibank N.A. v. Citytrust*, 756 F.2d 273, 276 (2d Cir. 1985)

(finding that "significant delay" in applying for preliminary

injunctive relief may justify denial); *Transcience Corp. v. Big*

*Time Toys, LLC*, 50 F. Supp. 3d 441, 458 (S.D.N.Y. 2014)

(denying injunctive relief where plaintiffs waited nine months

to commence lawsuit).

Second, Petitioners will have had an opportunity to

challenge their agreement to arbitrate before the arbitration

panel, and indeed Petitioners are arguing before the tribunal

that the "LTS and CA are voidable and that the Respondents have

rescinded the LTS and CA by virtue of Acuity's fraudulent

misrepresentation."

To the extent that Petitioners claim they will be

prejudiced by the denial of a TRO because Mr. Roe cannot travel

to testify at the Singapore Arbitration proceedings, that

argument is not persuasive given the Arbitrator's July 5, 2025

ruling that allows Mr. Roe to appear virtually.  See Dkt. 20-9

P7FCroeC

at 3.  Under the Arbitrator's ruling, the parties are to agree

upon accommodations to facilitate Mr. Roe's remote appearance.

Id.  Thus, this factor therefore weighs against Petitioners'

relief that is sought.

The next factor is whether Petitioners are likely to

prevail on the merits of their underlying petition to Stay the

Singapore action or there are serious questions in that regard.

For the reasons that I'm about to describe, this factor, too,

weighs against the Petitioners.

"Under New York law, to state a claim for fraud, a

plaintiff must demonstrate:  One, a misrepresentation or

omission of material fact; two, which the defendant knew to be

false; three, which the defendant made with the intent of

inducing reliance; four, upon which the plaintiff reasonably

relied; and five, which caused injury to the plaintiff." *Wynn*

*v. AC Rochester*, 273 F.3d 153, 156 (2d Cir. 2001).

Petitioners assert that the LTS and CA's arbitration

clause was procured by Acuity's fraud and thus is not a valid

and binding arbitration agreement.  Respondents, in turn, argue

that Petitioners are unlikely to succeed on the merits because,

one, they have brought their application to the wrong

jurisdiction; and two, under the severability doctrine,

arbitration clauses are severable absent particularized

allegations of fraud with respect to the arbitration clauses

themselves.  Opp. at 18-19.  For the reasons that I will

P7FCroeC

describe, the Court agrees with Respondents that Petitioners

are unlikely to succeed on the merits and have not presented a

serious question in that regard.

          With respect to the appropriate jurisdiction to

consider objections to a tribunal's power, the Convention on

the Recognition and Enforcement of Foreign Arbitral Awards (the

"New York Convention"), 9 U.S.C. Section 203, applies in this

case because Acuity is a foreign corporation based in

Australia.  *See, e.g., Scandinavian Reinsurance Co. Ltd. v.*

*St. Paul Fire and Marine Ins. Co.*, 668 F.3d 60, 71 (2d Cir.

2012) ("The New York Convention applies in this case because

Scandinavian is a foreign corporation." (citing 9 U.S.C. §

202).  "Under the New York Convention, the country in which the

arbitral award is made 'is said to have primary jurisdiction

over the arbitration award.'"  *CBF Industria de Gusa S/A v.*

*AMCHI Holdings, Inc.*, 850 F.3d 58, 71 (2d Cir. 2017) (quoting

*Karaha Bodas Co. v. Perusahaan Pertambangan Minyak Dan Gas Bumi*

*Negara,* 500 F.3d 111, 115 n.1 (2d Cir. 2007)).  "An arbitral

award is 'made' in the country of the 'arbitral seat,' which is

'the jurisdiction designated by the parties or by an entity

empowered to do so on their behalf to be the judicial home of

the arbitration.'"  *CBF Industria,* 850 F.3d at 70 (quoting

Rest. (3d) of the U.S. Law of Int'l Commercial Arbitration §

1-1(s), (aa) (Am. Law Inst., Tentative Draft No. 2, 2012)).

          Here, the parties have set the seat of the arbitration

P7FCroeC

as Singapore.  See, e.g., Dkt. 20-3 ("The Respondents take the

position that the appropriate seat of the arbitration should be

Singapore.").  Under the terms of the parties' LS&C, Singapore

law applies.  See Dkt. 6-1 at 9 ("Laws of Singapore will apply

to this Loan Term Sheet and Costs Agreement.").  Under the New

York Convention, "the country which is the legal seat of the

arbitration (or whose law governs the conduct of the

arbitration) is referred to as the primary jurisdiction and its

law (the lex arbitri) generally controls the procedural side of

the proceeding.  All other countries which are signatories to

the Convention are considered secondary jurisdictions."

*Corporacion AIC, SA v. Hidroelectrica Santa Rita S.A.*, 66 F.4th

876, 883 (11th Cir. 2023).  The parties' LTS and CA therefore

creates a presumption that Singapore law governs the procedural

aspects of the current arbitration proceedings, and Singapore

courts are certainly available for the adjudication of the

present motion.

        Rule 28.2 of the 2016 SIAC Rules provides also that

"the Tribunal shall have the power to rule on its own

jurisdiction, including any objections with respect to the

existence, validity, or scope of the arbitration agreement."

Petitioners did not object to the SIAC's jurisdiction in their

statement of defense, notwithstanding that SIAC's Rule 28.3(a)

provides that "any objection that the Tribunal does not have

jurisdiction shall be raised no later than in a statement of

P7FCroeC

defense or in a statement of defense to a counterclaim."

Moreover, as Petitioners note here, the arbitration clause at

issue is broad, covering "any dispute arising out of or in

connection with" the parties' contract, "including any question

regarding its existence, validity, or termination."  Dkt.

6-1 6.

Moreover, under Singapore law, a party may be found to

have waived its right to challenge a tribunal's jurisdiction

when it fails to make a timely objection to the tribunal's

jurisdiction.  See, e.g., Dkt. 20-14, respondents cites to some

Singaporean law in that regard.  Indeed, courts in this

District have made similar observations with respect to waiver

in the context of arbitral proceedings.  *See, e.g., Opals on

Ice Lingerie v. Bodylines Inc*., 320 F.3d 362, 368 (2d Cir.

2003) ("If a party participates in arbitration proceedings

without making a timely objection to the submission of the

dispute to arbitration, that party may be found to have waived

its right to object to the arbitration."); *Sokolowski v.

Metropolitan Transp. Auth*., 723 F.3d 187, 192 (2d Cir. 2013)

("Because arbitrators derive their authority from the

contractual agreement of the parties, a party may waive its

right to challenge an arbitrator's authority to decide a matter

by voluntarily participating in an arbitration and failing to

object on the grounds that there was no agreement to

arbitrate.") (quoting *United Indus. Workers v. Gov't of Virgin*

P7FCroeC

*Islands*, 987 F.2d 162, 168 (3d Cir. 1993)).  Therefore, given

the Petitioners failure to timely object to the SIAC's

jurisdiction consistent with the SIAC's procedural rules, there

is an argument, and a strong one, that they have waived any

such objection.

In any event, and in the alternative, Petitioners are

also unlikely to succeed on the merits because they have not

pleaded allegations of fraud specific to the arbitration clause

itself.  It is well-established "a party's challenge to... the

contract as a whole does not prevent a court from enforcing a

specific agreement to arbitrate."  *Kaiser v. StubHub, Inc.*, No.

1:24-cv-00044 (JLR), 2024 WL 3445059, at *5 (S.D.N.Y. June 16,

2024) (quoting *Rent-A-Ctr., W., Inc. v. Jackson*, 561 U.S 63, 70

(2010)).  Courts have deemed arbitration provisions as

"severable from the remainder of the contract."  *Buckeye Check

Cashing, Inc. v. Cardegna*, 546 U.S. 440, 445 (2006).

Therefore, "it is well settled that a claim or defense of

fraudulent inducement, when it challenges generally the

enforceability of a contract containing an arbitration clause

rather than specifically the arbitration clause itself, may be

subject to arbitration."  *ACE Cap. Re. Overseas Ltd. v. Central

United Life Ins. Co.*, 307 F.3d 24, 29 (2d Cir. 2002); *see also*

*Prima Paint Corp v. Flood & Conklin Mfg. Co.*, 388 U.S. 395,

403-04 (1967) ("If the claim is fraud in the inducement of the

arbitration clause itself — an issue which goes to the 'making'

P7FCroeC

of the agreement to arbitrate — the federal court may proceed
to adjudicate it.  But the statutory language of the FAA does
not permit the federal court to consider claims of fraud in the
inducement the contract generally.").  Therefore, where, as
here, a party alleges that a "contract is voidable," "for the
party to receive a trial on the validity of the arbitration
clause, the party must specifically allege that the arbitration
clause is itself voidable" and "produce some evidence
substantiating its claim."  *Sphere Drake Ins. Ltd. v. Clarendon
Ins. Co.*, 263 F.3d 26, 32 (2d Cir. 2001).

        The Second Circuit has also held that there must be
"some substantial relationship between the fraud or
misrepresentation and the arbitration clause in particular."
*Campaniello Imports, Ltd. v. Saporiti Italia S.p.A.*, 117 F.3d
665, 667 (2d Cir. 1997).

        Petitioners' allegations are not sufficient to show a
likelihood of prevailing on their fraudulent inducement claim
regarding the arbitration provision or that there is
substantial questions of the same.  Petitioners allege that
"Acuity was aware that it would not be able to perform under
the LTS and CA prior to the formation of the agreement, and
made material misrepresentations to Petitioners... in order to
induce Petitioners to enter into the LTS and CA."  Pet. 47.
According to Petitioners, "Acuity knew that there would be no
legitimate loan offer made to Petitioners by either Global Wise

P7FCroeC

or another third-party lender," and "Petitioners entered into the LTS and CA in reliance on Acuity's fraudulent misrepresentations, and paid Acuity for a service that Petitioners did not receive and that Acuity never intended to provide." Pet. 50. Petitioners' allegations therefore center upon Acuity's purported knowledge, at the time of the signing of the parties' agreement, "that it had no intention of facilitating a legitimate loan from any third-party lender." Pet. 9. Petitioners' fraudulent inducement claims are not, however, particularized to the arbitration clause. To the extent that Petitioners allege that Acuity "selected the SIAC as the forum for arbitration, knowing that arbitration in Singapore would be severely disadvantageous to Petitioners," Pet. 25, Petitioners do not allege that Respondents concealed or otherwise misrepresented the contents of the arbitration clause. Rather, Petitioners allege and acknowledge that "Mr. Roe executed the LTS and CA in reliance on Acuity's representation that it would arrange for the funding of the Loan by a third-party lender that was ready, willing, and able to fund the loan." Br. at 5. Nothing to do with the arbitration clause. Moreover, per the Arbitrator's July 5, 2025 ruling on the issue, Mr. Roe will not in fact be required to appear in-person at the SIAC evidentiary hearing.

        Petitioners' citation to the Second Circuit's decision in *Garten v. Kurth* is not persuasive. There, the Second

P7FCroeC

Circuit, applying the Supreme Court's decisions in *Moseley v. Electronic & Missile Facilities, Inc.*, 374 U.S. 167 (1963), and *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 404 (1967), underscored that there must be a "substantial relationship between the fraud or misrepresentation and the arbitration clause in particular."  265 F.3d at 143.  "This 'substantial relationship,' the Second Circuit has held, requires more than a mere claim that the 'arbitration clause is an element of the scheme to defraud'; it must include 'particularized facts specific to the... arbitration clause which indicate how it was used to effect the scheme to defraud.'"  Id. (quoting *Campaniello*, 117 F.3d at 667).  In *Garten*, because the "only allegation of a link between the arbitration clause and the general fraud asserted by plaintiffs rested on the threats made by respondent regarding his experience with arbitration and the costs to plaintiffs of proceeding in arbitration," the Second Circuit held that the plaintiffs had not established the requisite nexus between the arbitration clause and the fraudulent scheme.  Id. at 143-44.

Likewise here, while Petitioners make the conclusory assertion that the arbitration clause "itself is a substantial element of the fraudulent scheme," they do not include any "particularized facts specific to the arbitration clause" to support that argument.  Petitioners claim that "Acuity was aware of Mr. Roe's advanced age and infirmity, and the

P7FCroeC

1    likelihood that he would be unable to travel to Singapore to

2    participate in any arbitration proceeding to give testimony."

3    Pet. 25.  But Petitioners were aware of the site of arbitration

4    proceedings at the time that they signed the agreement.  "There

5    is nothing deficient in the arbitration clause itself," *Garten*,

6    265 F.3d at 144, or any "indication here that there was any

7    misrepresentation or fraud related to the arbitration clause

8    itself," *Campaniello*, 117 F.3d at 667.

9         In fact, as Respondents note, provisions of the

10   parties' LTS and CA agreements expressly stated that

11   Petitioners had read and understood the terms of the agreement,

12   were advised to seek legal and financial advice before signing

13   the agreement, and had not been unduly pressured into executing

14   the Agreement.  See Dkt. 6-2 at 7, 13.

15        Under these circumstances, the Court finds that

16   Petitioners are unlikely to succeed on the merits.

17        Lastly, in terms of the balance of hardships and the

18   public interest, the balance does not tip in favor of the

19   Petitioners, and certainly not decidedly so.

20        The parties have participated in arbitration

21   proceedings since April of 2024.  Petitioners have willingly

22   participated in those proceedings for more than a year, going

23   as far as submitting a counterclaim, and waiting until just

24   weeks before the final evidentiary hearing to challenge the

25   agreement's arbitration clause and seek a stay.  Petitioners'

P7FCroeC

active participation in the arbitration over a prolonged period

weighs against them.  *See, e.g., Leibowitz v. Smith Barney,*

*Inc.,* 863 F. Supp. 171, 175 (S.D.N.Y. 1994) (finding the

balance of hardships did not favor the plaintiffs where, among

other things, plaintiffs "participated in the arbitration

proceeding for 22 months, including some 16 months after they

retained their current attorneys," and "defendants had

participated in the arbitration proceedings for nearly two

years" and were "ready to proceed with the hearing").

Acuity, on the other hand, would suffer hardship if

injunctive relief is granted, including because the Arbitrator

has suggested that any postponement of the evidentiary hearing

will require rescheduling the hearing to the first quarter of

2026.  See Dkt. 20-7 at 3.

Therefore, the balance of hardships favors the

Respondents and the public interest favors the Respondents.

Therefore, the Court will deny Petitioners' request

for a TRO.

I think that takes care of the only thing that is

presently before the Court.  Is there anything else that we

need to handle here today?  Mr. Conway.

MR. CONWAY:  Not on behalf of the petitioner, your

Honor.

THE COURT:  Thank you.

Anything further, Mr. Molina?

P7FCroeC

1          MR. MOLINA:  No, your Honor.  Thank you.

2          THE COURT:  Thank you.  I presume that the parties

3   will then proceed in the normal course for this litigation.  If

4   there's anything else, I'm certain that you'll let me know.

5   Otherwise, court is adjourned.  Thank you very much.

6                              * * *